LTL Attorneys LLP
Kevin M. Bringuel (Bar No. 196279)
  kevin.bringuel@ltlattorneys.com
Enoch H. Liang (Bar No. 212324)
  enoch.liang@ltlattorneys.com
Prashanth Chennakesavan (Bar No. 284022)
  prashanth.chennakesavan@ltlattorneys.com
300 South Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900
Fax: (213) 612-3773

Attorneys for IMPRIMIS PHARMACEUTICALS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ALLERGAN USA, INC., | Case No. 8:17-cv-01551-DOC-JDE |
| Plaintiff, | **IMPRIMIS PHARMACEUTICALS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULES 8, 9, AND 12, OR, IN THE ALTERNATIVE, STAY LITIGATION** |
| v. | |
| IMPRIMIS PHARMACEUTICALS, INC., | |
| Defendant. | *Request for Judicial Notice and Proposed Order filed concurrently herewith* |
| | <u>Hearing</u> |
| | Date:         November 13, 2017 |
| | Time:        8:30 a.m. |
| | Judge:       Hon. David O. Carter |
| | Location:   Courtroom 9D |

242125.2

1  **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2       **PLEASE TAKE NOTICE THAT** at 8:30 a.m. on November 13, 2017, or as

3  soon thereafter as the matter may be heard, in Courtroom 9D in the Ronald Reagan

4  Federal Building and United States Courthouse for the Central District of California,

5  411 West 4th Street, Santa Ana, California 92701, before the Honorable David O.

6  Carter, Defendant Imprimis Pharmaceuticals, Inc. ("Imprimis"), by and through its

7  undersigned counsel, will and hereby does move for an order dismissing Plaintiff

8  Allergan USA, Inc.'s ("Allergan") Complaint ("Compl.") in its entirety pursuant to

9  Federal Rules of Civil Procedure 8, 9, and 12, on the grounds that the Complaint: (1)

10  fails to state a claim for relief; (2) fails to allege fraud or mistake with sufficient

11  particularity; and (3) fails to state a claim upon which relief can be granted.

12       This Motion is based on this Notice of Motion and Motion; the attached

13  Memorandum of Points and Authorities; the accompanying Request for Judicial

14  Notice; all other papers, documents or exhibits currently on file in this action; all other

15  papers, documents, or exhibits that may be filed in support of this Motion; and the

16  argument of counsel made at the hearing.

17       This Motion is made following the conference of counsel pursuant to Civil Local

18  Rule 7-3 which took place on September 27, 2017.

19

20  Date: October 11, 2017            LTL ATTORNEYS LLP

21

22                  By: /s/ Kevin M. Bringuel

22                      Kevin M. Bringuel

23                      Enoch H. Liang

24                      Prashanth Chennakesavan

24                      Attorneys for IMPRIMIS

25                      PHARMACEUTICALS, INC.

26

27

28

                                    1                    No. 8:17-cv-01551-DOC-JDE

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................iii

Introduction ............................................................................................................... 1

Statement of facts ..................................................................................................... 4

    A.  503A Facilities May Compound Based On Patient Prescriptions ................. 5

    B.  503B Facilities May Compound In Bulk For Hospitals And Physicians ....... 6

    C.  The FDA Is In The Process Of Creating Relevant Regulations .................... 6

    D.  California Has Implemented Regulations Addressing Compounding ........... 8

    E.  Imprimis Complies With Sections 503A & B, And State Regulations ......... 9

Summary of Allegations ......................................................................................... 10

Argument ................................................................................................................ 11

I.   Legal Standard ................................................................................................ 11

II.  Allergan's Lanham Act Claim should be dismissed ........................................ 11

    A.  Allergan's Lanham Act Fails To The Extent It Is Based on Alleged
        Violations of the FDCA and FDA Regulations ........................................... 12

        1.  A court may not adjudicate alleged FDCA violations ........................... 12

        2.  Allergan seeks to usurp the authority of the FDA ................................. 14

        3.  The Court should dismiss or stay litigation based on the primary
            jurisdiction doctrine ............................................................................... 16

        4.  Allergan fails to allege facts that plausibly suggest Imprimis is in
            violation of federal law ......................................................................... 17

    B.  Allergan's Lanham Act Claim Fails To The Extent It Is Predicated On
        Violation Of State Law ............................................................................... 19

        1.  Compounded drugs are not "new drugs" in California .......................... 20

        2.  California law permits promotion to healthcare professionals ............... 21

        3.  Allergan does not allege violation of compounding regulations ........... 22

NOTICE OF MOTION AND MOTION TO DISMISS

242125.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C. Allergan's Lanham Act Claim Fails To The Extent It Is Based On Imprimis's Alleged Effectiveness Or Preference Claims ............................ 23

D. Allergan's Has Failed to Plead Injury With Specificity .............................. 24

III. Allergan's UCL Claim Fails as a Matter of Law ................................. 24

Conclusion ........................................................................................... 25

242125.2

NOTICE OF MOTION AND MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................11

*Astiana v. Hain Celestial Grp., Inc.,*
  783 F.3d 753 (9th Cir. 2015) .....................................................................17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................11

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ...................................................................................12

*Clark v. Time Warner Cable,*
  523 F.3d 1110 (9th Cir. 2008) ...................................................................16

*Cmty. Redevelopment Agency v. City. of Los Angeles,*
  89 Cal. App. 4th 719 (2001) ......................................................................20

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
  173 F.3d 725 (9th Cir. 1999) ...............................................................23, 24

*Concordia Pharm. Inc., S.À.R.L. v. Winder Labs., LLC,*
  2017 WL 1001533 (N.D. Ga. Mar. 15, 2017) ...........................................14

*Cook, Perkiss and Liehe, Inc. v. N. California Collection Serv., Inc.,*
  911 F.2d 242 (9th Cir. 1990) .....................................................................23

*Cty. of Orange v. Ass'n of Orange Cty. Deputy Sheriffs,*
  192 Cal. App. 4th 21 (2011) ......................................................................20

*Davis v. RiverSource Life Ins. Co.,*
  240 F. Supp. 3d 1011 (N.D. Cal. 2017) ......................................................4

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.,*
  711 F. Supp. 2d 1074 (C.D. Cal. 2010) .....................................................11

*GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.,*
  650 F.3d 1257 (9th Cir. 2011) ...................................................................16

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861, 120 S. Ct. 1913 ...................................................................13

*Gisvold v. Merck & Co., Inc.,*
  62 F. Supp. 3d 1198 (S.D. Cal. 2014) ........................................................16

*Hemi Grp., LLC v. City of New York, N.Y.,*
  559 U.S. 1 (2010) .........................................................................................4

242125.2

*Hi-Tech Pharm., Inc. v. Hodges Consulting, Inc.,*
230 F. Supp. 3d 1323 (N.D. Ga. 2016) ........................................................14

*In re Tobacco II,*
46 Cal. 4th 298 (2009)................................................................................24, 25

*JHP Pharm., LLC v. Hospira, Inc.,*
52 F. Supp. 3d 992 (C.D. Cal. 2014)......................................................14, 15, 19

*Kwikset Corp. v. Superior Court,*
51 Cal. 4th 310 (2011) ...................................................................................24

*L.A. Taxi Coop., Inc. v. Uber Techs, Inc.,*
114 F. Supp. 3d 852 (N.D. Cal. 2015)...........................................................25

*Lexmark Int'l., Inc. v. Static Control Components, Inc.,*
134 S. Ct. 1377 (2014) ....................................................................................24

*Maronyan v. Toyota Motor Sales, U.S.A., Inc.,*
658 F.3d 1038 (9th Cir. 2011) ........................................................................16

*Mutual Pharm. Co. v. Ivax Pharm., Inc.,*
459 F. Supp. 2d 925 (C.D. Cal. 2006) ......................................................13, 15

*PhotoMedex, Inc. v. Irwin,*
601 F.3d 919 (9th Cir. 2010) ..........................................................................13

*POM Wonderful LLC v. Coca-Cola Co.,*
134 S. Ct. 2228, 189 L. Ed. 2d 141 (2014) ..............................................12, 15, 19

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.,*
902 F.2d 222 (3d Cir. 1990) ......................................................................13, 14

*Smith v. Pride Mobility Prods. Corp.,*
2016 WL 6393549 (N.D. Cal. Oct. 28, 2016) ..............................................19

*Southland Sod Farms v. Stover Seed Co.,*
108 F.3d 1134 (9th Cir. 1997) ........................................................................11

*Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.,*
922 F. Supp. 299 (C.D. Cal. 1996)................................................................14

*Summit Tech., Inc. v. High-Line Med. Instruments, Co.,*
933 F. Supp. 918 (C.D. Cal. 1996)................................................................13

*Thomas v. Costco Wholesale Corp.,*
2015 WL 4776298 (N.D. Cal. Aug. 13, 2015) ..............................................19

**Statutes**

15 U.S.C. § 1051...............................................................................................10

15 U.S.C. § 1125 ...............................................................................................11

21 U.S.C. § 337 ................................................................................................12

21 U.S.C. § 353a ...........................................................................5, 6, 1517, 18

21 U.S.C. § 353b ...................................................................................5, 6, 18

28 U.S.C. § 1367 .............................................................................................25

Cal. Bus. & Prof. Code § 4127 ........................................................................9

Cal. Health & Safety Code § 109980 ...........................................................20

Cal. Health & Safety Code § 109925 .............................................................8

Cal. Health & Safety Code § 109980 .............................................................8

Cal. Health & Safety Code § 110110 .............................................................8

Cal. Health & Safety Code § 110403 ...........................................................21

Cal. Health & Safety Code § 110405 ...........................................................21

Cal. Health and Safety Code § 111330 ........................................................21

Cal. Health and Safety Code § 111375 ........................................................21

Cal. Health and Safety Code § 111395 ........................................................21

Cal. Health and Safety Code § 111440 ........................................................21

Cal. Health and Safety Code § 111445 ........................................................21

Cal. Health and Safety Code § 111550 ........................................................20

Cal. Business and Professions Code § 17200 ....................................10, 11, 24

**Rules and Regulations**

Fed. R. Civ. P. 8 ...............................................................................................1

Fed. R. Civ. P. 9 ........................................................................................1, 12

Fed. R. Civ. P. 12 .............................................................................................1

Cal. Code Regs. tit. 16, § 1735 ...............................................................20, 21

Cal. Code Regs. tit. 16, § 1735.1 ..................................................................22

Cal. Code Regs. tit. 16, § 1735.2 .............................................................9, 22

Cal. Code Regs. tit. 16, § 1735.4 .............................................................9, 22

Cal. Code Regs. tit. 16, § 1735.5 ..................................................................22

Cal. Code Regs. tit. 16, § 1735.7 ..................................................................22

Cal. Code Regs. tit. 16, § 1735.8 ..................................................................22

242125.2

**Other Authorities**

159 Cong. Rec. H5946-02 ............................................................................................5

61 Cal. Op. Att'y Gen. 192, 1978 WL 22751 (Cal. A.G. 1978) ............................9, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

For decades, compounding pharmacies have stepped in to fill the void left by large pharmaceutical companies like plaintiff Allergan USA, Inc. While Big Pharma has focused maintaining monopolies, chasing profits and limiting choice, compounding pharmacies have worked with physicians to prepare drug solutions with specific patient care in mind. However, because of its *ad hoc* nature, traditional compounding has a serious flaw: the preparation of drugs in thousands of pharmacies scattered around the country, unsupervised by the Food and Drug Administration ("FDA"), may increase the likelihood of substandard manufacturing, risking safety. That flaw was exposed in 2012 when a Massachusetts pharmacy caused a nationwide outbreak that killed 64 and injured hundreds more. Recognizing the important role compounding plays in the healthcare system, but aware of the risks of unsupervised pharmacies, in response, Congress sought to enable the FDA to oversee and regulate compounding pharmacies, increase cooperation between states and the FDA, and encourage a shift from small-batch compounding to larger scale manufacturing of frequently used drugs that would enable tighter manufacturing control. Regulated, larger-scale compounding is not a legal loophole, it is the product of a deliberate Congressional effort to enhance public safety.

The result of that effort was the 2013 Drug Quality and Security Act ("DQSA"), which: (1) amended section 503A of the Food, Drug, and Cosmetic Act ("FDCA"), regulating interstate shipment of non-FDA approved drug compounds prepared based on individual prescriptions; and (2) added section 503B to the FDCA, creating new regulations pertaining to interstate shipment of such compounds prepared in "outsourcing facilities." Congress delegated to the FDA authority to create appropriate regulations in consultation with manufacturers, physicians, pharmacists, and states. Over the past four years, the FDA has worked to create a regulatory framework that balances the demand from physicians for custom compounds that Big Pharma has been

1    unable, or unwilling, to meet and the need to ensure safety. The FDA is also in the

2    process of creating rules addressing, for example, the types of drugs 503A and 503B

3    facilities may compound, the appropriate level of interstate shipment, the quantity of

4    drugs 503A facilities may manufacture in anticipation of receiving prescriptions, and

5    bulk drug ingredients these facilities may use. The FDA has issued nonbinding, draft

6    guidance, but not final regulations in most of these areas. In the interim, the FDA has

7    encouraged registration, increased its inspection of registered outsourcing facilities and

8    taken a risk-based approach to enforcement, prioritizing safety and exercising its right

9    to decline to enforce certain requirements until it issues final regulations.

10       Imprimis Pharmaceuticals, Inc. is the San Diego-based parent company of three

11   subsidiary pharmacies that since 2011 have compounded drugs to address unmet

12   patient and physician medical needs. Imprimis manufactures all of its compounds in

13   the United States and has registered with, and is regulated by, both the FDA and state

14   agencies where applicable.  While Imprimis compounds a range of drugs, such as those

15   used to treat diabetic retinopathy, urologic conditions, and another that physicians

16   around the country prescribed to treat an infection potentially fatal to AIDS and cancer

17   patients when notorious "Pharma Bro" Martin Shkreli raised overnight the cost of

18   Daraprim 5,500%, the Imprimis compounds at issue here are two used during and after

19   ocular surgery—"Dropless Therapy" and "LessDrops," (compounds that may be

20   injected during surgery or used topically after surgery) and "Simple Drops" (unique

21   topical compounds that contain combinations of medications for glaucoma patients to

22   reduce the number of different eye drops a patient has to use).

23       Although Congress and the FDA have worked to increase access to safe,

24   effective compounded drugs prepared in American pharmacies under the auspices of

25   the FDA and state agencies, Allergan seeks to shut down what it refers to as a "Business

26   Model," one actively encouraged by Congress and the FDA. While lengthy, Allergan's

27   Complaint is straightforward: Allergan feels threatened by the sale of custom

28   compounds that Congress has exempted from the new drug approval process and wants

the competition to stop.[1] Though dressed as a claim for violations of the Lanham Act and California's Unfair Competition Law ("UCL"), Allergan seeks to litigate whether Imprimis's "Business Model"—i.e. compounding in FDA-registered and inspected 503A and 503B facilities—violates the FDCA and state laws.

The timing of Allergan's Complaint is more than suspicious. The FDA has not issued final regulations pursuant to its exclusive jurisdiction and has, as a matter of policy, declined to enforce draft guidance. Yet, Allergan seeks to usurp the FDA's authority. Perhaps Allergan sees the writing on the wall and is afraid the millions it has spent on lobbying will not result in regulations in its favor. Or, perhaps it is apprehensive about how compounding in FDA-regulated facilities will affect Allergan's foreign-made one-size-fits-all offerings. Regardless of its motives, Allergan's claims fail as a matter of law.

The crux of Allergan's Lanham Act claim is that Imprimis's statements that it is FDCA-compliant are false or misleading because it is in violation of the FDCA and FDA regulations. Such a claim is precluded because it requires litigation in the first instance of whether Imprimis is actually in violation of the FDCA, an issue left to the FDA's exclusive jurisdiction. Allergan's Lanham Act claim also fails to the extent it is based on Imprimis's statements that it is in compliance with California state laws because, like the Lanham Act, the California Sherman Food, Drug, and Cosmetics Law ("Sherman Law") does not permit private enforcement. Moreover, based on the factual allegations in the Complaint and matters of which the Court may take judicial notice, Imprimis is not in violation of the FDCA or California laws. As for the allegation that two promotional claims of effectiveness are misleading, matters of opinion unrelated

---

[1] To stifle any threat to its drug monopolies, Allergan has gone to such lengths as suing small generic manufacturers, transferring patents to sovereign Native American tribes to avoid inter partes review of its patents, and scheming with doctors to block competitors. *See* M. Tirrell, *Allergan responds to mounting criticism of Mohawk patent deal*, CNBC (Oct. 3, 2017), available at http://cnb.cx/2yh2pP7; J. Stempel, *Shire sues Allergan*, Reuters (Oct. 2, 2017), available at http://reut.rs/2hKcoGO.

1   to specific product characteristics are not actionable. Allergan further lacks standing
2   because it has not alleged any injury. Allergan's Lanham Act claim must thus be
3   dismissed.

4   In addition, Allergan's UCL claim fails because it has failed to plead actual
5   reliance or facts suggesting any unlawful or unfair conduct by Imprimis.

6   Imprimis respectfully requests that the Court dismiss the Complaint and place
7   the important policy questions raised therein where they belong: before the FDA and
8   state regulators.

9                    **STATEMENT OF FACTS**[2]

10  In some cases, the health needs of a patient "cannot be met by a commercially
11  available, approved drug." (Compl. ¶ 13.) For example, a patient may have "an allergy
12  and need[] a medication to be made without a dye contained in the commercially
13  available" drug or may be unable to "swallow a pill and need[] a medicine in liquid
14  form." (*Id.*) Those patients' needs are met by drug compounding, a practice where a
15  pharmacist, physician, or "a person under the supervision of a licensed pharmacist,
16  combines, mixes, or alters ingredients of a drug to create a medication tailored to the
17  needs of an individual patient." (RJN, Ex. 1 ("Compounding and the FDA").)
18  Compounding can thus "serve an important public health need" and is a "vital service
19  that helps many people." (RJN, Ex. 2 ("The Special Risks of Compounding") (internal
20  quotations omitted).)

21  Traditionally, state Boards of Pharmacy had "primary responsibility for the day-
22

23  _____
    [2] For purposes of this motion to dismiss *only*, Imprimis accepts as true the non-
24  conclusory factual allegations of the Complaint except those contradicted by facts of
    which the Court may take judicial notice. *See Hemi Grp., LLC v. City of New York,*
25  *N.Y.*, 559 U.S. 1, 5 (2010); *Davis v. RiverSource Life Ins. Co.*, 240 F. Supp. 3d 1011,
26  1014 (N.D. Cal. 2017) (on a motion to dismiss, a court may look to matters in the public
    record and documents subject to judicial notice without converting the motion into one
27  for summary judgment). Concurrently with this Motion, Imprimis files a Request for
28  Judicial Notice ("RJN").

1    to-day oversight of state-licensed pharmacies that compound[ed] drugs." (RJN, Ex. 1)

2    For its part, the FDA "cobble[d] together a piecemeal approach to regulating

3    compounding pharmacies . . . ." (RJN, Ex. 14 (159 Cong. Rec. H5946-02) at H5961.)

4    That piecemeal approach created loopholes that compounders could exploit, leading to

5    tragic consequences. (*Id.*) For example, in 2012, there was a nationwide outbreak of

6    fungal meningitis linked to an injectable steroid distributed by a Framingham,

7    Massachusetts facility that killed 64 and sickened at least 751 people. (Compl. ¶ 19.)

8         In response to the 2012 outbreak, Congress sought to enable the FDA to regulate

9    compounders and enhance communication between state Boards of Pharmacy and the

10   FDA (RJN, Ex. 14 at H5961), and in 2013 enacted the DQSA, amending relevant

11   sections of the FDCA. The DQSA, codified at 21 U.S.C. § 353a, *et seq.*, amended

12   section 503A of the FDCA by removing provisions related to advertising the Supreme

13   Court had previously found unconstitutional. 21 U.S.C. § 353a; *see also* RJN, Ex. 3

14   (Jan. 8, 2014 "Dear Colleague" letter) at 2. The legislation also created "a new section

15   503B in the [FDCA] under which a facility that compounds sterile drugs can register

16   to become an 'outsourcing facility.'" 21 U.S.C. § 353b; *see also* RJN, Ex. 3 at 2.

17   **A.  503A Facilities May Compound Based on Patient Prescriptions**

18        Section 503A of the FDCA exempts, under certain conditions, compounded

19   drugs shipped interstate from the requirements of sections 501(a)(2)(B), 502(f)(1), and

20   505 of the FDCA, which restrict shipment of adulterated, misbranded, and new drugs,

21   respectively. 21 U.S.C. § 353a. As relevant here (*see* Compl. ¶¶ 71-74), section 503A

22   permits facilities to compound "on the prescription order for [an] individual patient" or

23   "limited quantities before the receipt of a valid prescription," but not "regularly or in

24   inordinate amounts (as defined by the Secretary) any drug products that are essentially

25   copies of a commercially available drug product." *Id.* In addition, a compounder may

26   ship products interstate in accordance with a "memorandum of understanding" between

27   the state of compounding and "the Secretary which addresses the distribution of

28   inordinate amounts of compounded drug products interstate" and, in the absence of a

1   memorandum, no more than "5 percent of the total prescription orders." *Id.*

2       Congress sought to establish "a national uniform standard" (RJN, Ex. 14 at

3   H5964) and tasked the FDA with creating relevant regulations addressing

4   manufacturing quantities, copies, and interstate shipment. (RJN, Ex. 4 (June 2016

5   Guidance to 503A Facilities) at 5-6.)

6   **B.  503B Facilities May Compound in Bulk for Hospitals and Physicians**

7       Section 503B of the FDCA permits registered "outsourcing facilit[ies]" to

8   compound in larger quantities without receiving prescriptions for individually

9   identified patients. 21 U.S.C. § 353b. These facilities are required to follow current

10  good manufacturing practice ("cGMP"), "subject to FDA inspections according to a

11  risk-based schedule, specific adverse event reporting requirements, and other

12  conditions that help to mitigate" risks. (RJN, Ex. 5 (December 2016 Guidance re:

13  Prescriptions) at 2.) Facilities may only compound using "bulk drug substances" that

14  are "defined in regulations of the Secretary" and non-bulk ingredients that comply with

15  industry standards, and may not manufacture drugs that are essentially copies of

16  commercially available drug products. 21 U.S.C. §§ 353b(a)(2), (3) & (5).

17  **C.  The FDA Is In The Process of Creating Relevant Regulations**

18      Sections 503A and 503B require the Secretary of Health and Human Services to

19  "issue regulations to implement" their requirements. 21 U.S.C. §§ 353a(c)(1),

20  353b(c)(1). Before issuing regulations the "Secretary shall convene and consult an

21  advisory committee on compounding" that includes "representatives from the National

22  Association of Boards of Pharmacy, the United States Pharmacopoeia, pharmacy,

23  physician, and consumer organizations, and other experts selected by the Secretary."

24  *Id.* In accordance with its rulemaking authority, since 2013, the FDA has convened six

25  intergovernmental meetings on drug compounding. (*See* RJN, Ex. 6 (Sept. 26, 2017

26  Remarks by A. Abram).) The FDA has been "working hard to implement" the DQSA

27  and find an appropriate balance between "meet[ing] patients' needs for compounded

28  drugs" and potential harm. (*Id.*) Recognizing that the "sector is maturing," the FDA

has worked to develop appropriate regulations and help facilities "meet regulatory standards." *Id.* To that end, the FDA is still "working to finalize" cGMP guidance for outsourcing facilities that is "carefully tailored to the activities these entities engage in," developing relevant regulations "such as the limitations on making essentially a copy of FDA-approved drugs and the use of bulk drug substances in compounding," and "working to revise the draft standard memorandum of understanding between FDA and states to address inordinate interstate distribution of compounded drug products." (*Id.*) In short, the FDA is in the process of developing, but has not issued, final regulations implementing the DQSA that "appropriately calibrate the regulatory burden." (RJN, Ex. 11 (Sept. 26, 2017 Statement by S. Gottlieb).)

In the interim, recognizing the important role compounding facilities play in the nation's healthcare system, the FDA has not prohibited all compounding. To the contrary, shortly after Congress enacted the DQSA, FDA Commissioner Margaret A. Hamburg authored a "Dear Colleague" letter to the industry inviting pharmacies to register with the FDA to permit inspections and enhance oversight, and encouraging healthcare professionals to purchase drugs compounded in registered outsourcing facilities. (RJN, Ex. 3.) Current Commissioner Scott Gottlieb recently reiterated that message (RJN, Ex. 11) and physicians, including the American Academy of Ophthalmology ("AAOA"), have repeatedly emphasized their "reliance on compounded and repackaged drugs to treat [] patients." (*See* RJN, Ex. 13 (Ltr. from M. Repka))

The FDA has also issued *nonbinding draft* guidance to help compounders. For example, the FDA has recognized that it would be impractical—and potentially unsafe—for 503A facilities to only compound after receiving a prescription for an identifiable patient. (RJN, Ex. 5 at 6.) "Anticipatory compounding," which is the practice of preparing "a batch of drugs in anticipation of receiving" patient-specific prescriptions "can be beneficial because larger batch sizes can increase efficiency and reduce the likelihood of human error that is associated with compounding many small

batches of a drug." (*Id.*) Accordingly, until it issues final regulations, the FDA has recommended that 503A facilities either compound upon receipt of a patient-specific prescription or maintain a supply "based on an expectation" of receiving patient-specific prescriptions. (*Id.*) The recommendation is "suggested [], but not required." (*Id.* at 1.) Similarly, the FDA has issued nonbinding guidance stating it "does not intend to enforce the 5% limit on interstate distribution" until it "has finalized an MOU and made it available to the states for their consideration and signature" (RJN, Ex. 4 at 5-6) and explained that its "current thinking" on "essentially copies" is that a facility should not fill more than four prescriptions in a calendar month of a compound that has the: (1) same active pharmaceutical ingredients; (2) same or similar dosage strength; and (3) same route of administration as a commercially available drug unless a "prescriber determines" the compound produces "a significant difference" for the patient. (RJN, Ex. 7 (July 2016 Guidance re: "Essentially Copies") at 5-6.)

The FDA is also in the process of creating a list of bulk drug substances that may be used by 503A and 503B facilities. In response to a December 2013 *Federal Register* notice, the FDA received "over 2,000 [] nominations" for the bulk drug substances lists. (RJN, Ex. 8 (Jan. 2017 Guidance re: 503A Bulk Substances); Ex. 9 (Jan 2017 Guidance re: 503B Bulk Substances) at 3.) The FDA has proposed a rule addressing just 10 of those nominations—six substances that should be included and four that should be excluded from the list. (RJN, Ex. 10 (Dec. 2016 Prop. R.).) In addition, the FDA has noted in a nonbinding policy statement that it "intends to evaluate substances nominated" on "a rolling basis" and "publish a notice in the *Federal Register* that describes its proposed position on each substance it has evaluated along with the rationale for that proposal, for public comment." (RJN, Ex. 8 at 8-9; Ex. 9 at 5-7.)

**D.  California Has Implemented Regulations Addressing Compounding**

California's Sherman Law adopts the FDCA's definition of "drug" and "new drug" and "incorporates '[a]ll regulations relating to . . . new drug applications . . . adopted pursuant to Section 505' of the" FDCA. (Compl. ¶ 82-85; Cal. Health & Safety

1  Code §§ 109925(c), 109980, 110110(a).) California has also long recognized that
2  compounds created by licensed pharmacies are not "new drugs" (61 Cal. Op. Att'y
3  Gen. 192 (Cal. A.G. 1978), 1978 WL 22751) and has enacted a comprehensive
4  framework regulating compounding. "A pharmacy that compounds sterile drug
5  products" is required to "possess a sterile compounding pharmacy license." Cal. Bus.
6  & Prof. Code § 4127, *et seq.* A "drug preparation shall [not] be compounded prior to
7  receipt by a pharmacy of a valid prescription for an individual patient," but a pharmacy
8  "may prepare and store a limited quantity of compounded drug preparation in advance
9  of receipt of a patient-specific prescription" where it is "necessary to ensure continuity
10 of care for an identified population of patients of the pharmacy." Cal. Code Regs. tit.
11 16, §§ 1735.2(a) & (b). In addition, a pharmacy may furnish a reasonable quantity "to
12 a prescriber for office use by the prescriber." *Id.* § 1735.2(c). Like federal law,
13 California regulations preclude pharmacies from preparing compounds that are
14 "essentially a copy of one or more commercially available drug products." *Id.* §
15 1735.2(d)(3). Finally, as relevant here, a "compounded drug preparation shall be
16 affixed with a container label" containing specified information. *Id.* § 1735.4(a).

17    **E.   Imprimis Complies With Sections 503A & B, and State Regulations**

18        Imprimis uses "compounding pharmacies for the formulation and distribution of
19 high-quality formulations that are supported by the clinical experience of physicians."
20 (Compl., Ex. B.) At issue here are three product ranges: Dropless Therapy, LessDrops
21 and Simple Drops. (Compl. ¶ 52.) Dropless Therapy refers to two injectable drugs that
22 are "injected at the end of [a] cataract" surgery procedure. (*Id.*; *id.*, Ex. A at 15.) The
23 drugs "reduce[] or eliminate[] the need for post-operative eye drops" (*id.*, Ex. A at 15)
24 and may be used by physicians as a practical clinical tool to "reduce issues with patient
25 compliance." (*Id.*, Ex. H at 1.) LessDrops and Simple Drops allow prescribers to
26 combine multiple medications into a single bottle to "significantly reduce the number
27 of eye drops needed" and thus to reduce "patient compliance issues." (*Id.*, Exs. I & J.)
28 Imprimis owns and operates three compounding facilities—a 503A facility in Irvine,

1   California, another 503A facility in Ledgewood, New Jersey, and a 503B outsourcing

2   facility in Ledgewood, New Jersey. (*Id.* ¶¶ 33-34.)

3   ## SUMMARY OF ALLEGATIONS

4   Allergan pleads two causes of action—for violations of the Lanham Act, 15

5   U.S.C. § 1051, *et seq.*, and California Business and Professions Code § 17200, *et seq.*,

6   California's Unfair Competition Law.

7   Allergan claims Imprimis has violated the Lanham Act by using "false or

8   misleading descriptions of fact" and "false or misleading representations of fact" in

9   commercial advertising by making statements that its products comply with federal and

10   state laws, making certain claims about safety and efficacy, and failing to disclose risks

11   (Compl. ¶¶ 110-11.) According to Allergan, Imprimis's statements that it operates

12   "under the regulatory framework" of the DQSA is false or misleading because

13   Imprimis is actually in violation of sections 503A and 503B of the FDCA and relevant

14   FDA regulations. (Compl. ¶¶ 69-78.) Specifically, Imprimis allegedly violates section

15   503A because its business model is "inconsistent" with statutory provisions requiring

16   advance prescriptions, drugs that are not "essentially copies," and limited interstate

17   shipment. (Compl. ¶¶ 71-74.) Allergan's section 503B claim is based on Imprimis's

18   alleged use of bulk substances that are not included in an FDA list, and manufacture of

19   drugs that are "essentially copies" in 503B facilities. (Compl. ¶¶ 75-78.) Allergan

20   further joins issue with two advertising claims—that Imprimis injectable products work

21   "more effectively" than topical medications and that "95% of cataract surgeons

22   surveyed would prefer Dropless Therapy." (Compl. ¶¶ 79-80.)

23   Another basis of Allergan's Lanham Act claim is Imprimis's statements that it

24   is in compliance with California laws. That, alleges Allergan, is false or misleading

25   because Imprimis is in violation of various sections of California's Sherman Law and

26   compounding regulations, including: (1) a restriction on selling unapproved new drugs;

27   (2) a prohibition on advertising that an unapproved drug has an effect on "conditions

28   of the eye"; (3) a requirement that Imprimis disclose "material risks" in promotional

materials; (4) a prohibition on compounding prior to receipt of a valid prescription; (5) a prohibition on providing drugs for "office use" before receiving a prescription; (6) a prohibition on compounding drugs that are "essentially copies" of commercially available drugs; and (7) a requirement that compounding facilities ensure quality. (*See* Compl. ¶¶ 81-86, 93-106.)

Allergan's section 17200 cause of action relies on the same facts, and alleges Imprimis has violated the UCL by "unlawfully" compounding, marketing, and selling its products in violation of the Sherman Law and state compounding regulations.

**ARGUMENT**

## I.   LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotations and citation omitted). Courts are not bound to accept as true legal conclusions couched as factual allegations. *Twombly*, 500 U.S. at 555.

## II.   ALLERGAN'S LANHAM ACT CLAIM SHOULD BE DISMISSED

The Lanham Act creates a cause of action against any person who, in commercial advertising or promotion, "misrepresents the nature, characteristics [or] qualities ... of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). Where, as here, a Lanham Act claim is based on alleged false advertising, a plaintiff must plead, *inter alia*, "(1) a false statement of fact . . .; (2) the statement actually deceived or has the tendency to deceive . . .; (3) the deception is material"; and (4) injury and causation. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Because false advertising claims are "grounded in fraud," *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1085 (C.D. Cal. 2010), to survive a motion to dismiss, a complaint "must state with particularity

1 the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

2       **A.**   **Allergan's Lanham Act Fails to the Extent It Is Based on Alleged**

3              **Violations of the FDCA and FDA Regulations**

4           **1.**   **A court may not adjudicate alleged FDCA violations**

5       The gravamen of Allergan's Lanham Act claim is that Imprimis "makes the false

6 and misleading claim that it operates 'under the regulatory framework of the'" DQSA.

7 (Compl. ¶ 70.) That necessarily requires an adjudication of whether Imprimis is in fact

8 in violation of the DQSA and FDA regulations. However, it is black letter law that "all

9 [] proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by

10 and in the name of the United States." 21 U.S.C. § 337(a). Claims that "exist solely by

11 virtue of [] FDCA" requirements are precluded. *Buckman Co. v. Plaintiffs' Legal*

12 *Comm.*, 531 U.S. 341, 352-53 (2001).

13       Although a Lanham Act claim may be viable where it "touch[es] on the same

14 subject matter as the FDCA," *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228,

15 2238-39, 189 L. Ed. 2d 141 (2014), there is a fundamental difference between a claim

16 that merely overlaps with, and one that depends entirely on litigating violations of, the

17 FDCA. *POM Wonderful* is instructive. There, plaintiff, a maker and seller of

18 "pomegranate juice products, including a pomegranate-blueberry juice blend," accused

19 defendant of deceptive and misleading labeling in violation of the Lanham Act because

20 defendant prominently displayed the words "pomegranate blueberry" even though its

21 product contained "but 0.3% pomegranate juice and 0.2% blueberry juice." *Id.* at 2233.

22 Defendant argued that the FDCA "preclude[d] POM's Lanham Act claim because"

23 food labeling was regulated by the FDCA and Congress "intended national uniformity

24 in food and beverage labeling." *Id.* at 2239. The Court disagreed, holding that because

25 the Lanham Act also subjects anyone who "'misrepresents the nature, characteristics,

26 qualities, or geographic origin' of goods or services to suit," it complements, and is not

27 precluded by, the FDCA. *Id.* at 2237. In so holding, the Court distinguished the at-issue

28 lawsuit from one where a plaintiff seeks to "undermin[e] an agency judgment." *Id.* at

1   2241; *see Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 875, 120 S. Ct. 1913, 146 L.

2   Ed. 3d 914 (2000) (agency regulation allowing manufacturers to choose between two

3   kinds of airbags precluded lawsuit challenging one of those choices).

4        *POM Wonderful* reinforced a long line of cases distinguishing between Lanham

5   Act claims that overlap with the FDCA and those that require adjudication of alleged

6   FDCA violations in the first instance. Courts have consistently "refused to allow a

7   Lanham Act claim to proceed where, in order to determine the falsity or misleading

8   nature of the representation at issue, the court would be required to interpret and then

9   apply FDCA statutory or regulatory provisions." *Mutual Pharm. Co. v. Ivax Pharm.,*

10  *Inc.*, 459 F. Supp. 2d 925, 934 (C.D. Cal. 2006). "Application of [the] rule invariably

11  occurs when the FDA has failed to take a position on the particular issue that is the

12  subject of the alleged false representation comprising the Lanham Act claim." *Id.* "On

13  the other hand, once the FDA has taken a position on a particular matter, courts have

14  consistently allowed the Lanham Act claim to proceed even if" determining falsity

15  requires "reference to the FDA action." *Id.* at 934-35.

16       Underpinning preclusion jurisprudence are two important principles: (1) "what

17  the FDCA . . . do[es] not create directly, the Lanham Act does not create indirectly, at

18  least not in cases requiring original interpretation of these Acts or their accompanying

19  regulations," *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d

20  Cir. 1990); and (2) "the Lanham Act does not allow a federal court to 'determine

21  preemptively how a federal agency will interpret and enforce its own regulations.'"

22  *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 933 (C.D.

23  Cal. 1996) ("*Summit II*") (quoting *Sandoz*, 902 F.2d at 231); *see also PhotoMedex, Inc.*

24  *v. Irwin*, 601 F.3d 919 (9th Cir. 2010) ("a private action brought under the Lanham Act

25  may not be pursued when [] claim would require litigation of the alleged underlying

26  FDCA violation in a circumstance where the FDA has not itself concluded that there

27  was such a violation").

28       Applying those principles, courts have rejected Lanham Act claims that seek to

---

13                                                      No. 8:17-cv-01551-DOC-JDE

litigate in the first instance matters Congress has committed to the FDA's exclusive jurisdiction. For example, in *Sandoz*, the Third Circuit held a false labeling claim that required adjudication of whether an ingredient was "inactive" precluded because it would "require [the court] to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations." 902 F.2d at 230-31. The court reached a similar conclusion in *Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.*, 922 F. Supp. 299, 306 (C.D. Cal. 1996) ("*Summit I*"), and dismissed a false advertising Lanham Act claim based on defendants' alleged importation, sale, and use of a non-FDA approved device.

*POM Wonderful* did not alter the landscape. Earlier this year, the court in *Concordia Pharm. Inc., S.À.R.L. v. Winder Labs., LLC*, No. 2:16-CV-00004-RWS, 2017 WL 1001533 (N.D. Ga. Mar. 15, 2017), addressed the viability of a Lanham Act claim based on defendant's alleged false statement that its products "were reviewed and classified by the FDA." *Id.* at *3. Noting that falsity "depend[ed] on the meaning of the word 'drug' in an FDA regulation," which the FDA had not yet interpreted, the court found the relevant portion of plaintiff's claim precluded because adjudication "would require the [c]ourt to interpret [a FDA regulation] without permitting the FDA to do so first." *Id.* at *3-44. Unlike in *POM Wonderful*, "determining falsity of [d]efendants' representations depend[ed] on an interpretation in the first instance of FDA regulations under the FDCA." *Id.* at *4; *see also Hi-Tech Pharm., Inc. v. Hodges Consulting, Inc.*, 230 F. Supp. 3d 1323, 1331-32 (N.D. Ga. 2016) (portion of Lanham Act claim that required adjudication of whether product was a "new drug" or "prescription drug" precluded); *JHP Pharm., LLC v. Hospira, Inc.*, 52 F. Supp. 3d 992, 999 (C.D. Cal. 2014) (portion of Lanham Act claim that required "determination of whether drug [was] 'new,' and whether it [could] be lawfully marketed under the FDCA" precluded because it involved matters Congress delegated to the FDA).

## 2. Allergan seeks to usurp the authority of the FDA

The bulk of Allergan's Lanham Act claim requires an adjudication in the first

instance of whether Imprimis's "Business Model" violates the FDCA. Allergan does not identify any independent Lanham Act provision that complements sections 503A and 503B (*compare POM Wonderful*, 134 S. Ct. at 2233) or final FDA regulation that has already determined Imprimis's compounding is unlawful (*compare Mutual Pharm. Co.*, 459 F. Supp. 2d at 939). Instead, Allergan alleges Imprimis's claims—that its products comply with the FDCA—are "false or misleading" because the products, based on Allergan's interpretation of the DQSA, are not in compliance. (Compl. ¶¶ 69-80, 108-13.) It is for the FDA, not Allergan, to make that determination.

When Congress enacted the DQSA, it instructed the FDA to "issue regulations to implement" its provisions. 21 U.S.C. §§ 353a(c)(1); 353b(c)(1). In accordance with its rulemaking authority, the FDA has sought to balance "complex issues of history, public safety, and administrative priorities," *JHP Pharm.*, 52 F. Supp. 3d at 1004, and enact "appropriately calibrate[d]" regulations that ensure patients have access to compounded drugs. (RJN, Ex. 11.) The FDA is engaged in active rulemaking regarding the *very issues* Allergan seeks to litigate. As explained *supra* at 7-8, the FDA has issued *draft* guidance addressing the quantity of drugs a 503A facility may manufacture ahead of receiving patient-specific prescriptions (*see* Compl. ¶ 72; RJN, Ex. 5); what constitutes compounding "regularly or in inordinate amounts" products that are "essentially copies" of commercially available drugs (*see* Compl. ¶¶ 73, 77; RJN, Ex. 7); the appropriate amount of interstate shipment by 503A facilities (*see* Compl. ¶ 74; RJN, Ex. 4); and the list of approved bulk drug substances (*see* Compl. ¶ 78; RJN, Exs. 8-10). In order to encourage facilities to register with the FDA and promote uniformity, and to ensure patient needs continue to be met, while it is in the process of finalizing regulations, the FDA has explicitly declined to enforce certain provisions of the DQSA or its nonbinding guidelines. (*See supra* at 6-8.) Allergan's claim is precluded to the extent it seeks to litigate "statements about products' compliance with federal" law. (Compl. ¶ 111.)

### 3.   The Court should dismiss or stay litigation based on the primary jurisdiction doctrine

Primary jurisdiction "is a prudential doctrine, which, under appropriate circumstances, provides that 'the initial decision making responsibility should be performed by the relevant agency rather than the courts.'" *Gisvold v. Merck & Co., Inc.*, 62 F. Supp. 3d 1198, 1203-04 (S.D. Cal. 2014) (quoting *GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1263 (9th Cir. 2011)). Courts must defer to the administrative agency "where (1) the issue is not within the conventional experiences of judges, (2) the issue involves technical or policy considerations within the agency's particular field of expertise, (3) the issue is particularly within the agency's discretion, or (4) there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658 F.3d 1038, 1048–49 (9th Cir. 2011) (internal quotation marks and citation omitted). The doctrine is especially appropriate where a "claim requires resolution of an issue of first impression, or a particularly complicated issue that Congress has committed to a regulatory agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114-15 (9th Cir. 2008) (quotation marks and citations omitted).

The doctrine is especially appropriate here. Congress has committed regulation of 503A and 503B facilities to the FDA and the FDA is actively engaged in rulemaking, balancing various competing interests. (*See supra* at 6-8.) The FDA has "particular [] expertise" in the relevant "technical [and] policy considerations" and is tasked with developing uniform, nationwide rules that replaces the previous patchwork of state-specific regulation. *Gisvold*, 62 F. Supp. 3d at 1203-04. Litigating myriad lawsuits brought by deep-pocketed pharmaceutical companies like Allergan instead of permitting the FDA to exercise its congressionally mandated exclusive jurisdiction will result in a patchwork of standards and ultimately discourage smaller compounders from registering as 503A and 503B facilities—the opposite of what Congress intended when it enacted the DQSA.

Should the Court decline to dismiss Allergan's Complaint on the merits, it

1   should dismiss without prejudice or stay litigation pending final and binding FDA

2   rulemaking. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 761-62 (9th Cir. 2015)

3   ("Once a district court determines that primary jurisdiction is appropriate, it may either

4   stay proceedings or dismiss the case without prejudice.")

### 4.   Allergan fails to allege facts that plausibly suggest Imprimis is in violation of federal law

7       Even if Allergan may enforce the FDCA—and it may not—its factual allegations

8   do not give rise to a plausible claim that Imprimis is in violation of the FDCA. Allergan

9   claims Imprimis's 503A facilities violate the FDCA for three reasons: (1) Imprimis's

10  "model of mass-manufacturing" is "inconsistent" with section 503A's requirement that

11  drugs be "compounded for an identified individual patient" (Compl. ¶ 72); (2) Imprimis

12  "compound[s] regularly or in inordinate amounts (as defined by the Secretary) [] drug

13  products that are essentially copies of a commercially available drug product" (*Id.* ¶

14  73); and (3) Allergan believes Imprimis is shipping more than 5% of its product from

15  503A facilities interstate (*Id.* ¶¶ 51, 74.) Imprimis's 503B facility allegedly violates the

16  FDCA because it uses bulk drug substances that are not included in an FDA list and

17  manufactures drugs that are "essentially copies." (*Id.* ¶¶ 76-78.)

18      Allergan's factual allegations do not suggest Imprimis violates *any* of section

19  503A's requirements. *First*, section 503A explicitly permits facilities to compound

20  drugs "in limited quantities *before* the receipt of a valid prescription order for [an]

21  individual patient" as long as the quantity is based on order history. 21 U.S.C. §

22  353a(a)(2) (emphasis added). Other than a vague allegation that Imprimis is "mass

23  manufacturing," the Complaint is silent as to what "limited quantities" means or the

24  permissible level of pre-order compounding. Allergan does not allege Imprimis is in

25  violation of the FDA's draft guidance (*see* RJN, Ex. 5), let alone any final regulation.

26  *Second*, Allergan's claim that Imprimis is compounding in "regularly or in inordinate

27  amounts (as defined by the Secretary)" is nonsensical because, as explained *supra* at 8,

28  the FDA has not issued a final regulation defining the term. Further, Allergan has not

1    identified any commercially available drug product of which an Imprimis compound

2    is a copy. To the contrary, Allegan alleges that each at-issue compound combines two

3    or more active ingredients or drugs. (Compl. ¶ 52.) While Allergan goes through great

4    lengths to identify the ingredients in Imprimis compounds (*see id.*), it does not identify

5    a single commercially available drug that combines the same active ingredients. *Third*,

6    section 503A's "5 percent" limit only applies to facilities located in states that have not

7    "entered into a memorandum of understanding with the Secretary which addresses

8    [interstate] distribution." 21 U.S.C. § 353a(b)(B). Congress mandated that the FDA

9    "develop a standard memorandum of understanding for use by the States." *Id.* As

10   explained *supra* at 8, the FDA has not yet developed a standard MOU, rendering the

11   limit unenforceable. (*See* RJN, Ex. 4.)

12        Allergan's section 503B allegations fare no better. Although section 503B

13   prohibits registered outsourcing facilities from compounding drugs that are "essentially

14   a copy," the FDA has not issued final regulations defining the term (*see* RJN, Ex. 7)

15   and Allergan has not identified any commercially available drug that includes all of the

16   same ingredients in the same dosage as an Imprimis compound. In addition, because

17   the FDA has not established a bulk drug substances list for use in 503B facilities (*see*

18   RJN, Ex. 9), Imprimis cannot be in violation. In fact, the FDA is aware of, and has

19   declined to halt, the production of the very compounds Allergan claims are sold in

20   violation of FDA regulations. Allergan avers that Imprimis's compounding of

21   LessDrops in a 503B facility is unlawful because it does not appear on the "FDA's

22   drug shortage list, and neither gatifloxacin nor nepafenac . . . appears on [the] FDA's

23   bulk substances list." (Compl. ¶ 78.) Section 503B requires outsourcing facilities to

24   report to the FDA "the drug products that they compounded during the previous six

25   month period." (21 U.S.C. § 353b(b)(2); RJN, Ex 11.) The FDA recently released a list

26   of all drugs registered facilities have compounded that includes the Imprimis

27   compound with the active ingredients gatifloxacin and nepafenac. (RJN, Ex. 12

28   (Excerpt from FDA Report).) Further, none of the post-inspection FDA "warning

letters" Allergan attaches to its Complaint states any Imprimis 503A or 503B facility is using any unauthorized bulk substance. (*See* Compl., Exs. K-S.) [3] Imprimis has informed the FDA that it is manufacturing a compound using certain bulk drug substances, and the FDA has "made a policy judgment"—consistent with Congressional authorization—regarding enforcement. *POM Wonderful*, 134 S. Ct. at 2241. Allergan seeks to "undermin[e that] agency judgment." *Id.* Permitting Allergan to litigate whether Imprimis's compounding conforms to FDCA regulations would "arrogate the authority of the FDA to decide, at least in the first instance, the legality or illegality of" manufacturing and dispensing practices. *JHP Pharm.*, 52 F. Supp. 3d at 1004.

## B.   Allergan's Lanham Act Claim Fails to the Extent It Is Predicated on Violation of State Law

Allergan's allegation that Imprimis is "making false and misleading statements about its products' compliance with [] state laws" mirrors its FDCA allegation and fails for the same reasons. According to Allergan, its Lanham Act claim seeks to redress Imprimis's alleged violation of the "Sherman Law's Drug-Approval Provisions . . . [and] False Advertising Provisions, . . . [and] California's Compounding Regulations." (Compl. ¶¶ 111, 81-86, 93-107.) However, as with the FDCA, there "is no private right of action under the Sherman Law." *Smith v. Pride Mobility Prods. Corp.*, No. 16-CV-04411-LHK, 2016 WL 6393549, *7 (N.D. Cal. Oct. 28, 2016).[4] Allergan's claim fails because it is an end run around that basic principle; the falsity of the "state laws" statement depends on whether Imprimis is actually in violation of California's Sherman Law and related regulations.

---

[3] As explained in more detail *infra* at II.B.3, FDA warning letters are pre-enforcement notices and do not constitute final agency action.

[4] While a party may file a UCL claim for alleged violations of the Sherman Law (*see Thomas v. Costco Wholesale Corp.*, No. 12-CV-02908-BLF, 2015 WL 4776298, at *7 (N.D. Cal. Aug. 13, 2015)), Allergan lacks UCL standing. *See infra* at III.

Moreover, Allergan has not alleged facts that suggest Imprimis has violated any state law or regulation. According to Allergan, Imprimis violates: (1) approval provisions by dispensing compounded drugs that have not been approved as new drugs (Compl. ¶¶81-86); (2) the Sherman Law's false advertising provisions by representing compounds have an effect on the eye and failing to attach appropriate labels; and (3) various compounding regulations. Those do not withstand scrutiny.

### 1.   Compounded drugs are not "new drugs" in California

Citing California Health and Safety Code section 111550, Allergan accuses Imprimis of unlawfully dispensing a "new drug" without FDA or State approval. (Compl. ¶ 86; Cal. Health & Safety Code § 111550.) By its terms, however, section 111550 only applies to *new* drugs, which are those "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs." Cal. Health & Safety Code § 109980. Drug compounds that combine active ingredients already in common use prepared on the basis of prescriptions from physicians—i.e. those with the requisite scientific training and experience—are by definition not "new drugs," and exempt from approval requirements. California has long recognized that a "pharmacist may compound and dispense, pursuant to an individual prescription order of a physician, . . . materials for an individual patient's needs so long as the component elements" have not been banned. (*See* 61 Cal. Op. Att'y Gen. 192 (Cal. A.G. 1978).[5]) Such compounds are likewise exempt from most labeling requirements that would ordinarily apply to commercial drugs. *See id.* In place of the new drug approval process, California has enacted a comprehensive scheme that regulates pharmacy compounding. *See* Cal. Code

---

[5] On issues of state law, a California Attorney General opinion is "regarded as having a quasi judicial character," *Cmty. Redevelopment Agency v. City of Los Angeles*, 89 Cal. App. 4th 719, 727 (2001), and are relied upon in the absence of case authority. *Cty. of Orange v. Ass'n of Orange Cty. Deputy Sheriffs*, 192 Cal. App. 4th 21, 36 (2011).

242125.2

1 | Regs. tit. 16, § 1735, *et. seq.*

2 | **2.  California law permits promotion to healthcare professionals**

3 | The second way in which Allergan accuses Imprimis of violating California law

4 | is by advertising drugs that have "not been approved or cleared for marketing" to as

5 | having an effect on "[d]iseases, disorders, or conditions of the eye." (Compl. ¶ 94; Cal.

6 | Health & Safety Code §§ 110403, 110405.) The restriction does not apply, however,

7 | when advertising is "[d]isseminated only to members of the medical, dental,

8 | pharmaceutical, or veterinary professions." *Id.* § 110405. It is beyond dispute that

9 | Imprimis's promotional materials are disseminated solely to physicians. Imprimis's

10 | allegedly wrongful advertising for Dropless Therapy states Imprimis serves

11 | "[o]pthamologists with ophthalmic compounded formulations" that are used during

12 | surgery. (Compl., Ex. H.) The document goes on to describe how physicians ordinarily

13 | use the compound during surgery and notes that it is "compounded by a pharmacist

14 | pursuant to an individual patient prescription" and "[m]ay be customized." (*Id.*) The

15 | websites describing LessDrops and SimpleDrops likewise identify Imprimis as an

16 | entity that serves ophthalmologists, and explains to physicians that the drugs were

17 | developed "with your patients top-of-mind" and enable prescribers to help patients

18 | "better [] follow" a regimen. (Compl., Exs. I, J.)  Allergan has failed to identify *any*

19 | advertising to patients and any order from a 503A facility requires a patient-specific

20 | prescription from a physician.

21 | Nor are California compounders required to attach labels that conform to Health

22 | & Safety Code sections 111330, 111375, 110398, 111440, and 111445. (Compl. ¶ 95.)

23 | As explained *supra* at II.B.1, compounds prepared on the basis of physicians'

24 | prescriptions are regulated by section 1735, *et. seq.*, of California Regulations, title 16.

25 | Section 1735.4 specifies that "compounded drug preparation[s]" are only required to

26 | identify: (1) pharmacy name; (2) active ingredients; (3) storage instructions; (4) use by

27 | date; (5) compounding date; and (6) lot number or pharmacy reference number.

28 | Allergan's claim that labels are false or misleading because they do not include

1  information ordinarily required for commercially available drugs, including "warnings

2  about potential adverse events, contraindications, and adverse drug interactions," fails

3  because California's strict compounding regulations do not require that labels include

4  that information.

5       **3.    Allergan does not allege violation of compounding regulations**

6       Allergan asserts Imprimis is in violation of California regulations that parallel

7  FDCA statutory requirements. Specifically, Allergan alleges Imprimis violates: (1)

8  section 1735.2(a) by providing certain compounds to "physicians for 'office use' in

9  advance of receiving a valid prescription"; (2) section 1735.2(d) because its

10  compounds are "essentially copies" of commercially available drugs; and (3) sections

11  1735.5, 1735.7, and 1735.8, which address manufacturing methodology, quality

12  monitoring, and personnel documentation, because it has received some FDA warning

13  letters. Allergan's factual assertions do not plausibly support any finding of violations.

14       *First*, section 1735.2(c) explicitly permits pharmacies to "furnish[] to a

15  prescriber for office use" a "reasonable quantity" of compounded drugs. The

16  Complaint does not identify any instance of Imprimis's provision of an unreasonable

17  quantity of drugs for office use, or even plead what "reasonable quantity" means.

18       *Second*, based on the allegations in the Complaint, none of the at-issue drugs are

19  "essentially copies" of commercially available medications. California regulations

20  define "copy or essentially a copy" as drugs that are "comparable in active ingredients

21  to commercially available drug products" and specifically exclude from the definition

22  preparations that produce "a clinically significant difference, *as determined by a*

23  *prescribing practitioner*." Cal. Code Regs. tit. 16, § 1735.1 (emphasis added). Imprimis

24  only dispenses compounds in California based on prescriptions—i.e. following

25  determinations by licensed practitioners that the compounds are most appropriate for

26  their patients. Moreover, as explained in more detail *supra* at II.A.4, each of the at-

27  issue drugs combine two or more active ingredients and Allergan has failed to identify

28  any commercially available drug that includes all of the active ingredients and

1  excipients (the combination of which make Imprimis's formulations unique) in the

2  same doses and strengths as Imprimis compounds.

3    *Third*, Allergan's reliance on FDA warning letters to establish violations of

4  California regulations is unavailing. FDA warning letters do not constitute final agency

5  action. They are merely *pre-enforcement* notices to firms that give them "an

6  opportunity to take voluntary and prompt corrective action." FDA Manual § 4-1-1.

7  Warning letters "are issued to achieve voluntary compliance and to establish prior

8  notice." *Id.* Moreover, Imprimis is regulated by the State of California, and Allergan's

9  Complaint makes no reference to any finding of violations by state inspectors.

10    Allergan has not alleged any facts that plausibly give rise to a claim that

11  Imprimis violates state law, let alone with the type of detail Rule 9(b) requires.

12    **C. Allergan's Lanham Act Claim Fails to the Extent It Is Based on**

13    **Imprimis's Alleged Effectiveness or Preference Claims**

14    Allergan complains two advertising claims are misleading or false: (1) a

15  statement in a video that Imprimis's compounds are "more effective[]" than topical

16  medications; and (2) an assertion that "95% of cataract surgeons surveyed would prefer

17  Dropless Therapy." (Compl. ¶¶ 79-80.) Imprimis supposedly "has no basis to claim"

18  its products are more effective and that the survey performed did not have a sufficiently

19  large sample. (*Id.*)

20    Statements that a product is "more effective" or "preferred" are, as a matter of

21  law, not actionable under the Lanham Act. As the Ninth Circuit has held, to be

22  actionable, the statement must be a "specific and measurable claim, capable of being

23  proved false or of being reasonably interpreted as a statement of objective fact."

24  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.

25  1999). While "misdescriptions of specific or absolute characteristics of a product are

26  actionable," "advertising which merely states in general terms that one product is

27  superior is not." *Cook, Perkiss and Liehe, Inc. v. N. California Collection Serv., Inc.*,

28  911 F.2d 242, 246 (9th Cir. 1990) ("we're the low cost [] collection experts" not

1   actionable). Neither at-issue claim describes "specific or absolute characteristics" of a

2   product; they are generalized statements of opinions that products are "more effective"

3   and "preferred." *See Coastal Abstract*, 173 F.3d at 731 (claim that plaintiff's facility

4   was "too small" did not give rise to a Lanham Act claim).

5         **D.  Allergan's Has Failed to Plead Injury With Specificity**

6         To state a false advertising claim under the Lanham Act, a plaintiff must, at the

7   very least, "allege an injury to a commercial interest in reputation or sales" and that the

8   injury was "proximately caused by violations of the statute." *Lexmark Int'l., Inc. v.*

9   *Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014). Other than a conclusory

10  statement that it "has suffered and is suffering competitive injuries as a result of

11  Imprimis's unlawful activities" (Compl. ¶ 29), Allergan has not pleaded facts giving

12  rise to a plausible claim that it has suffered an injury caused by Imprimis. Allergan has

13  not identified lost sales, damage to reputation, or any other cognizable injury, and has

14  not claimed physicians have switched from Allergan to Imprimis products.[6] *Compare*

15  *Lexmark*, 134 S. Ct. at 1393.  The Lanham Act claim fails for this additional reason.

16  **III.   ALLERGAN'S UCL CLAIM FAILS AS A MATTER OF LAW**

17        Although seemingly broad, the UCL, which makes "unlawful, unfair or

18  fraudulent" practices actionable, has a strict standing requirement.  Cal. Bus. & Prof.

19  Code § 17200. "[A] plaintiff 'proceeding on a claim of misrepresentation as the basis

20  of his or her UCL action must demonstrate actual reliance on the allegedly deceptive

21  or misleading statements.'" *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320-21

22  (2011) (quoting *In re Tobacco II*, 46 Cal. 4th 298, 306, 326 (2009)). The "plaintiff must

23  allege he or she was motivated to act or refrain from action." *Id.* The actual reliance

24  requirement applies equally to claims brought by competitors, who must allege "the

25

26  [6] It is telling that Allergan's allegation that at-issue compounds include some of the
27  same active ingredients as commercially available products fails to identify any
     commercially available *Allergan* product that includes the same ingredients.  (*See*
28  Compl. ¶ 52(c).)

242125.2

1  defendant's misrepresentation or nondisclosure was an immediate cause of the

2  *plaintiff's* injury-producing conduct." *L.A. Taxi Coop., Inc. v. Uber Techs, Inc.*, 114 F.

3  Supp. 3d 852, 857 (N.D. Cal. 2015) (quoting *Tobacco II*, 46 Cal. 4th at 326) (emphasis

4  added in *L.A. Taxi*). An UCL claim cannot be based on third-party reliance. *Id.*

5  (dismissing taxi companies' claim Uber deceived riders by suggesting it was safer).

6       Allergan's injury claim (Compl. ¶ 123) is insufficient. Allergan has not alleged

7  *it* took any action, or refrained from any conduct based on Imprimis's statements.

8  Instead, Allergan seeks to redress supposed injury to consumers as the result of

9  Imprimis's compounding practices. (Compl. ¶¶ 114-124.) Because it has failed to

10  allege actual reliance, Allergan's UCL claim must be dismissed. In addition, the UCL

11  claim fails because, as explained *supra* at II.B, Allergan does not pleaded facts

12  plausibly suggesting Imprimis violated any state law or regulation, the supposed

13  underlying "unlawful" conduct.[7]

## CONCLUSION

15       For the foregoing reasons, Imprimis respectfully requests that the Court dismiss

16  the Complaint, or, in the alternative, stay litigation.

17  Date: October 11, 2017                LTL ATTORNEYS LLP

19                                        By:  /s/ Kevin M. Bringuel
                                               Kevin M. Bringuel
20                                             Enoch H. Liang
                                               Prashanth Chennakesavan
21                                             Attorneys for IMPRIMIS
22                                             PHARMACEUTICALS, INC.

---

[7] This Court supposedly has jurisdiction over Allergan's UCL claim pursuant to 28 U.S.C. § 1367. (Compl. ¶ 37.) In the absence of a viable federal claim, the Court should decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367 (c).