# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ALLERGAN USA, INC.,<br><br>       Plaintiff,<br><br><br>vs.<br><br><br>IMPRIMIS PHARMACEUTICALS, INC.,<br><br>       Defendants. | Case No.: 8:17-cv-01551-DOC-JDE<br><br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR RECONSIDERATION [93], [110], [109]** |

Before the Court is Plaintiff Allergan USA, Inc.'s ("Plaintiff" or "Allergan") Motion for Partial Summary Judgment and for Summary Judgment ("Allergan Motion") (Dkt. 110) and Defendants Imprimis Pharmaceuticals, Inc.'s ("Defendant" or "Imprimis") Motion for Partial Summary Judgment, or, Alternatively, a Stay ("Imprimis Mot.") (Dkt. 93).[1] The Court heard oral arguments on March 26, 2019.

## I.    Requests for Judicial Notice

Imprimis requests that the Court take judicial notice of seventeen documents, Exhibits A through Q of the Imprimis Request for Judicial Notice ("Imprimis RJN") (Dkt. 101). Allergan requests that the Court take judicial notice of seventeen documents, Exhibits A through O of Allergan's Request for Judicial Notice ("Allergan RJN") (Dkt. 110-9); Exhibit P of the Supplemental Request for Judicial Notice (Dkt. 116-5); and Exhibit Q of the Notice of Supplemental Authority (Dkt. 135).[2] Each document is a publicly available Federal Drug Administration ("FDA") document, court record, Congressional record, or fiscal report. *See generally* Imprimis RJN; Allergan RJN.

"Judicial notice" is a court's recognition of the existence of a fact without the necessity of formal proof. *See Castillo-Villagra v. I.N.S.*, 972 F.2d 1017, 1026 (9th Cir. 1992). Under Federal Rule of Evidence 201, a court may take judicial notice of court filings and other matters of public record. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that a court may take judicial notice of "undisputed matters of public record"); *see also Reyn's Pasta Bell a, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court filings). In addition, judicial notice is appropriate for information obtained from government websites, *see Paralyzed Victims of Am. v. McPherson*, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 8, 2008), as well as copies of "records and reports of administrative bodies." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003). The Court does not, however, take judicial notice of reasonably disputed facts contained within the judicially noticed documents. *See Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).

---

[1] Also before the Court is Imprimis's Motion for Reconsideration (Dkt. 109).

[2] Allergan has submitted two documents labeled "Exhibit P." The Court refers to the March 11, 2019 submission as Exhibit Q. All requests for judicial notice shall be referred to as "Allergan RJN."

Therefore, the Court takes judicial notice of the existence of the documents above. However, the Court does not take judicial notice of the facts within these exhibits subject to reasonable dispute. *See Lee*, 250 F.3d at 690.

## II.   Background

### A.   Facts[3]

Imprimis formulates, prepares, and sells ophthalmic drugs. Statement of Uncontroverted Facts ISO Allergan Mot. ("Allergan SUF") (Dkt. 110-1) ¶ 1; Declaration of Joseph N. Akrotirianakis ("Akro. Decl.") (Dkt. 111), Ex. 31 at 1040–47 (listing drugs, including Dropless, LessDrops, Total Tears, and Simple Drops). "Ophthalmic" drugs relate to the eye or structures in the region of the eye ophthalmic artery. Imprimis sells its ophthalmic drugs pursuant to Sections 503A and 503B of the Food Drug and Cosmetic Act ("FDCA"). *Id*. ¶ 3. Imprimis owns two traditional compounding pharmacies, or "Section 503A" pharmacies—one in Irvine, California, and the second in New Jersey. *Id*. ¶¶ 4–6. These facilities are referred to by the Court as the "503A facilities." Imprimis also owns one outsourcing facility registered under Section 503B of the FDCA, also in New Jersey. *Id*. ¶ 7. This facility is referred to by the Court as the "503B facility." Certain of Imprimis's drugs—including Dropless Therapy, LessDrops, and Total Tears—are compounded in the 503A facilities in California and New Jersey, and manufactured in the 503B outsourcing facility in New Jersey. *Id*. ¶ 10. Imprimis prepares standardized formulations in its 503A compounding pharmacies. *Id*. ¶ 18. Defendant estimates that batch-prepared formulations comprise 90 to 95 percent of its ophthalmic drug sales. *Id*. ¶ 22. Imprimis distributes drugs to all 50 states. *Id*. ¶ 12.

None of Imprimis's ophthalmic drugs are approved by the FDA. *Id*. ¶ 2. And Imprimis does not limit its interstate distribution of compounded drugs to 5 percent of its total prescription orders. *Id*. ¶ 14. Interstate shipments have never been less than 33 percent of the total prescription orders dispensed or distributed from the 503A pharmacies. *Id*. ¶¶ 15–16. Neither California nor New Jersey (the states where Defendant's Section 503A facilities are

---

[3] Unless otherwise indicated, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

located) has entered a memorandum of understanding that addresses the distribution of compounded drug products interstate. *Id*. ¶ 13. Moreover, Imprimis used artesunate to prepare drugs and distribute them from its 503A facilities from at least December 2015 to September 2018; this drug is not a component of an FDA-approved human drug and does not appear on the 503A bulks list. *Id*. ¶¶ 30–31. Imprimis continued to prepare drugs using artesunate until it received a letter from FDA addressing its use of the drug. *Id. ¶* 32.

None of the drugs Defendant manufactures in its 503B registered outsourcing facility has ever been on the drug shortage list. *Id*. ¶ 35. The FDA has not promulgated a list identifying bulk drug substances for which there is a clinical need. *Id*. ¶ 36.  In February 2017, Defendant began using bulk gatifloxacin and bulk nepafenac in drugs it produced and dispensed from its 503B registered outsourcing facility. *Id*. ¶ 38. Gatifloxacin has never been on the FDA's Category 1 Bulk Drug Substances List for 503B. *Id*. ¶ 39. Defendant continues to use bulk gatifloxacin in drugs it produces and dispenses from its 503B registered outsourcing facility. *Id*. ¶ 40.[4] Defendant used bulk nepafenac in formulations it distributed from its 503B registered outsourcing facility from February 2017 until at least January 30, 2018. *Id*. ¶ 42. Nepafenac was not added to the FDA's Category 1 Bulk Drug Substances List for 503B until July 23, 2018. *Id*. ¶ 41.

Defendant markets compounded drugs in all 50 states. *Id*. ¶ 51. Defendant promoted its business and its products by claiming its pharmacies "only use FDA-approved ingredients." SUF ¶ 77. In a "Note from the CEO" provided as part of a product catalog, Imprimis advertises that it is "Setting the Standard in Commitment to Quality" such that "All ImprimisRx Pharmacies are FDA inspected and only use FDA-approved ingredients." Akro. Decl., Ex. 47 at 1604. Imprimis also stated that its Cyclosporine-based formulations are "made from FDA-approved drug components." Akro. Decl., Ex. 12 at 842; *see also* SUF ¶ 81 (listing exhibits). Defendant also stated to a potential customer in Kansas that "In simpler terms, FDA found our products and services to be safe and effective." Akro. Decl., Ex. 59 at 1748; *see also* Akro. Decl., Ex. 61 at 1756–57; Ex. 62 at 1778.

---

[4] Imprimis argues that it is in the process of phasing out gatifloxacin and will not be compounding the substance at the time of trial. Imprimis SGD (as defined *infra*) ¶ 40.

Defendant posted a video featuring Dr. Jim Lewis on its Go Dropless website that included the statement, "The patient is protected from infection and inflammation even more effectively than can be achieved with expensive, inconvenient and irritating topical medications." SUF ¶ 112. The video remained on Defendant's website for approximately 3.5 years. *Id*. ¶ 113. Defendant also issued a press release on June 24, 2014 announcing "Imprimis Pharmaceuticals Go Dropless™ Video Interview Survey Reveals 95% of Leading Cataract Surgeons Surveyed Would Prefer Dropless Therapy." *Id*. ¶ 116. Imprimis does not have the specific questions survey participants were asked but understands survey participants were asked "Would you prefer your patients not to have to take topical eye drops following an ocular surgery." *Id*. ¶ 121. No specific formulation—such as Defendant's Dropless Therapy injectables—was identified in the survey. *Id*. ¶ 122. When the survey was conducted in April 2014, Defendant "probably had less than ten customers" for its injectable Tri-Moxi Dropless formulations. *Id*. ¶ 123. Of the 21 surgeons surveyed, only "a handful" had used Defendant's injectable Tri-Moxi Dropless formulation. *Id*. ¶ 124.

Defendant's June 24, 2014 press release was sent to "All Employees" of Imprimis. *Id*. ¶ 118. Defendant's regional business director, Bindu Manne, emailed Defendant's June 24, 2014 press release to customers or potential customers. *Id*. ¶ 119. On October 26, 2015 (i.e., 16 months after the survey was conducted), Defendant issued a press release that provides: "At a recent major ophthalmology conference, 95% of cataract surgeons surveyed commented they would prefer Dropless Therapy™ compared to the current standard of care eye drop regimen." *Id*. ¶ 126. Defendant's October 26, 2015 press release does not disclose that the "95% of cataract surgeons" statistic is based on a survey of only 21 cataract surgeons. *Id*. ¶ 128. Defendant's October 26, 2015 press release was emailed to "All Employees" of Imprimis. *Id*. ¶ 129. Defendant's Dropless Therapy patient brochure as of February 2016 (i.e., 20 months after Defendant's "survey") read: "A growing number of eye care physicians understand the value of Dropless. In a recent survey, 95% of cataract surgeons prefer Dropless Therapy for their practices and their patients." *Id*. ¶ 131.

### B.    Procedural History

Allergan filed this action on September 7, 2017. *See* Complaint (Dkt. 1).  Allergan brings two claims: (1) unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (2) unlawful and/or unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq*. by unlawfully marketing, selling, and distributing their products in violation of the California Sherman Law and compounding laws. Compl. ¶¶ 108–24. Defendants answered on November 29, 2017 (Dkt. 32).

On January 28, 2019, Allergan filed the present Motion for partial summary judgment. On February 4, 2019, Imprimis opposed ("Imprimis Opp'n") (Dkt. 113). On February 11, 2019, Allergan replied ("Allergan Reply") (Dkt. 120).

Also on January 28, 2019, Imprimis filed the present Motion for partial summary judgment. On February 4, 2019, Allergan opposed ("Allergan Opp'n") (Dkt. 116). And on February 11, 2019, Imprimis replied ("Imprimis Reply") (Dkt. 121).

### III.    Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

When the non-moving party bears the burden of proving the claim or defense at trial, the moving party can meet its burden for summary judgment by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). A party cannot create a genuine issue of material fact simply by making

assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

## IV.    Discussion

On January 11, 2019, in a 32-page opinion, this Court granted in part and denied in part Allergan's motion for summary judgment in the related case *Allergan USA, Inc. v. Prescribers Choice, Inc., et al.*, Case No. 17-cv-1550-DOC-JDE (C.D. Cal. Jan. 11, 2019). Similar to *Prescribers Choice*, this case is about alleged improper drug compounding and false advertising. First, according to Allergan, Imprimis is violating California's Sherman Law by compounding drugs in violation of sections 503A and 503B of the Drug Quality and Security Act ("DQSA") and thus is acting "unlawfully" under California Business & Professions Code Section 17200. Allergan Mot. at 11. Second, Allergan argues that Imprimis made certain allegedly false statements regarding (a) the legality of its business under Sections 503A and 503B, and (b) the efficacy of certain of its formulations. *Id*. at 20–25. Imprimis also moves for summary judgment, arguing that Allergan cannot recover monetary relief under (1) the Lanham Act as a matter of law because it cannot show that any false advertising caused damage with reasonable certainty or had any effect in the marketplace; or (2) the UCL because Allergan seeks actual damages and nonrestitutionary disgorgement of profits, which are not available remedies. Imprimis Mot. at 15–18. Moreover, according to Imprimis, it is in compliance with FDA guidance and any Section 17200 claim is pre-empted by the DQSA. *Id*. at 18–24.

The Court addresses each claim in turn, beginning with an overview of the statutory and regulatory background governing outsourcing facilities.

## A.    Statutory and Regulatory Background

According to FDA, compounding can be critical for advancing the health of patients who have specific medical needs that cannot be met by FDA-approved drugs. Imprimis RJN, Ex. H at 1. Compounding is a long-recognized practice essential to certain patients, such as those patients who cannot tolerate conventional dosage forms (*e.g.*, tablets) or who are allergic

to certain ingredients in approved drugs.[5] However, because compounded drugs are not FDA approved and do not undergo premarket review by FDA for safety, effectiveness, and quality, they also present a greater risk to patients than FDA-approved drugs. *Id*. There are fewer assurances of safety and quality associated with a bulk drug substance than with an FDA-approved drug. *Id*. Compounding from bulk drug substances also involves more numerous and complex steps than compounding from approved drugs. *Id*. This process can introduce increased risk for compounding errors or contamination. *Id*. This was illustrated by the 2012 nationwide fungal meningitis outbreak. *Id*. This outbreak led to more than 750 cases of illness and the deaths of 64 individuals who had used a compounded drug for injection that was supposed to be sterile, but became contaminated. *Id.* In response to that public health event, Congress enacted the DQSA in 2013 to enhance the safety and quality of these medicines. *Id*.

### 1.    Passage of the DQSA

The Congressional record makes clear that passage of the DQSA was in direct response to the 2012 public health event and an attempt to remove barriers to FDA regulation of compounders. Before passage of the DQSA, "FDA's authorities over compounding pharmacies were not up to the task. Divergent court decisions[6] on the underlying statute had forced the agency to cobble together piecemeal approach to regulating compounding pharmacies that was different in some parts of the country than in others. That untenable legal situation created loopholes that companies . . . were able to exploit." House Hearing on H.R. 3204, 113th Cong. 1399 (2013) (statement of Rep. Henry Waxman). According to the Congressional record, the DQSA would "take a major step" toward addressing these issues, including by resolving a constitutional issue that "wreaked havoc on FDA's ability to regulate compounders." *Id*. The law was intended to "give hospitals and doctors the ability to access a source of compounded medicines that are made in a facility that is subject to stringent FDA quality standards and oversight." *Id.; see also* House Hearing on H.R. 3204, 113th Cong. 1399 (2013) (statement of

---

[5] *See FDA's Human Drug Compounding Progress Report: Three Years After Enactment of the Drug Quality and Security Act* (Jan. 2017), available at https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/ PharmacyCompounding/UCM536549.pdf.

[6] The Supreme Court held unconstitutional the statute's advertising and solicitation restrictions, and a circuit split arose as to the viability of the rest of the law.

Rep. Joseph Pitts) (the law "clarifies FDA's authority over the practice of compounding drugs, and it requires FDA to engage in dialogue with State regulators"); *id*. (statement of Rep. Frank Pallone) ("This effort also makes clear that FDA's authorities over compounding pharmacies needed to be fixed. A court split decision over the statute had hampered FDA's ability to effectively enforce their authority over compounding pharmacies and ensure the safety and effectiveness of compounded medications."); *id*. (statement of Rep. Deborah Dingell) (the law "represents a major step in securing our pharmaceutical supply chain and improving FDA's authority to oversee compounding pharmacies").

The DQSA amended FDCA Section 503A and added Section 503B. *See* DQSA, 113 Pub. L. No. 54, 127 Stat. 587 (2013). The DQSA recognizes two categories of compounders: (1) compounders such as state-licensed pharmacies (sometimes referred to as "traditional compounders") that compound drugs solely for identified individual patients based on the receipt of valid prescriptions (Section 503A); and (2) outsourcing facilities (Section 503B).

Section 503A of the FDCA, codified at 21 U.S.C. § 353a, regulates pharmacy compounding. Drug products compounded "for an identified individual patient . . . [that are] necessary for the identified patient" are exempted from normal drug-approval requirements under Section 503A when certain conditions are met. 21 U.S.C. § 353a(a). Section 503A allows pharmacy compounding in two scenarios: (1) drug compounding after the receipt of a prescription; and (2) drug compounding before the receipt of a prescription when the compounding is "based on a history [of] receiving valid prescription orders for the compounding of the drug product, which orders have been generated solely within an established relationship between" the compounding pharmacy and the patient or prescribing physician. *Id*. In both scenarios, Section 503A also requires that the compounded drug is (1) compounded using approved drug products; (2) compounded using ingredients that comply with national standards; (3) not compounded "regularly or in inordinate amounts (as defined by the Secretary)" if the compounded drug is "essentially a copy of a commercially available product"; (4) not a drug product whose safety or effectiveness may be adversely effected by compounding; and (5) compounded in a state that has entered into a "Memorandum of Understanding" ("MOU") with

the FDA or, if no such MOU exists for that state, compounded by a pharmacy or individual that distributes less than "5 percent of [its] total prescription orders" to out-of-state patients. 21 U.S.C. § 353a(b).

Section 503B of the FDCA, codified at 21 U.S.C. § 353b, regulates compounding by "outsourcing facilities." Outsourcing facilities that seek to compound drugs under this provision must comply with certain registration and reporting requirements. 21 U.S.C. §§ 353b(a)(1), 353b(b). Section 503B does not require a patient prescription for compounding, but instead specifically limits the types of drugs that can be compounded at outsourcing facilities registered under Section 503B. Such 503B facilities can only compound bulk drug substances that appear on (1) a list established by the FDA "identifying bulk drug substances for which there is a clinical need"; or (2) a drug shortage list established by the FDA. 21 U.S.C. § 353b(a)(2)(A). In addition to the limitation on the types of drugs that may be compounded, Section 503B also imposes a litany of other conditions including, inter alia: (1) the drug is not "essentially a copy of one or more approved drugs"; (2) the drug is not sold wholesale; and (3) the "drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance [with Section 503B]." 21 U.S.C. § 353b(a).

Section 503B outsourcing facilities are subject to greater regulation than traditional 503A compounders. For example, unlike traditional compounders, outsourcing facilities must adhere to current good manufacturing practice requirements, and are subject to regular risk-based inspection by FDA. They are also subject to specific adverse event reporting requirements. *Id*. § 353b(b)(4)–(5); *see* 21 U.S.C. § 351(a)(2)(B) (current good manufacturing requirement). Entities that register with FDA as outsourcing facilities and comply with these and other enumerated statutory conditions in 21 U.S.C. §353b are exempt from certain FDCA provisions, including the need to obtain premarket approval for drugs. *See* 21 U.S.C. § 353b(a) (the exempted sections are new drug approvals (21 U.S.C. § 355); the requirement of labeling with adequate directions for use (21 U.S.C. § 352(f)(1)); and drug supply chain security requirements (21 U.S.C. § 360eee-1)). Again, Congress only granted the exemption from these FDCA requirements conditionally, subject to the FDA's confirmation that a certain drug is on a

shortage list or has determined through notice-and-comment that there is a specific clinical need to use a particular bulk rather than the approved product. 21 U.S.C. § 353b(a)(2).

## 2.    FDA Implementation of the DQSA

The DQSA clarified FDA's authority to regulate compounding pharmacies. For outsourcing facilities, FDA needed to, among other things, define "clinical need" and develop the clinical need list, 21 U.S.C. § 353b(a)(2)(A)(i); provide further guidance about what it means to compound a drug that is essentially a copy of one or more approved drugs, *id.* § 353b(a)(5); develop and promulgate by regulation a list of drugs that are demonstrably difficult to compound, *id.* §§ 353b(a)(6), 353b(c); establish reporting requirements for outsourcing facilities, *id.* § 353b(b); and establish a risk-based schedule for inspecting outsourcing facilities, *id.* § 353b(b)(4). For traditional compounders, FDA needed to, among other things, promulgate by regulation a list of certain bulk drug substances that may be used for traditional compounding, *id.* § 353a(b)(1)(A); define the extent and nature of regular or inordinate amounts of compounding drug products that are essentially a copy of commercially available drug products, *id.* § 353a(b)(1)(D); promulgate by regulation a list of drug products that present demonstrable difficulties for compounding, *id.* § 353a(b)(3)(A); and prepare a standard memorandum of understanding between FDA and state authorities to address certain distributions of compounded drugs, *id.* § 353a(b)(3)(B). In addition, FDA must convene and consult with FDA's Pharmacy Compounding Advisory Committee on certain provisions including development of the list of bulk drug substances that may be used by traditional compounders list, *id.* § 353a(d).

FDA has issued interim policies related to its implementation of the DQSA. In *Prescribers Choice*, this Court analyzed in depth the *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the FFDCA: Guidance for Industry* (the "503B Interim Policy"). The 503B Interim Policy advises stakeholders about how FDA is developing a list of bulk drug substances that may be used in compounding based on clinical need (the "clinical need list") and outlines how FDA intends to exercise its enforcement discretion while the agency puts that piece of the statutory framework into place. The Interim Policy is an

interim measure spanning the gaps between (1) the DQSA's enactment, (2) FDA's solicitation for and receipt of nominations for inclusion on the clinical need list, (3) FDA's clinical need evaluation of those substances nominated with sufficient information, (4) FDA's proposed determination and request for comment on each nominated substance, and (5) FDA's review of comments relating to, and final determination for, each nominated substance. The FDA stated that it does not "intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance that does not appear on the 503B [clinical need] list . . . provided that the following conditions are met: (1) The bulk drug substance appears on 503B Category 1 on FDA's website[.]" 503B Interim Policy at 8.

To begin assembling the clinical need list, FDA published Federal Register notices in December 2013 and July 2014, calling for nominations of bulk drug substances, and in October 2015, opening a docket for new nominations or re-nominations. In January 2018, FDA's Commissioner released the *2018 Compounding Policy Priorities Plan* ("CPPP"),[7] which detailed the agency's progress in implementing the DQSA, as well as planned actions and timetables for further actions in 2018. In March 2018, FDA published a draft guidance regarding its interpretation of the statutory phrase "bulk drug substances for which there is a clinical need." *See Evaluation of Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act (Draft Guidance for Industry)*, 83 Fed. Reg. 12,952 (Mar. 26, 2018). Most recently, in March 2019, FDA released an updated version of the 503B guidance, which includes a flow chart demonstrating how FDA generally intends to evaluate bulk drug substances that have been nominated for inclusion on the 503B clinical needs list. Allergan RJN, Ex. Q at 18. And FDA has also entered into agreements with university partners to help it prepare clinical need analyses for nominated substances when FDA deems such help necessary.[8]

---

[7] Available at https://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/pharmacycompounding/ucm592795.htm
[8] *See FDA Continues Taking Key Actions On Bulk Drug Substances Used for Compounding to Advance the Regulatory Framework Governing Compounded Drugs and to Protect Patients* (July 23, 2018), available at https://www.fda.gov/newsevents/newsroom/pressAnnouncements/ucm614281.htm.

### 3.     Federal Lawsuits

As the FDA assembles the clinical need list and otherwise implements the DQSA, pharmaceutical companies (that have gone through the FDA drug-approval process) have brought lawsuits against the United States government and compounders. For example, on October 26, 2017, Par Sterile Products, LLC and Endo Par Innovation Company ("Par") filed a lawsuit in the United States District Court for the District of Columbia pursuant to the Administrative Procedure Act, challenging the FDA's 503B Interim Policy. *Par Sterile Products, LLC, et al. v. Azar II, et al.*, Case No. 17-cv-2221 (APM) (Oct. 26, 2017). Par alleged that FDA has "ignored that Congressional mandate for four years and has instead chosen to implement its own 'interim' bulk compounding program directly contrary to specific requirements of the statute." *Par* Dkt. 1 at ¶ 1. Par argued that FDA has "improperly authorized bulk compounding of hundreds of drugs, including a drug product that is 'essentially a copy'" of its FDA-approved drug. *Id*. On January 25, 2018, the District Court granted a stipulated stay of the case as FDA continued its implementation process.  On February 6, 2019, the parties filed a joint motion to continue the stay as FDA "expects to publish the final clinical need determination for [the drug at issue] on or before March 15, 2019." *Par* Dkt. 58. The pending motions remain in abeyance.

In this Court, Allergan filed twin cases against compounders for alleged violations of the Lanham Act and state law on September 7, 2017. At the pleading stage, the Court resolved Imprimis's motion to dismiss on November 14, 2017. In denying the motion to dismiss, the Court primarily viewed the case through the lens of the Lanham Act and allegations regarding Imprimis's statements about the legality of its business. This Court held that as alleged in the Complaint, Imprimis's conduct violates the plain text of the FDCA and therefore "the question of legality in this case does not implicate FDA's rulemaking authority." Dkt. 31 at 12. In the order on the motion to dismiss, the Court largely poo-pooed the significance of FDA discretion regarding the enforcement of certain Section 503A and 503B requirements, noting that "as an executive agency, the FDA has discretion to enforce the law, but the lack of enforcement does not make Imprimis's actions legal." *Id*. The Court also denied Imprimis's request for a stay

under the primary jurisdiction doctrine. *Id*. at 14. "Imprimis contends that the Court should apply the primary jurisdiction doctrine and dismiss or stay Allergan's claims relating to Imprimis's statements about the legality of its business." *Id*. The "primary jurisdiction is inappropriate for four reasons: (1) the FDA's particular expertise is not required; (2) Lanham Act claims are appropriately heard by the courts; (3) some risk of variation is acceptable; and (4) it is unclear when the FDA will complete its rulemaking process, if ever." *Id*. The Court noted that the "Office of Management and Budget has placed the FDA's rulemaking with regards to Section 503A and 503B on an 'Inactive Actions' list." *Id*. at 15.

On January 30, 2018, after the District Court for the District of Columbia entered the stay in *Par* and after this Court issued the order on the motion to dismiss, FDA's Commissioner testified before the Committee on Energy and Commerce's Subcommittee on Health in the U.S. House of Representatives and stated, among other things, that FDA intended to begin issuing proposed determinations about whether certain nominated substances were eligible for the clinical need list by the end of the 2018. *See* Par Dkt. 53; *see also* Allergan RJN, Ex. E (*2018 Compounding Policy Priorities Plan*). On March 23, 2018, FDA issued the draft clinical need guidance. Imprimis RJN, Ex. H. On July 23, 2018, FDA issued a press release announcing that the agency was updating the categories of substances subject to the Interim Policies. *Id*., Ex. K. On September 7, 2018, FDA issued a statement on new steps to help ensure the quality of and preserve access to compounded drugs by pursuing closer collaboration with states. *Id*., Ex. M ("The FDA will make even more progress on the implementation of this plan over the next few months. And we'll soon share new policies relating to insanitary conditions at compounding facilities and a risk-based approach to current good manufacturing practice (CGMP) requirements for outsourcing facilities").

In *Prescribers Choice*, Allergan's twin case also before this Court, the crux of Allergan's lawsuits and FDA's role in implementing the DQSA crystalized. While the Court held that the undisputed facts showed Prescribers Choice made unlawful statements regarding "FDA approval" and held the compounder liable under the Lanham Act, the Court declined to hold the defendants liable under the Sherman Law and UCL so long as the compounder

complied with FDA's interim guidance, especially in light of the agency's ongoing implementation efforts. The Court held:

> "[T]he Court should not ignore the FDA's Interim Policy on compounding bulk drug substances under Section 503B and the guidance it provides for outsourcing facilities like Sincerus. If the FDA is allowing outsourcing facilities to manufacture and distribute drugs during an interim period while the agency determines what clinical needs exist, the Court is hesitant to hold Defendants liable for complying with the FDA's guidance . . . The Court will not hold Sincerus liable as a matter of law for "sell[ing], deliver[ing], or giv[ing] away any new drug" that has not been approved by the California Department of Health Services or FDA if they have complied with the Interim Policy. Cal. Health & Safety Code § 111550(a)–(b). While the Interim Policy does not override statutory obligations, the Court supports the FDA's authority and flexibility as it determines what clinical needs exist. The Court does not wish to set a policy that limits the ability of the FDA to determine whether there is a clinical need for particular drugs while simultaneously allowing the compounding of certain drugs to meet health needs.

*Prescribers Choice* Dkt. 149. The Court's reasoning is in fact consistent with Allergan's own approach in another case addressing the intersection of FDA regulation and private enforcement. As Allergan argued in *Goldsmith v. Allergan, Inc.*, 2011 WL 147714 (C.D. Cal. Jan. 13, 2011), "a private party cannot enforce the FDCA through the UCL." *See* Allergan Reply at 4; Declaration of Daniel Rasmussen ("Rasmussen Decl.") (Dkt. 113-1), Ex. C ("Plaintiff's Complaint is, therefore, an impermissible attempt to privately enforce the FDCA and related regulations. It would require the Court to invade the FDA's exclusive authority to enforce and restrain violations of the FDCA and related regulations—something that the Court has previously, and correctly, declined to do.").

But in *Prescribers Choice*, the Court declined to go so far as to hold that the FDCA bars Allergan's lawsuit under the Sherman Law. Indeed, the Court held Defendants liable under the

Sherman Law and UCL because the undisputed facts proved that Defendants "were making and selling unapproved drugs without complying with Section 503B or the FDA's Interim Policy up until July 2018." *Prescribers Choice* Dkt. 149 at 21. Following the *Prescribers Choice* summary judgment order, the parties settled the case and the Court entered a consent judgment. Allergan and Imprimis then filed the present Motions for summary judgment in this action. As in *Prescribers Choice*, the Court treads carefully in this evolving regulatory landscape that Congress intended to streamline. The Sherman Law remains a valid mechanism for private enforcement of FDCA violations,[9] but the Court must weigh Congressional intent to enable FDA and untangle judicially created complexity.

**B.     Whether Imprimis Violates California's Sherman Law/UCL**

Allergan argues that it is entitled to partial summary judgment because Imprimis violates the California Sherman Law by manufacturing and marketing drugs that have not been approved by the California Department of Health Services or the FDA. Allergan Mot. at 11. Allergan argues that Imprimis does not comply with Section 503A or Section 503B and that its practice of compounding drugs violates the Sherman Law. According to Allergan, the undisputed facts show that Imprimis does not comply with the conditions of either section and "does not even attempt to comply." Allergan Mot. at 11 (citing Akro. Decl., Ex. 2 at 248, 252, 255–56, 259–62). According to Allergan, such conduct is therefore actionable under the UCL as an unlawful business practice. *Id*. Imprimis argues that it is entitled to summary judgment on the UCL claim because Imprimis is in compliance with the FDA's guidance and thus is not acting unlawfully. Imprimis Mot. at 18.

---

[9] The Court denies Imprimis's motion for reconsideration of denial of stay. As discussed *infra*, Imprimis has engaged in clear violations of the Lanham Act and California law. While there is some risk of variation between this Court's decision and FDA enforcement, the Court has largely deferred to the FDA's policies and enforcement discretion. Contemporaneous enforcement of California law is necessary to protect consumers and prevent economic harms. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1356 (Fed. Cir. 2013) ("[T]he California Health Code is not an obstacle to realizing federal objectives. To the contrary, it contains provisions that parallel the FDCA, such that the statutes have consistent goals."). Moreover, Allergan clearly has standing under the UCL. Imprimis has sold drugs without FDA approval and in violation of federal and state law. Cal. Health & Safety Code § 111550 ("[n]o person shall sell, deliver, or give away any new drug" that has not been approved by the California Department of Health Services or FDA); *see also Franz v. Beiersdorf, Inc.*, 745 F. App'x 47, 48 (9th Cir. 2018) ("Plaintiff has standing under [the UCL]. Plaintiff alleges that Defendant sold a 'drug'—Nivea CoQ10—without FDA approval. Plaintiff contends that doing so violates the [FDCA and Sherman Law].").

The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Under the "unlawful" prong, the UCL incorporates other state laws, and violations of those laws are independently actionable. *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000). This includes California's Sherman Law. *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1179 n.13 (2008) (holding that Sherman Law violations may form the basis of a UCL claim). California's Sherman Law provides that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by the California Department of Health Services or FDA. Cal. Health & Safety Code § 111550(a)–(b).

### 1.     Section 503A – 5 Percent Rule

*First*, Allergan argues that Imprimis violates Section 503A's "5 percent rule." According to Allergan, Imprimis does not track what percentage of its 503A sales are interstate despite the requirement that 503A facilities not ship more than five percent of their drugs out of state absent an MOU with the Secretary of each state in which it compounds. *Id*. at 12. Allergan notes that Imprimis on average sells out of state more than 85 percent of the drugs produced at its New Jersey 503A facility and more than 50 percent of the drugs produced at its California 503A facility. *Id*. Allergan points to the testimony of Imprimis's Rule 30(b)(6) designee, who stated that he would not be surprised to learn that as much as 98 percent of sales from its New Jersey 503A facility are made to customers outside of New Jersey. *Id*. at 13 (citing Akro. Decl., Ex. 2 at 248).

Imprimis responds that Allergan is attempting to privately enforce the DQSA under the guise of Section 17200's unlawful prong and adopt positions "contrary to those currently espoused by the FDA." Imprimis Opp'n at 7. Imprimis notes that the FDA in June 2016 announced that it "does not intend to enforce the 5 percent limit on interstate distribution until after FDA has finalized an MOU and made it available to the states for their consideration and signature." Imprimis RJN, Ex. F at 6. The FDA reiterated the same multiple times last year. *Id*., Exs. G, M, N.

According to Allergan, Imprimis cannot rely on FDA's decision not to enforce the 5 percent rule. *Id*. Allergan notes that FDA issued draft MOUs in 2015 and 2018 that would

direct states to "[t]ake action regarding any pharmacy, pharmacist, or physician that distributes inordinate amounts of compounded human drug products interstate" (citing Allergan RJN, Ex. F at 189) and "[n]otify FDA if the State identifies any pharmacy or physician within its jurisdiction that has distributed inordinate amounts of compounded drug products interstate." (citing Allergan RJN, Ex. G at 198). According to Allergan, Section 503A's MOU provision is intended to incentivize states to meet their responsibility to oversee pharmacies, which are largely under the purview of state boards of pharmacy rather than FDA. Allergan Mot. at 13. Moreover, Allergan argues that Imprimis does not even comply with FDA's policy proposals. *Id*. Allergan notes that in its 2015 draft MOU, FDA proposed to define "inordinate amounts" as "greater than 30 percent of the number of units compounded and noncompounded drug products distributed or dispensed both intrastate and interstate . . . during that calendar month." *Id*. (citing RJN Ex. F at 189). And in its 2018 draft MOU, FDA raised the threshold to 50 percent. *Id*. (citing RJN Ex. H at 209); *see also* Declaration of John Taylor ("Taylor Decl.") (Dkt. 110-4), ¶ 37.

The Court begins by noting that the State of California has done exactly what the FDA's Section 503A MOU is intended to incentivize: "[the state's] responsibility to oversee [traditional] pharmacies, which are largely under the purview of state boards of pharmacy." Allergan Mot. at 13. On November 16, 2018, the State of California through the executive officer of the Board of Pharmacy, Department of Consumer Affairs, filed the First Amended Accusation against Imprimis's Irvine-based 503A facility. Akro. Decl., Ex. 28. The First Amended Accusation asserts twenty-one causes for discipline including failure to comply with the FDCA, and seeks a decision (1) revoking or suspending the facility's pharmacy permit, sterile compounding permit, pharmacist licenses; and (2) imposing reasonable costs. Akro. Decl., Ex. 28. Imprimis knew it was "just a matter of time before" the Board of Pharmacy took action against its facility. Akro. Decl., Exs. 88–91.

But the question here is not whether Imprimis should be disciplined by the State Board of Pharmacy for violations of the Health and Safety Code. Allergan asks this Court to hold Imprimis liable under state law for failure to comply with the DQSA's 5 percent rule, despite

the FDA's explicit statements that it will not enforce the regulation pending the execution of MOUs. Under section 503A(b)(3)(B)(ii), an individual or firm in a state that does not enter into an MOU with FDA that distributes, or causes to be distributed, compounded drug products out of the state in which they are compounded, can compound for interstate distribution outside the state only 5 percent of the total prescription orders dispensed or distributed by the individual or firm. But FDA does not intend to enforce the 5 percent limit on interstate distribution until after FDA has finalized an MOU and made it available to the states for their consideration and signature. The Federal Register notice that will announce the availability of the draft MOU will specify a time period during which the MOU will be made available to the states to sign. After this time period expires, FDA intends to begin enforcing the 5 percent limit in states that have not signed the MOU.

Contrary to Allergan's representation, the current draft MOU proposed by the FDA has no limit on the amount of interstate shipments; rather, under the current MOU, shipments in excess of 50 percent only trigger additional reporting requirements. Imprimis RJN, Exs. M, N. Under the FDA's revised draft MOU issued on September 7, 2018, *states* would agree to *identify* compounders that distribute more than 50 percent of their total prescription orders for compounded drugs interstate and *report certain information to FDA about those compounders*. Imprimis RJN, Ex. M. This includes information about the volume of compounded drugs distributed interstate and the number of states in which the compounder is licensed. *Id*. FDA stated that it hopes this information "will assist both the FDA and the states in developing risk-based oversight priorities to have the greatest public health impact." *Id*.

Allergan's attack on Section 503A's 5 percent rule suffers the same flaw this Court addressed in *Prescribers Choice*. Congress passed the DQSA to clarify FDA's enforcement authorities and to ameliorate the complexity created by incongruous judicial decisions. This Court will not muddy FDA's ongoing process of DQSA implementation in contravention of Congressional intent. The California Board of Pharmacy and FDA are currently engaged in such oversight with this specific defendant and is in the process of clarifying its implementation of the DQSA more generally.

## 2. Section 503A – Customization/Individual Prescription

But that does not end the Sherman Law analysis. *Second*, Allergan argues that summary judgment should be granted on the Sherman Law/UCL claim because Congress mandated that "a compounded product [must be] necessary for the identified patient." Allergan Mot. at 14–15 (citing 21 U.S.C. § 353a(a)). Allergan argues that rather than make customized compounded medications, 90% to 95% of Imprimis's ophthalmic drug sales are of standardized (not individualized) formulations that it batch-prepares and maintains as stock in its 503A production facilities. *Id*. at 15 (citing SUF ¶¶ 18–22). Allergan argues that Imprimis uses historical sales data to determine how much of its standardized formulations to make, and it will only customize drugs "from time to time." *Id*. (citing Akro. Decl. Exh. 1 at 198–99). According to Allergan, Imprimis also does not attempt to comply with the individual prescription requirement. *Id*. Allergan argues that Imprimis has encouraged customers to do so by shipping drugs based on "patient" names that Imprimis randomly "picked" from recent orders and by shipping drugs to customers that simply attach a surgery schedule or patient list to a large order without any identification of which, if any, patients supposedly need a compounded product. *Id*. at 15–16.

Imprimis responds that Allergan is mischaracterizing the statute by asserting that a medication must be both "customized" and subject to an individual prescription. Imprimis Opp'n at 11. Defendant argues that there is no requirement that the compounded medicine be "different" for every patient as "sometimes, brand-name drugs do not work for large percentages of the population." *Id*. And Imprimis argues that "receipt of a valid prescription order from a doctor alone is adequate under the statute. Nothing further is required." *Id*. at 12. According to Imprimis, the formulations made at Imprimis's subsidiaries' 503A facilities are always generated pursuant to a valid prescription or statement of medical necessity from a practicing doctor for an identified individual patient. *Id*. at 12. "In other words, each shipment that goes out of the 503A facilities is tied to a valid prescription for an identified individual patient." *Id*.

Under 21 U.S.C. § 353a(a), a drug is exempt from premarket approval requirements if the drug product is "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription

order that a compounded product is necessary for the identified patient, if the drug product meets the requirements of this section, and [listing conditions of the "prescription" requirement]." 21 U.S.C. § 353a(a). The statute also allows a drug to be exempt from premarket approval requirements if it is compounded "in limited quantities before the receipt of a valid prescription order for such individual patient," if done so "based on a history of . . . receiving valid prescription orders for the compounding of the drug product . . . within an established relationship[.]" 21 U.S.C. § 353a(a)(2).  Under the plain language of the statute, anticipatory mass compounding of standardized drugs in a 503A facility without identified individual patients based on valid prescription orders is clearly violative of the FDCA. Such compounded drugs are neither approved by the FDA nor exempt under the FDCA carveouts; and Imprimis does not adequately address whether it is protected by any interim FDA guidelines on customization or prescription requirements.[10] True, there is no requirement that the 503A compounded drugs be different for every patient; there may well be common allergies to FDA-approved drugs that require large productions of 503A compounded drugs. But that reality does not eliminate the requirement that 503A facilities customize drugs for identified individual patients.[11]

Imprimis prepares standardized as well as customized formulations in its 503A compounding pharmacies. SUF ¶ 18; Akro. Decl., Ex. 1[12] at 63–64.[13]  The standardized formulations include Dropless, LessDrops, Simple Drops, and Total Tears formulations. *Id* ¶ 20. Imprimis bases anticipatory compounding needs in part on historical sales data. Akro Decl., Ex.

---

[10] The parties have not adequately addressed compliance with FDA guidance on the prescription or customization requirements. FDA appears to have set forth its policy on anticipatory compounding under Section 503A including a 30-day supply limit of a particular compounded drug to fill valid prescriptions not yet received. *See Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry*. Consistent with this Court's approach throughout its Section 503A and 503B analyses, injunctive relief will be limited to noncompliance with such policies.

[11] As noted during oral argument, this requirement also distinguishes compounding under 503A from compounding by an outsourcing facility under Section 503B, which states that an outsourcing facility may or may not obtain prescriptions for identified individual patients and is subject to more oversight and conditions. Imprimis acknowledged that such bulk production could be pursued under 503B.

[12] Both Akro. Decl., Ex. 1 and Rasmussen Decl., Ex. D are selections from the deposition transcript of Andrew R. Boll, Imprimis's 30(b)(6) witness.

[13] "Q: In its 503A pharmacies, does Imprimis only prepare a formulation upon receipt of a prescription, or does it prepare formulations in advance and then dispense them upon receipt of a prescription? A. They will do both. Q: So if you need to customize something, you would make it after you get the order for it. But as far as the standardized formulations, those you maintain stock of? A: Correct."

1 at 64. And batch-prepared formulations comprise 90 to 95 percent of Imprimis's ophthalmic drug sales. SUF ¶ 22. The parties dispute whether the formulations at the 503A facilities are generated pursuant to valid prescriptions from a practicing doctor for an identified individual patient. SGD ¶ 21; Rasmussen Decl., Ex. D at 78 ("Q: How is it that Imprimis complies with the individual prescription requirement of Section 503A? A: We receive a prescription prior to dispensing any products out of our 503 pharmacies."); Akro. Decl., Ex. 1 at 71 ("Q: [D]oes Imprimis distribute formulations to healthcare providers or patients from its 503A facilities in advance of receiving a prescription for an identified patient? A: Not that I know of."). According to Imprimis, "each shipment that goes out of the 503A facilities is tied to a valid prescription for an identified individual patient." Opp'n at 12 (citing Rasmussen Decl., Ex. E). But this dispute is not genuine. Imprimis has not matched orders with specific patients and customized prescriptions. One e-mail reflects intent to "pick 3 names" in order to ship Tri-Moxi, which Imprimis's Chief Commercial Officer admitted is contrary to how 503A is supposed to work. SUF ¶ 26; Akro. Decl., Ex. 5 at 458 ("Q: That's actually not how Section 503A works, right? A: Yes, not how it works."). And Imprimis has allowed customers to provide a surgery schedule or list of patients to obtain drug orders from the 503A facility. Akro Decl., Ex. 37 at 1173[14] ("because we are a 503A facility, you must attach patient information . . . Most accounts just attach their working Surgery Schedule or patient list with each order."). Imprimis can distribute compounded drugs under section 503A only pursuant to a valid patient-specific prescription. The uncontroverted facts show that Imprimis's 503A facilities have violated the customization and individual prescription requirements, and such drugs are therefore unapproved in violation of the Sherman Law.

### 3.    Section 503A – Bulk Substance Requirement

**Third**, Allergan argues that from at least December 2015 until September 2018, Imprimis used the bulk drug substance artesunate in violation of 503A. Imprimis concedes that it failed to comply with Section 503A in the past by using bulk artesunate. SUF ¶ 31. Imprimis continued to prepare drugs using artesunate until it received a letter from FDA dated September

---

[14] Imprimis objects to this evidence for lack of authentication of its own document under Federal Rule of Evidence 901. The Court overrules this objection at this stage; Imprimis may renew its objection at trial.

25, 2018 that states, "Drug products compounded using artesunate are not eligible for the

exemptions provided by section 503A(a), because this bulk drug substance is not the subject of

applicable USP or NF monograph, is not a component of an FDA-approved human drug, and

does not appear on the 503A bulks list." *Id*. ¶ 32. Imprimis states that it will "stipulate that it

will not use artesunate in the future (absent a statement from the FDA regarding the necessity

or propriety of such use)." Imprimis Opp'n at 12.  But such a concession in its papers is not

sufficient. Imprimis has affronted the Sherman Law by selling unapproved drugs with bulk

artesunate.

### 4.      Section 503B

The parties are familiar with this Court's views on Section 503B as set forth in

*Prescribers Choice*. And as discussed *supra*, the FDA is currently implementing the DQSA as it

develops the clinical needs list and other policies. As in *Prescribers Choice*, the Court narrows

the question to whether Imprimis is using or has used bulk substances not on the Interim

Category 1 list. In February 2017, Defendant began using bulk gatifloxacin and bulk nepafenac

in drugs it produced and dispensed from its 503B registered outsourcing facility. SUF ¶ 38.

Gatifloxacin has never been on the FDA's Category 1 Bulk Drug Substances List for 503B. *Id*. ¶

39. Nepafenac was not added to the FDA's Category 1 Bulk Drug Substances List for 503B

until July 23, 2018. *Id*. ¶ 41. Imprimis argues that it is phasing out of gatifloxacin and will not be

compounding the substance by the time of trial. SGD ¶ 40. Maybe so. But again, such a

statement is not sufficient. Imprimis has violated the Sherman Law by selling unapproved drugs

with bulk gatifloxacin and nepafenac.

### 5.      Damages

The parties agree that restitution is the "only monetary remedy available under" the UCL.

Allergan Opp'n at 13. The parties dispute whether Allergan is entitled to restitutionary

disgorgement of Imprimis's profits. *Id*.

As the California Supreme Court has explained, "While the scope of conduct covered by

the UCL is broad, its remedies are limited." *Korea Supply Co. v. Lockheed Martin Corp*., 29

Cal. 4th 1134, 1144 (2003). The UCL makes specific relief available: "Any person who

engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.  Cal. Bus. & Prof. Code § 17203. Accordingly, damages are not available under the UCL, only injunctive relief and restitution. *Korea Supply Co*., 29 Cal. 4th at 1144 ("We have stated that under the UCL, '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.'"). Because "[t]he object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest," restitution recoveries are limited only to returning money or property once in the possession of the plaintiff, or in which the plaintiff had a vested interest. *Id*. at 1149. "Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." *Id*. at 1151 (quoting *MAI Systems Corp. v. UIPS*, 856 F.Supp. 538, 542 (N.D. Cal. 1994)).

Allergan argues that in cases like this one involving competitors, courts in this Circuit have held that "lost market shares constitute the loss of a vested interest for purposes of UCL claims, so that restitutionary relief remains available." Allergan Opp'n at 13 (citing *POM Wonderful LLC v. Coca Cola Co.*, No. CV 08-06237 SJO FMOX, 2009 WL 6254619, at *3 (C.D. Cal. Sept. 15, 2009)). This Court declines to follow the reasoning in *POM Wonderful*. The profits obtained by Imprimis come from third parties rather than from Allergan. They were never in Allergan's possession. The relief Allergan requests is essentially damages, not the return of money in which it has an identifiable vested property interest. *See SkinMedica, Inc. v. Histogen Inc*., 869 F. Supp. 2d 1176, 1186 (S.D. Cal. 2012) ("[P]arties cannot simply restyle speculative damages claims as "restitution" for sales they might have made, or value their business might have lost or gained, in order to obtain relief under section 17200. To allow Histogen to recover for these contingent values would be to allow the UCL to function as an all-purpose substitute for a tort or contract action, something the legislature never intended.")

(internal quotations omitted). Allergan's relief under the UCL is therefore limited to injunctive relief consistent with this Order.

**B.      Lanham Act**

Allergan next moves for partial summary judgment on its claim for false advertisement under the Lanham Act.

As a preliminary matter, Imprimis argues that Allergan's Lanham Act claim may not be premised on alleged false statements not particularly pled in the complaint. Imprimis Opp'n at 15. Imprimis argues that while Allergan claims to have identified during discovery other allegedly false statements, Allergan never amended the Complaint and therefore such allegations should not be considered. *Id*. This approach falls flat. Allergan quoted specific advertisements "by way of example only" to illustrate the sorts of false advertising described elsewhere in the complaint. Compl. ¶ 110. Imprimis received notice, the evidence is in, and the Court will address the statements made.

To state a claim for false advertising under the Lanham Act, a plaintiff must allege that: (1) the defendant made a false statement of fact in a commercial advertisement; (2) the statement actually deceives or has the tendency to deceive its audience; (3) the deception is material; (4) the defendant entered its false statement into interstate commerce; and (5) the plaintiff has or is likely to be injured as a result. *Southland Sod Farms v. Stover Steed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *see also Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008). Where a promotional claim is literally false, consumer confusion is presumed and need not be demonstrated. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040–41 (9th Cir. 1986).

**1.      False Statements in Commercial Promotion**

According to Allergan, Imprimis's false claims fall into four main categories, including statements (1) that FDA has found its drugs to be safe and effective and that they are tested for safety and effectiveness; (2) that its drugs use FDA-approved "components" and "ingredients"; (3) that it complies with the requirements of Section 503B; and (4) that tout the supposed superiority of its products, including that Dropless Therapy is more effective in treating

infection and inflammation following intraocular surgery than topical medications and that 95%
of cataract surgeons prefer Dropless Therapy. Allergan Mot. at 21. Allergan argues that the first
three categories of statements are all literally false because (1) FDA has never found Imprimis's
drugs to be safe and effective and Imprimis does not subject its drugs to clinical trials that could
support such a finding by FDA; (2) FDA does not approve drug "components" or "ingredients";
and (3) Imprimis does not comply with Section 503B. *Id.*

**FDA-approved ingredients.** Defendant promoted its business and its products by
claiming its pharmacies "only use FDA-approved ingredients." SUF ¶ 77. In a "Note from the
CEO" provided as part of a product catalog, Imprimis advertises that it is "Setting the Standard
in Commitment to Quality" such that "All ImprimisRx Pharmacies are FDA inspected and only
use FDA-approved ingredients." Akro. Decl., Ex. 47 at 1604. Imprimis also stated that its
Cyclosporine-based formulations are "made from FDA-approved drug components." Akro.
Decl., Ex. 12 at 842; *see also* SUF ¶ 81 (listing exhibits). These statements are literally false.
FDA does not approve individual "ingredients" or "components" of drugs. SUF ¶ 76; Akro.
Decl., Ex. 5 at 437.

**FDA, safe and effective.** Defendant also stated to a potential customer in Kansas that "In
simpler terms, FDA found our products and services to be safe and effective." Akro. Decl., Ex.
59 at 1748; *see also* Akro. Decl., Ex. 61 at 1756–57; Ex. 62 at 1778. Such statements are
literally false. The undisputed evidence shows that Imprimis does not subject its drugs to the
FDA approval process that would support such a finding.

**Requirements of 503B.** Several of Defendant's promotional materials stated that
Defendant "Meets requirements under Section 503B of the FD&C Act." SUF ¶ 104. For the
reasons already stated, this is literally false. Imprimis has a 503B facility and can describe itself
as such, but it concedes it does not meet the requirements of 503B by selling certain bulk drugs.
Such statements of meeting the requirements of the law are literally false.

**Superiority.** Defendant posted a video featuring Dr. Jim Lewis on its Go Dropless
website that included the statement, "The patient is protected from infection and inflammation
even more effectively than can be achieved with expensive, inconvenient and irritating topical

medications." SUF ¶ 112. The video remained on Defendant's website for approximately 3.5 years. *Id*. ¶ 113. Defendant also issued a press release on June 24, 2014 announcing "Imprimis Pharmaceuticals Go Dropless™ Video Interview Survey Reveals 95% of Leading Cataract Surgeons Surveyed Would Prefer Dropless Therapy." *Id*. ¶ 116. Imprimis does not have the specific questions survey participants were asked but understands survey participants were asked "Would you prefer your patients not to have to take topical eye drops following an ocular surgery." *Id*. ¶ 121. No specific formulation—such as Defendant's Dropless Therapy injectables—was identified in the survey. *Id*. ¶ 122. When the survey was conducted in April 2014, Defendant "probably had less than ten customers" for its injectable Tri-Moxi Dropless formulations. *Id*. ¶ 123. Of the 21 surgeons surveyed, only "a handful" had used Defendant's injectable Tri-Moxi Dropless formulation. *Id*. ¶ 124.

Defendant's June 24, 2014 press release was sent to "All Employees" of Imprimis. *Id*. ¶ 118. Defendant's regional business director, Bindu Manne, emailed Defendant's June 24, 2014 press release to customers or potential customers. *Id*. ¶ 119. On October 26, 2015 (i.e., 16 months after the survey was conducted), Defendant issued a press release that provides: "At a recent major ophthalmology conference, 95% of cataract surgeons surveyed commented they would prefer Dropless Therapy™ compared to the current standard of care eye drop regimen." *Id*. ¶ 126. Defendant's October 26, 2015 press release does not disclose that the "95% of cataract surgeons" statistic is based on a survey of only 21 cataract surgeons. *Id*. ¶ 128. Defendant's October 26, 2015 press release was emailed to "All Employees" of Imprimis. *Id*. ¶ 129. Defendant's Dropless Therapy patient brochure as of February 2016 (i.e., 20 months after Defendant's "survey") read: "A growing number of eye care physicians understand the value of Dropless. In a recent survey, 95% of cataract surgeons prefer Dropless Therapy for their practices and their patients." *Id*. ¶ 131.

To prove that an advertisement claim based on product testing is literally false, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." *Southland*, 108 F.3d at 1139. Rather, the plaintiff must demonstrate that such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they

established' the claim made. *Id*. (citations omitted). A plaintiff may meet this burden by attacking the validity of the defendant's tests directly. *Id*.

Allergan argues that the statements about the 95% survey are literally false because the survey did not ask surgeons to compare Imprimis's drug to any other drug; that 21 surgeons is not a sufficiently reliable survey to support the claim; and Imprimis failed to inform patients that the drugs are not FDA-approved. Allergan Mot. at 22–23. Imprimis responds that the standard method of sustaining Allergan's burden on falsity is to rely upon admissible expert testimony, which Allergan has not put forth. Imprimis Opp'n at 22. And Imprimis argues that objections based on flaws with a survey should be left to the jury. *Id*.

The Court does not require expert testimony to address the survey. No reasonable jury could determine the survey was sufficiently reliable to conclude with reasonable certainty that 95% of cataract surgeons surveyed prefer Dropless Therapy. Those surveyed were not even asked about Dropless Therapy with a capital D and a capital T. Akro. Decl., Ex. 1 at 164 ("Q: Were the cataract surgeons asked about Imprimis's Dropless Therapy product or about the concept of a dropless therapy . . . In other words, were they asked about Dropless Therapy, capital D, capital T, or the concept of a dropless therapy[?] A: I don't think there was a specific formulation identified in the survey."). Such statements are literally false under *Southland*.

Imprimis is also not immune from liability with regards to the Dr. Lewis video. Dr. Lewis's statement that "the patient is protected from infection and inflammation even more effectively than can be achieved with expensive, inconvenient, and irritating topical medications" is not merely a professional opinion; it is a promotional statement published by the company, and Dr. Lewis appears to have been a consultant paid by Imprimis to speak with ophthalmologists and investors. Akro. Decl., Ex. 199. Imprimis's witnesses state they know of no basis for this claim that the drugs can protect a patient from infection and inflammation "even more effectively" than other topical medications. SUF ¶ 115.

## 2.    Material Deception

An advertisement that is not literally false may support a Lanham Act claim only if it is shown "that the advertisement has misled, confused, or deceived the consuming public."

*Southland Sod*, 108 F.3d at 1140. Deliberately false comparative claims give rise to a rebuttable presumption of actual deception. *Id*. at 1146.  Because the statements discussed above are literally false, there is a rebuttable presumption of actual deception. Regardless, the uncontroverted facts also establish that the statements were material. Some of the false commercial promotions were even made in direct follow-up to consumer questions about quality and FDA compliance. *See* SUF ¶¶ 88, 91–101.

### 3.    Whether Allergan Suffered Harm

Here, Imprimis moves for summary judgment arguing that Allergan cannot recover monetary relief under the Lanham Act as a matter of law. Imprimis Mot. at 15. According to Imprimis, Allergan lacks evidence from which a reasonable juror could find that the false advertisements had any effect in the marketplace. *Id*. at 16. Imprimis argues that Allergan has no direct testimony from a consumer who was deceived and therefore purchased from Imprimis instead of Allergan or evidence that the sales trends of its products indicate harm caused by Imprimis's allegedly false advertisements. *Id*. at 16–17.

The Court reserves this issue for trial. The undisputed facts show that Imprimis and Allergan sell prescription drugs for post-cataract surgery. The extent of the harm suffered by Allergan as a result of Imprimis's unlawful conduct will be determined by the jury.

## V.    Disposition

For the reasons explained above, the Court GRANTS IN PART Defendant's motion for partial summary judgment as to UCL damages and DENIES Defendant's motion for reconsideration.

The Court GRANTS IN PART Allergan's motion for partial summary judgment as to liability under the Sherman Law/UCL claims.

1        The Court GRANTS IN PART Allergan's motion for partial summary judgment as to

2   liability under the Lanham Act.

3

4   DATED:  March 27, 2019

5                                                                          *David O. Carter*

6                                                                    DAVID O. CARTER
                                                            UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28