Daniel L. Rasmussen (State Bar No. 120276)
dlr@paynefears.com
PAYNE & FEARS LLP
Attorneys at Law
4 Park Plaza, Suite 1100
Irvine, California 92614
Telephone: (949) 851-1100
Facsimile: (949) 851-1212

Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Carl Alan Roth (State Bar No. 151517)
  croth@bgrfirm.com
BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Defendant
Imprimis Pharmaceuticals, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| ALLERGAN USA, INC., | Case No. 8:17-cv-01551-DOC-JDE |
|---|---|
| Plaintiff, | **NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 4 OF DEFENDANT IMPRIMIS PHARMACEUTICALS, INC. TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D** |
| vs. | |
| IMPRIMIS PHARMACEUTICALS, INC., | |
| Defendant. | Judge: Hon. David O. Carter<br>Date: May 9, 2019<br>Time: 8:30 am<br>Crtrm.: 9D<br><br>Final Pretrial Conference:<br>    May 9, 2019, 8:30 a.m.<br>Trial Date:<br>    May 14, 2019, 8:30 a.m.<br>Complaint Filed:<br>    September 7, 2017 |

1237253.16

Case No. 8:17-cv-01551-DOC-JDE

NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 4 OF DEFENDANT IMPRIMIS PHARMACEUTICALS, INC. TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that at the Pretrial Conference on May 9, 2019 at 8:30 a.m., or as soon thereafter as may be heard in Courtroom 9D of the United States District Court, Central District of California-Southern Division, Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701, Imprimis Pharmaceuticals, Inc., will and hereby does move this Court, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the report and testimony of Jeffery A. Stec, Ph.D, the expert of Plaintiff Allergan USA, Inc., on the grounds that the opinions are fatally flawed and unreliable (the "Motion").

This Motion is made after the conference of counsel required by Local Rule 7-3, which took place on April 19, 2019, but was unable to resolve the issues raised by this Motion.

This Motion is based on the accompanying Memorandum of Points and Authorities, the supporting Declaration of David D. Kim, the papers and records on file herein, and on such oral and documentary evidence as may be presented at or before the hearing on this Motion.

Dated:  April 26, 2019

PAYNE & FEARS LLP
Attorneys at Law
   Daniel L. Rasmussen

BROWNE GEORGE ROSS LLP
   Keith J. Wesley
   Carl Alan Roth

By:   _____*/s/  Keith J. Wesley*_____

Attorneys for Defendant
Imprimis Pharmaceuticals, Inc.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Allergan seeks damages from three categories of false Imprimis advertisements under the Lanham Act. Allergan's damages expert, Jeffery A. Stec, does not offer an opinion as to whether or to what extent any of those ads harmed it. Instead, Stec assumes, without any evidence or analysis, that Imprimis would not have made a single sale – not one compounded drug – but for the false ads; he then allocates Imprimis's sales to Allergan based on market share statistics. In doing so, Stec concedes that he has made no effort to "disentangle" the damages caused by conduct as to which monetary relief is available from damages caused by conduct as to which monetary relief is not available; much less disaggregating damages associated with conduct that may be perfectly legal. Stec's error arises from a faulty assumption: Imprimis's entire business model is on trial, Stec believes, thus every sale is illegitimate.

Stec has it wrong: Imprimis's business model is not on trial. Rather, the focus at trial will be limited to three specific categories of false ads, and the damages they caused to Allergan, if any. Plainly then, Stec's opinion is not "a model purporting to serve as evidence of damages . . . measur[ing] only those damages attributable" to a Allergan's liability theory. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985). Hence, Allergan has not and cannot meet its burden to establish that Stec's opinion satisfies the test for expert opinion under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590–91 (1993).[1]

---

[1] This Court has emphasized that the party offering expert testimony bears the burden of proving that Rule 702 and *Daubert* are satisfied. *See Colony Holdings, Inc. v. Texaco Refining And Marketing, Inc.*, 2001 WL 1398403,*3 (C.D. Cal. Oct. 29, 2001) (J. Carter); *DCS Marketing, Inc. v. Homer Laughlin China Co.*, 2009 WL 10674051, *3 (C. D. Cal. Nov. 5, 2009) (J. Carter); *see also Lust v. Merrell Dow*

## II. ARGUMENT

### A. Allergan Must Disaggregate Its Damages

This Court has made clear that expert testimony is admissible only if it is reliable and if it will assist the trier of fact to understand the evidence or to determine a fact in issue. *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, *21 (C.D. Cal. June 8, 2015) (J. Carter) (excluding plaintiff's lost profits opinion in Lanham Act case); *see also Daubert*, 509 U.S. at 590–91.[2]

To meet its "gatekeeping" duties under Rule 702, the district court must make a preliminary determination that the expert's testimony is reliable. *United States v. Slocum*, 2007 WL 5673959, *1 (C.D. Cal. Feb. 6, 2007) (J. Carter); *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). In performing these duties, courts analyze, in particular, whether "a model purporting to serve as evidence of damages . . . measure[s] only those damages attributable" to a party's liability theory. *Comcast*, 133 S. Ct. at 1433; *see also Farley*, 786 F.2d at 1352 (plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate reacquires reversal of the verdict and remand for a new trial on the amount of damages); *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1372-73 (9th Cir. 1992) (affirming summary judgment for defendant because plaintiff lacked evidence of damages due to their expert's failure to disaggregate lost profits

---

*Pharm*, 89 F.3d 594, 598 (9th Cir. 1996).

[2] To guide district courts in ensuring that expert testimony is reliable, *Daubert* sets forth the following four factors: (1) whether the theory or technique that serves as the basis for the proposed expert testimony can be or has been tested; (2) whether the theory or technique has been published and subjected to peer review; (3) the known or potential rate of error experienced in the application of the particular technique; and (4) whether the theory or technique is generally accepted in a defined relevant community of experts. *Daubert*, 509 U.S. at 593-94.

damages between different alleged antitrust liability theories); *Magnetar Tech. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (plaintiffs "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award").[3]

*Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292 (4th Cir. 2017) is illustrative. There, defendant XYZ operated a business that sold ".xyz" domains. Plaintiff Verisign, which sold ".com" and ".net" domains, claimed that XYZ made a series of statements promoting the popularity of the .xyz domains and the scarcity of remaining .com and .net domains. *Id.* at 295. Verisign claimed that its sales had been diverted to XYZ due to the allegedly false statements. Verisign's expert used the following methodology to establish and calculate damages:

> [S]he began by identifying a decline in registrations on the .net domain between June 2014 and May 2015 – the time period during which XYZ made the allegedly false statements at issue. She then attributed to XYZ a percentage of those lost registrations, based on .xyz's market share of the new top-level domain market. Multiplying that percentage by what would have been Verisign's profits on the lost registrations, she arrived at her figure for lost profits.

*Id.* at 300.

The Court of Appeals affirmed the exclusion of Verisign's expert on the issue of damages. *Id.* at 300-01. The Court of Appeals explained why the damage methodology fails as a matter of law:

> That analysis suffers from what we have identified as a 'fatal flaw' in calculating Lanham Act damages: *It assumes rather than demonstrates that every .xyz registration during the relevant time period was the result of XYZ's allegedly false statements.* . . . Kindler's report does show that Verisign experienced a drop in .net registrations after .xyz—along with other new top-level domains—

---

[3] *See also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118 (C.D. Cal. 2015) ("damages calculation methodology fails under *Comcast Corp.*, because it does not measure the damages recoverable on plaintiffs' legal theory."); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (court rejected plaintiff's damages estimates because they did not establish any variation in the outcome depending on which acts of [the Defendant] were held to be legal).

> became available, and while XYZ was making the statements of which Verisign complains. What it does not show, however, is anything other than a temporal link between XYZ's statements and the drop-off in .net registrations. And that is not enough under the Lanham Act, where the plaintiff bears the burden of proving a causal link between actual damages and the defendant's actions.

*Id.* at 301 (emphasis added).

Similarly, in *Dependable Sales and Service, Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653 (S.D.N.Y. 2018), plaintiffs were automobile dealerships, and defendant was a website (TrueCar) that allegedly "promised consumers a 'no-haggle,' no-negotiation car buying experience, thus diverting business from the plaintiff dealers to TrueCar-affiliated dealers." *Id.* at 656. Plaintiffs posited, based on their damage expert, that all 48,104 purchases made through TrueCar, rather than a plaintiff-dealer in the area, were motivated by the allegedly false advertisements. *Id.* at 659. The court rejected the plaintiffs' theory, holding that their expert's analysis "suffers from the fundamental problem that he fails to support his conclusion that 100% of sales effectuated through TrueCar were motivated by the allegedly false 'no haggle' claim." *Id.* at 660. The court emphasized that plaintiffs' expert "did not account for the possibility that a consumer might have been influenced by external considerations in deciding to purchase from a TrueCar-affiliated dealer, such as their past interactions with that dealership or the plaintiff dealership, personal recommendations, or non-TrueCar promotions." *Id.* The court also rejected plaintiffs' assertion that their expert could simply rely on an "unsupported conclusion that the 'no-haggle' claim was a 'magic bullet' in enticing consumers to use TrueCar's services." *Id.* at 662.

### B. Dr. Stec Failed To Disaggregate Damages

Stec's opinion should be excluded because – as he admits – he made no attempt whatsoever to attribute the damage calculations he performed to Imprimis's alleged wrongdoing, *i.e.*, there is no demonstrated connection between the false ads and Stec's damages opinion.

Stec understands the hurdle he must leap: a "preliminary step" in the determination of lost profits, he opines, is "to establish a nexus between the alleged wrongful conduct and lost sales." (Dkt. 116-4, Exh. 5, Am. Expert Report of Jeffery A. Stec, Ph.D., January 2, 2019 ("Stec Report") at 27.)  But then Stec does not even to try to jump over the bar:  the alleged wrongful conduct, he assumes, is the "Imprimis business model" – not any single or group of false ads.  "Thus," he continues, "*I have been asked to assume that absent the alleged wrongful conduct, Imprimis would not have made any of the sales it did*." (*Id.* (emphasis added).)  In short, Stec seeks damages for Allergan based on Imprimis's decision to open its doors.

Allergan's Memorandum of Contentions of Fact and Law confirms as much.  Allergan argues that the jury should be instructed as to the Court's ruling that Imprimis violated California's Unfair Competition Law ("UCL") with respect to its compounding practices – but, notably, not inclusive of its advertising practices – because it somehow "provide[s] some of the foundation for Allergan's Lanham Act damages methodology and calculation." (Dkt. 140, 12:2–4.)  However, as addressed in greater detail in Imprimis's Motion *in Limine* No. 8, the Court's UCL ruling is entirely irrelevant to the remaining issues in this case – namely whether or not Imprimis's false advertising convinced medical professionals to purchase its products instead of Allergan's, and, if so, the extent of Allergan's damages.

In other words, the actual state of Imprimis's compliance with the compounding laws – the subject of the Court's UCL ruling – has no bearing on whether or not relevant purchasers were impacted by Imprimis's ad statements regarding the same.  There is no nexus between Imprimis's false ads and Allergan's Lanham Act damages.  Stec's erroneous assumption that a nexus exists, and his failure to disaggregate those damages in his calculations, renders his methodology fatally flawed.

Given Stec's flawed assumption, it is not surprising that, in his words, he is

unable to "disentangle" damages arising from any of the false ads from the basic operation of Imprimis's business. When asked at deposition if he could disaggregate the damages from false ads and the overall Imprimis business model, Stec admitted he could not:

> A. It's not clear to me. As I mentioned a moment ago, there is this intertwining of the unfair competition with the false statements because I think what Allergan's allegations are anyway, is that the false statements are false at least in part because of the unfair competition or the illegal compounding. And so it's not clear to me that the question that you're asking there could be disentangled like that.
>
> Q. Okay. At least you have not disentangled it; is that right?
>
> A. I have not been asked to as I sit here right now.

(Declaration of David D. Kim in Support of Defendant Imprimis Pharmaceuticals, Inc.'s Motions *in Limine* Nos. 4 and 6 ("Kim Decl.") ¶ 2, Exh. A at 203:17–204:6.)

As the Court has held, Allergan cannot seek monetary relief for unfair competition or "illegal compounding" – whatever that means. (Dkt. 138, MSJ Order at 23–25.) Hence, Stec effectively concedes that he has made no effort to "disentangle" the harm caused by action as to which monetary relief is available from conduct as to which monetary relief is not available. And, of course, Stec has made no effort to pull out from his damages calculations sales made by Imprimis without the benefit of any illegal conduct.

So as to emphasize the point, Stec made plain that neither he – nor anyone else on behalf of Allergan – had evaluated the harm caused by any of Imprimis's alleged false ads. Here is Stec's testimony:

> Q. Okay. I want to take a look at pages 1 and 2. Did you -- there is the ten statements on pages 1 and 2. I am going to go over those ten statements. Starting with statement 1, did you do anything to analyze the statement, quote, that "Imprimis operates under the regulatory framework of the Drug Quality & Security Act (2013) and state pharmacy laws"?
> …
> WITNESS: I was not asked to analyze the impact of that particular statement.
> …

Q.     Statement 2, quote, "ORDER NOW order. . .LessDrops from 503B Outsourcing Facility today. No patient information required." Did you analyze in the course of your work in this case the accuracy of that statement?

…

THE WITNESS: I was not asked to analyze the impact of that particular statement.

Q.     Statement No. 3: "The patient is protected from infection and inflammation even more effectively than can be achieved with expensive, inconvenient, and irritating topical medications." Do you see that?

…

THE WITNESS: In the context of this case, I wasn't asked to address the impact of that statement.

Q.     Statement No. 4, quote, "95 percent of cataract surgeons surveyed prefer DropLess Therapy," closed quote.
Did you analyze the accuracy of that statement, sir?

THE WITNESS: I was not asked to look at the impact of that particular statement.

…

Q.     All right. Statement 5: LessDrops compounded formulations combine FDA-approved components into one low cost eye drop that alleviates patient confusion and may increase patient compliance," closed quote.
Do you see that?

…

THE WITNESS: I wasn't asked to look at the impact of that particular statement.

Q.     Statement 6: "Compounded with FDA-approved drug components." Do you see that statement?

A.     I was not asked to address that statement with respect to that.

Q.     Statement 7: "The individual components (triamcinolone" –

…

Q.     Have you analyzed the impact of that statement on any medical professional during the course of your work in this case?

THE WITNESS: I was not asked to address the impact.

Q.     Statement 8: "Meets requirements under Section 503B of the FD&C Act." Do you see that?

…

Q.     Did you analyze the impact of that statement on any medical

1237253.16

-9-   Case No. 8:17-cv-01551-DOC-JDE

NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 4 OF DEFENDANT IMPRIMIS PHARMACEUTICALS, INC. TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D

professionals during the course of your work on this case?

A.  I was not asked to address the impact of that statement.

Q.  Statement 9:  As a small but rapidly growing company, we are forced to be nimble and responsive to our customer's needs by delivering safe, effective, and affordable medications."
Do you see that?

…

Q.  Did you analyze the impact of that statement on any medical professional during the course of your work in this matter?

THE WITNESS: I was not asked to address the impact of that statement.

Q.  Statement 10: "In other words, FDA found our products and services to be safe and effective, and there is no systemic failure within our organization." Do you see that?

…

THE WITNESS: I was not asked to address the impact of that statement.

Q.  With respect to each of these ten statements, were you aware whether any other person on behalf of Allergan analyzed their impact on any medical professional during the course of this case?

A.  As I sit here, I am not aware of any.

(Kim Decl. ¶ 2, Exh. A at 180:11–188:20.)

Notably, Stec is fully capable of offering an opinion that bears on whether the target audience for Imprimis's advertising – medical professionals – were influenced by the ads in their prescribing decisions.  Indeed, Stec is an expert in the use of surveys in false advertising cases, having offered and critiqued such surveys in prior case.  For example, Stec testified that he "addressed survey-related issues as well as damages-related issues" in the *ADT Security Services* case listed on page 3, Exhibit 2 to the Stec Report.  (Dkt. 110-3, Exh. 2 at 3; Kim Decl. ¶ 2, Exh. A at 52:2–24.)  He also proffered a survey in a "false statements" case called *Rimini v. Oracle* listed on page 6, Exhibit 2 to the Stec Report.  (Dkt. 110-3, Exh. 2 at 6; Kim Decl. ¶ 2, Exh. A at 66:6–18.)  In fact, Stec authored a chapter in SURVEY RESEARCH IN LITIGATION, which details the value in using surveys to test consumer impact:

Evidence pertaining to economic agents' opinions, perceptions,

preferences, or actual (or likely) reported actions is often unreliable or unavailable. Survey evidence derived from interviews of members of the target population can provide reliable evidence on which to base an expert opinion.

Even when the expert has data that reveal apparent preferences (i.e., data that represent actual business transactions), these data sometimes lack the specificity to address the relevant legal or damages issues. For example, in a patent infringement case, the financial expert could know the number of infringing sales made by the defendant but have little information on why customers purchased the infringing product. A well-constructed survey can inform the financial or economic expert on whether these customers purchased the infringing products because they had the patented feature or for some other reason.

(Kim Decl. ¶ 2, Exh A at 139:24–140:11; Kim Decl. ¶ 3, Exh. B at 7.)

Alas, Stec "was not asked" to conduct a survey, so he did not "analyze whether or not a survey was appropriate in this case." (Kim Decl. ¶ 2, Exh. A at 65:20–22.) Had Stec done so, or used some other method to evaluate the impact of Imprimis's false ads on buying decisions made by the target audience, he could have accounted for a variety of factors bearing on the damages analysis. For instance, Stec could have sought to account for the following:

- Were any medical professionals motivated exclusively by medical considerations and not Imprimis's advertising?;

- Were any of Imprimis's sales attributable to factors other than the Challenged Statements (as the Keegan survey proves was actually the case)?;

- Were any of the Challenged Statements taken down and thus would no longer affect purchaser behavior?;

- Did Imprimis's sales drop when the Challenged Statements were taken down, and did Allergan's sales rise correspondingly?;

- Did some purchasers not even see the Challenged Statements – like the vast majority of purchasers surveyed by Mr. Keegan, (Dkt. 113-13, Ex. B at 22–26 (only a little over half ever reviewed Imprimis's website or marketing materials and far less actually saw the Challenged Statements)) – and thus did not have an opportunity to have been influenced by the allegedly false advertisements?;

- What percentage of patients using Imprimis products could never have effectively used Allergan products at all (which is why they were provided an Imprimis alternative in the first place) and thus *could not*

have replaced an Imprimis prescription with an Allergan alternative?;

- Are there some patients who are uninsured and thus could never afford the retail price of Allergan drugs, yet could afford the retail price of Imprimis alternatives?; or

- How did the entire market fare during the period in question – *i.e.*, whether Allergan's trends were consistent with or departed from the overall market trends?

Because Stec fails to attribute damages to any or even all of Imprimis's false ads. or to account a handful of potential alternative factors, Allergan cannot meet its burden to show that Rule 702 and *Daubert* tests have been satisfied. *Comcast*, 133 S. Ct. at 1433; *Verisign*, 848 F.3d at 300-01; *Dependable Sales*, 311 F. Supp. 3d at 356; *Farley*, 786 F.2d at 1352; *City of Vernon*, 955 F.2d at 1372–73; *Magnetar Tech. Corp.*, 801 F.3d at 1159.

## III. CONCLUSION

For the reasons set forth above, Imprimis respectfully requests that this Court issue an order *in limine* excluding the report and testimony of Stec on the grounds that the opinions are fatally flawed and unreliable.

Dated: April 26, 2019

PAYNE & FEARS LLP
Attorneys at Law
    Daniel L. Rasmussen

BROWNE GEORGE ROSS LLP
    Keith J. Wesley
    Carl Alan Roth

By:     */s/  Keith J. Wesley*

Attorneys for Defendant
Imprimis Pharmaceuticals, Inc.

# CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2019, I electronically filed the foregoing **NOTICE OF MOTION AND MOTION IN LIMINE NO. 4 OF DEFENDANT IMPRIMIS PHARMACEUTICALS, INC. TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

## SERVICE LIST

*Allergan USA, INC. v. Imprimis Pharmaceuticals, Inc.*
USDC, Case No. 8:17-cv-01551-DOC-JDE

| | |
|---|---|
| **KING & SPALDING LLP**<br>Joseph N. Akrotirianakis<br>Aaron S. Craig<br>633 West Fifth Street, Suite 1700<br>Los Angeles, CA 90071<br>Telephone: (213) 443-4355<br>Facsimile: (213) 443-4310<br>Emails: jakro@kslaw.com;<br>acraig@kslaw.com | Attorneys for Plaintiff<br>Allergan USA, Inc. |
| **KING & SPALDING LLP**<br>Jeffrey S. Bucholtz (pro hac vice)<br>Kathleen E. McCarthy (pro hac vice)<br>1700 Pennsylvania Avenue NW<br>Washington, DC 20006<br>Telephone: (202) 737-0500<br>Facsimile: (202) 626-3737<br>Email: jbucholtz@kslaw.com;<br>kmccarthy@kslaw.com | |
| **PAYNE & FEARS LLP**<br>Daniel L. Rasmussen, Bar No. 120276<br>Philip K. Lem, Bar No. 282480<br>4 Park Plaza, Suite 1100<br>Irvine, California 92614<br>Telephone: (949) 851-1100<br>Facsimile: (949) 851-1212s<br>dlr@paynefears.com<br>pkl@paynefears.com | Co-Counsel for<br>Defendant Imprimis<br>Pharmaceuticals, Inc. |

*/s/ Andrea A. Augustine*
Andrea A. Augustine