JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
  *jakro@kslaw.com*
AARON S. CRAIG (Bar No. 204741)
  *acraig@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:    (213) 443-4310

JEFFREY S. BUCHOLTZ (pro hac vice)
  *jbucholtz@kslaw.com*
MARISA MALECK (pro hac vice)
  *mmaleck@kslaw.com*
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Telephone:   (202) 737-0500
Facsimile:    (202) 626-3737

Attorneys for Plaintiff
ALLERGAN USA, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ALLERGAN USA, INC.,<br><br>            Plaintiff,<br><br>                  v.<br><br>IMPRIMIS PHARMACEUTICALS, INC.,<br><br>            Defendant. | Case No. 8:17-cv-01551-DOC-JDE<br>*The Honorable David O. Carter*<br><br>**PLAINTIFF ALLERGAN USA, INC.'S OPPOSITION TO DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S MOTION IN LIMINE NO. 4 TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D.**<br><br>Complaint Filed: September 7, 2017<br>Pre-Trial Conference: May 8, 2019<br>Trial Date: May 9, 2019 |

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ........................................................................................ 1

II.  BACKGROUND ......................................................................................... 2

III. ARGUMENT ............................................................................................. 4

    **A.**   Courts do not Require False Advertising Damages to be Calculated with
        Exactness .............................................................................................. 4

    **B.**   Defendant should be Presumed to have made no Sales in the but-for Universe 5

    **C.**   Plaintiffs are Required to Disaggregate False Advertising Damages from
        Losses Caused by Lawful Factors ....................................................... 7

    **D.**   Defendant's Arguments that it had Sales Untethered to False Advertising are
        Specious ................................................................................................ 9

IV. CONCLUSION ........................................................................................ 11

i

PLAINTIFF ALLERGAN USA, INC.'S OPPOSITION TO DEFENDANT IMPRIMIS PHARMACEUTICALS INC.'S
MOTION IN LIMINE NO. 4 TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Burndy Corp. v. Teledyne Indus., Inc.*,
   748 F.2d 767 (2d Cir. 1984) ......................................................................... 4

*City of Vernon v. So. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ...................................................................... 8

*Comcast v. Behrend*,
   133 S.Ct. 1426 (2013) ................................................................................. 9

*Dependable Sales and Service, Inc. v. TrueCar, Inc.*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018) ....................................................... 7, 8

*Farley Transp. Co., Inc. v. Santa Fe Trial Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985) ...................................................................... 8

*Intel Corp. v. Terabyte Intern., Inc.*,
   6 F.3d 614 (9th Cir. 1993) ........................................................................... 5

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) ...................................................................... 4

*Magnetar Tech. Corp.v. Intamin, Ltd.*,
   801 F.3d 1150 (9th Cir. 2015) ...................................................................... 8

*In re NJOY, Inc. Consumer Class Action Litigation*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ....................................................... 9

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*,
   793 F.2d 1132 (9th Cir. 1986) ...................................................................... 4

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ................................................................... 4, 5

*TrafficSchool.com, Inc. v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011) ....................................................................... 4

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
   793 F.2d 1034 (9th Cir. 1986) ................................................................... 5, 7

*Verisign, Inc. v. XYZ.COM LLC,*
   848 F.3d 292 (4th Cir. 2017) ..................................................................................... 8

**Statutes**

15 U.S.C. § 1117(a) ................................................................................................ 4

Lanham Act............................................................................................................ 4, 5, 9

# I.   INTRODUCTION

Defendant is correct that Dr. Stec's damages methodology includes an assumption that Defendant would not have made any sales.  This assumption was based on other assumptions, all of which have since been borne out, that the Court would find that Defendant's advertisements were false, deceptive, and material to the doctors that prescribe these drugs because they address aspects that are at the very foundation of medicine:  the safety, efficacy and legality of Defendant's drugs.  Dr. Stec further assumed—correctly—that the Court would hold Defendant's business practices to be unlawful.

This appears to be a case of first impression as to how false advertising damages may be calculated against a defendant whose sales are made pursuant to an unlawful business practice.  Allergan is aware of no other false advertising case where the defendant's business model is unlawful.  In each of the false advertising cases that Defendant cites, the defendant is engaged in a lawful business such as selling domain names, cars, or grass seed.  Here, Defendant sells drugs that are unlawful, and then floods the marketplace with false statements that it complies with all legal requirements, that it uses FDA-approved components, and that FDA has found its drugs to be safe and effective.  In this unique factual situation, where Defendant's business model is unlawful and where it falsely advertises its drugs as lawful, the most reasonable approach is to presume that Defendant would not have made any sales.  If Defendant successfully rebuts that presumption with competent evidence to show that it would have achieved some sales even in the absence of its false statements, the jury, as the fact finder, may elect to award a damages figure smaller than the one to which Dr. Stec will testify.  But because its false advertising is so ubiquitous as to matters so fundamental to the doctors who prescribe Defendant's drugs, the burden here is properly placed on Defendant to show what percentage of its sales, if any, would have been made even without its false claims.  The Court should deny Defendant's motion and permit Dr. Stec to testify.

## II.   BACKGROUND

The Court has held that Defendant has engaged in unlawful business practices in both its 503A and 503B facilities.  The Court's Order Granting in Part Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 138) ("SJ Order") held that Defendant violated Section 503B because of its use of the bulk drug substances gatifloxacin and nepafenac.  (SJ Order at 23.)  Because section 503B requires that drugs be "compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance [with Section 503B]" (SJ Order at 10, quoting 21 U.S.C. § 353b(a)), this means that all Defendant's section 503B sales are unlawful and have been since Defendant opened its 503B facility in February 2017.  The Court further held that Defendant has engaged in an unlawful business practice in its section 503A facilities by violating the customization and individual prescription requirement.  Although the Court did not adjudicate the precise extent to which Defendant has violated these requirements, the evidence—and Defendant's own arguments—show that it is all-encompassing.  Defendant has not produced any evidence that any of the doctors who have sent orders to its 503A facility have included on these orders any notation that a compounded drug is medically necessary because the patient's needs cannot be met by an FDA-approved drug.  And Defendant argued that Section 503A does not require such a medical need for a compounded alternative to an FDA-approved drug—in keeping with its business model, which ignores that requirement and treats Section 503A as an alternative pathway to market for mass-produced, standardized drugs.

Additionally, the Court has held that Defendant has engaged in several false advertising campaigns, including: "(1) that FDA has found its drugs to be safe and effective and that they are tested for safety and effectiveness; (2) that its drugs use FDA-approved 'components' and 'ingredients'; (3) that it complies with the requirements of Section 503B; and (4) that tout the supposed superiority of its products, including that Dropless Therapy is more effective in treating infection and

inflammation following intraocular surgery than topical medications and that 95% of cataract surgeons prefer Dropless Therapy." (SJ Order at 25-26.)  Allergan submitted scores of exhibits showing the ubiquitousness of these false advertising campaigns through various media: on Defendant's website; in the promotional and marketing materials sales representatives gave their customers; in email communications; and during in-person sales calls.  And as the Court further found, "some of the false commercial promotions were even made in direct follow-up to consumer questions about quality and FDA compliance." (SJ Order at 29.)  Allergan has previously filed with the Court a panoply of admissions by Defendant about the importance of these issues to the doctors who prescribe its drugs. (Dkt. No. 110-1 at Undisputed Fact Nos. 59-73, 92-93.)

Allergan does not know who visited Defendant's website and cannot know everything that Defendant's sales representatives said to doctors over the course of thousands of sales calls.   However, Allergan knows that Defendant's sales representatives use a standardized sales pitch that included these false representations, and Defendant's drugs could not be ordered without first communicating at length with one of Defendant's sales representatives.  Allergan further knows that customers who were on the receiving end of these false promotional statements subsequently ordered Imprimis drugs.  For example, in the SJ Order, the Court cited the example of Defendant stating falsely to a potential customer: "In simpler terms, FDA found our products and services to be safe and effective."  (SJ Order at 4.)  That customer subsequently began ordering from Imprimis.  (Akro. Supp. Decl. Exhs. 79-80.) Allergan will present that and similar evidence at trial.[1]

---

[1] As another example, Imprimis sales representative Craig Andrews sent to Cecilia Montero of Pacific Eye Surgeons the claim that "LessDrops compounded formulations combines FDA-approved components into one low cost eye drop that alleviates patient confusion and may result in increased patient compliance." (Akro. Decl. Supp. Exh. 81.)  Mr. Andrews subsequently informed one of his Imprimis colleagues "You should of [sic] received a new account application from Pacific Eye

1

### III.   ARGUMENT

2

####    A.   Courts do not Require False Advertising Damages to be Calculated
3
with Exactness

4
"The purpose of section 1117 is to take all the economic incentive out of"
5
violations of the Lanham Act.  *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d
6
1132, 1135 (9th Cir. 1986).  A successful Lanham Act plaintiff is entitled to recover
7
"(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs
8
of the action."  15 U.S.C. § 1117(a). "A plaintiff must prove both the fact and the
9
amount of damage." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.
10
1993).  But only the *fact* of damages "must be established with reasonable certainty";
11
the *amount* of damages need not "be calculated with absolute exactness." *Id*.  "[A]
12
court may engage in some degree of speculation in computing the *amount* of [false
13
advertising] damages, particularly when the inability to compute them is attributable
14
to the defendant's wrongdoing." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767,
15
771 (2d Cir. 1984) (emphasis in original).

16
The Court has already adjudicated the fact of commercial injury/damage in the
17
SJ Order.  The Court granted Allergan's "motion for partial summary judgment as to
18
liability under the Lanham Act" (SJ Order at 30), and the fact of commercial injury is
19
one of the elements of liability.  *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d
20
1134, 1139 (9th Cir. 1997).  *See also* SJ Order at 29.  ("The undisputed facts show
21
that Imprimis and Allergan sell prescription drugs for post-cataract surgery.  The
22
extent of the harm suffered by Allergan as a result of Imprimis' unlawful conduct will
23
be determined by the jury.")  Moreover, the Ninth Circuit "generally presume[s]
24
commercial injury when defendant and plaintiff are direct competitors and defendant's
25
misrepresentation has a tendency to mislead consumers." *TrafficSchool.com, Inc. v.
26
Edriver Inc.,* 653 F.3d 820, 826 (9th Cir. 2011).

27

28
either today or on Friday." *Id.*

1    The fact of commercial injury having been established by both the Court's SJ
2  Order and the legal presumption, the Court has ample discretion to fashion a damages
3  award: "[T]he preferred approach allows the district court in its discretion to fashion
4  relief, including monetary relief, based on the totality of the circumstances."
5  *Southland Sod Farms*, 103 F.3d at 1146.  The Court here should allow Dr. Stec to
6  testify to his damages calculation based on his assumption that Defendants would not
7  have made any sales.  One of the purposes of awarding Lanham Act damages is to
8  deter those who would violate the Lanham Act from injuring their customers and
9  competitors.  *Intel Corp. v. Terabyte Intern., Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) ("If
10  the district court did not award damages, Terabyte and other brokers would not be
11  deterred from buying counterfeit math coprocessors at below market prices and selling
12  them to their unknowing customers.")  Granting Defendant's motion would reward
13  Defendant's misconduct.

14    **B.    Defendant should be Presumed to have made no Sales in the but-for**
15    **Universe**

16    In the particular circumstances of this case, the Court should presume that all of
17  Imprimis's customers heard false statements, were deceived by those false statements,
18  and that those statements were material to their decision to prescribe Imprimis's
19  drugs, and that therefore, Imprimis would have made no sales in the but-for world.

20    Where a promotional claim is literally false, consumer confusion is presumed
21  and need not be demonstrated.  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034,
22  1040-41 (9th Cir. 1986).  The Court has already held that because Imprimis's
23  statements "are literally false, there is a rebuttable presumption of actual deception."
24  (SJ Order at 28-29.)  Moreover, certain of Imprimis's efficacy claims compare how
25  well its products work compared to the standard regimen of FDA-approved drugs.
26  When defendants make literally false comparative claims, courts presume that
27  customers relied on them.  *U-Haul*, 793 F.2d at 1041.  Dr. Stec is merely applying
28  these legal presumptions of deception, materiality and reliance when he assumes that

5

Defendants would have made no sales in the but-for world.[2]

The facts of this case support this conclusion, because all of Imprimis's prescribers heard Imprimis's false advertising claims, and those claims were about fundamental attributes of Imprimis's drugs such as their lawfulness, safety and efficacy.  All doctors were exposed to Imprimis's ad claims:  Imprimis's drugs could not be ordered without having first communicated with Imprimis's sales representatives, visiting Imprimis's website, or both.  Because Imprimis's false statements were part of a standardized sales pitch by the sales representatives who signed up doctors and took their orders, and because the false statements pervaded Imprimis's marketing materials and its website, it should be presumed that all of Imprimis's customers heard them.  As set forth above, the evidence Allergan has previously submitted to the Court on summary judgment shows that Imprimis's false statements were ubiquitous in its marketing materials and the communications between Imprimis's employees (sales representatives and executives alike) and its customers.  Even if a few prescribers were to testify that they did not hear any of the false statements directly from Imprimis, it is highly likely they still heard these false statements from other physicians who were themselves infected by Imprimis's false ad campaigns.

It is implausible that Imprimis's customers would knowingly prescribe drugs that were being compounded in violation of Sections 503A and 503B, as doing so would expose their patients to increased risks and would likewise increase their own risk of malpractice liability.  Much of Imprimis's false advertising bears directly on

---

[2] To clarify, Dr. Stec assumes that Imprimis would have made no sales, but his opinion does not assume that all of Imprimis's sales would have gone to Allergan.  Dr. Stec calculated Allergan's market share in each of the markets in which Allergan's drugs and Imprimis's drugs compete.  Dr. Stec used that market share data to apportion to Allergan the number of sales commensurate with its share in each such market.  Dr. Stec then calculated Allergan's profitability for each of those drugs for each calendar quarter and multiplied Allergan's per-unit profit by the corresponding number of lost sales during each quarter to determine Allergan's lost profits.

1   whether its drugs were compounded in accordance with the applicable laws and
2   regulations such that they were lawful to sell in the first place.   These false statements
3   were about matters so fundamental to the practice of medicine that they would
4   influence every doctor who heard them.

5       The Court should presume that all of Imprimis's customers were impacted by
6   these false statements and should shift the burden to Defendant to prove that some
7   percentage of its customers were unaffected by these claims.  "He who has attempted
8   to deceive should not complain when required to bear the burden of rebutting a
9   presumption that he succeeded."  *U-Haul*, 793 F.2d at 1041.  If Imprimis were to
10  provide the jury with credible evidence that some physicians did not rely on
11  Imprimis's false advertising, the jury can of course take that into account in
12  determining the amount of damages to award to Allergan.

13      **C.    Plaintiffs are Required to Disaggregate False Advertising Damages**
14      **from Losses Caused by Lawful Factors**

15      Of all the cases cited by Imprimis, only two are false advertising cases.
16  Allergan acknowledges that in these two false advertising cases, the court excluded a
17  damages expert because the plaintiff failed to provide evidence of which sales were
18  caused by false advertising in the course of calculating damages.  However, in both of
19  these false advertising cases, the courts distinguished (explicitly or implicitly)
20  between sales caused by the false advertising and sales caused by the defendant's
21  *lawful conduct* and excluded the expert because of the failure to account for the
22  defendant's lawful sales.  In *Dependable Sales and Service, Inc. v. TrueCar, Inc.*, 311
23  F. Supp. 3d 653, 659 (S.D.N.Y. 2018), the court explicitly contrasted sales caused by
24  false advertising from sales caused by lawful factors: "A plaintiff must show that its
25  injury was caused by or attributable to the false advertisements, as opposed to a lawful
26  factor, like a defendant's lower prices."  In *TrueCar*, the defendant was engaged in the
27  business of selling cars and there were many lawful factors to which the defendant's
28  sales could be attributed.  Here, all of Imprimis's 503B sales, and presumptively all of

1    its 503A sales, were unlawful.

2        Just as in *TrueCar*, in *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292 (4th Cir.

3    2017), the defendant was engaged in a lawful business—selling internet domain

4    names.   The Fourth Circuit affirmed the exclusion by the district court of the

5    plaintiff's expert who opined that all of the defendant's sales were attributable to its

6    advertising claim.   In its opinion, the court identified other lawful factors that were

7    more plausibly responsible for the decline in the plaintiff's revenues from ".net"

8    domain registrations, such as the fact that "hundreds of new top-level domains were

9    clamoring for attention in a newly competitive market." *Id.* at 301.   Moreover, the

10   advertising in *Verisign* was "distributed to a narrow audience" and was "opinion or

11   puffery" in any event.   *Id.* at 301, 303.   The fact that the defendant's conduct in

12   *Verisign* was perfectly lawful (including its advertising) makes it readily

13   distinguishable from this case.

14       All the other cases cited by Imprimis are antitrust cases, which are of

15   questionable relevance to the methodology of a damages expert in a false advertising

16   case.  But even Imprimis's antitrust cases emphasize disaggregation between lost sales

17   attributable to the defendant's complained-of conduct and other *lawful* factors.   In

18   *Farley Transp. Co., Inc. v. Santa Fe Trial Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir.

19   1985), the court reversed and remanded for a new trial on damages because of the

20   plaintiff's "failure to make any segregation between damages attributable to lawful

21   competition and that attributable to the unlawful scheme to deviate from the tariff

22   rate."  Likewise, in *City of Vernon v. So. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th

23   Cir. 1992), the court excluded a study that "failed to segregate the losses, if any,

24   caused by acts which were not antitrust violations from those that were." *Magnetar*

25   *Tech. Corp.v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015), quotes that exact

26   language from *City of Vernon*, and proceeds to state that "Magnetar has not proven 'in

27   a reasonable manner the link between the injury suffered and the illegal practices of

28   the defendant.'"  801 F.3d at 1160 (emphasis added) (*quoting MCI Commc'ns Corp.*

8

1  *v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)).  The antitrust cases cited
2  by Defendant all explicitly discuss the requirement to disaggregate damages from
3  sales attributable to unlawful schemes, antitrust violations and illegal practices versus
4  sales earned from lawful factors.  These cases thus do not support excluding Dr. Stec's
5  testimony.[3]

6  Allergan is aware of no false advertising case in which the defendant's sales
7  were unlawful, let alone one where the false advertising pertained to that very
8  lawfulness.  In this unique situation, it should be presumed that Defendant would have
9  made no sales in the but-for world.  Such an approach is reasonable, supported by the
10  facts of this case and case law, and furthers the policy goals of Lanham Act damages.
11  And it is fair, as it preserves an opportunity for Defendant to try to demonstrate that
12  some quantum of its sales were unaffected by its false advertising campaign.

13  **D.  Defendant's Arguments that it had Sales Untethered to False**
14  **Advertising are Specious**

15  Imprimis's motion argues that Dr. Stec should have taken certain factors into
16  account relating to the sales Imprimis would have made in the but-for world or the
17  percentage of those sales that would have been achieved by Allergan.   These
18  arguments are not persuasive.

19  Imprimis contends that the survey by its expert Mark Keegan demonstrates that
20  some of Imprimis's sales were attributable to factors other than four certain
21  "Challenged Statements."  As Allergan's Motion in Limine No. 7 sets forth in detail,
22  Mr. Keegan is unqualified and his survey is unreliable and does not prove anything.

23

24  [3] Imprimis also cites *Comcast v. Behrend*, 133 S.Ct. 1426 (2013), and *In re NJOY, Inc.*
25  *Consumer Class Action Litigation*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015).  In both
   these antitrust class action cases, the question before the courts was not the validity *vel*
26  *non* of the damages model, but the fit between the proffered classwide damages model
   and the common claims.  This distinction makes these cases even farther removed
27  from the question of whether Dr. Stec's methodology satisfies Rule 702 in this single-
28  plaintiff false advertising case.

1    Moreover, the Court has rejected Imprimis's argument that Allergan is limited to the
2    four "Challenged Statements" that Mr. Keegan considered.

3          Imprimis raises the fact that it stopped making certain of the false advertising
4    statements after it was sued by Allergan and after it received a warning letter from
5    FDA.  Imprimis implies that when it ceased making the false advertising statements,
6    its liability ceased.  This is nonsense.  Advertising claims can affect behavior long
7    after the advertiser stops making them.  If a consumer initially tries a product during
8    the period of a false advertisement and continues to buy the product after the
9    advertiser stops making the claim, those subsequent sales would still be causally
10   linked to the false advertisement.  Moreover, consumers can see advertising claims
11   and rely on them to make an initial purchase after some lag time.  And people who are
12   exposed to advertising claims can subsequently relay those claims to others, even after
13   the advertiser itself stops making those claims.  Accordingly, Imprimis's questioning
14   whether its "sales drop[ped] when the Challenged Statements were taken down, and
15   did Allergan's sales rise correspondingly" is of no moment, and the "thus" in
16   Imprimis's question "were any of the Challenged Statements taken down and thus
17   could no longer affect purchaser behavior" does not follow.

18         Imprimis also raises the possibility that some percentage of patients using its
19   products could never have used Allergan's products at all and claims that that "is why
20   they were provided an Imprimis alternative in the first place."  (MIL at 11.)  This is
21   sheer defiance of the Court's SJ Order.  Compounding is *supposed to be* about
22   providing alternatives to patients who cannot take FDA-approved products.  But
23   Imprimis's business model blows past that fundamental limitation and treats
24   compounding as an alternate pathway to market for mass-produced, standardized
25   unapproved drugs marketed indiscriminately for all patients with a given condition
26   regardless of whether they have a medical need for an alternative to the FDA-
27   approved product.  The SJ Order has already rejected the notion that Imprimis
28   marketed and sold its products only to patients who cannot tolerate FDA-approved

PLAINTIFF ALLERGAN USA, INC.'S OPPOSITION TO DEFENDANT IMPRIMIS PHARMACEUTICALS INC.'S
MOTION IN LIMINE NO. 4 TO EXCLUDE REPORT AND TESTIMONY OF JEFFERY A. STEC, PH.D

drugs.  (SJ Order at 22.)  Indeed, when the Court explained in its tentative order that Imprimis does not comply with Section 503A's individual prescription and customization requirement for that reason, Imprimis strenuously argued at the hearing that its business relied on a contrary interpretation of Section 503A and that if the Court adhered to its tentative view of Section 503A, Imprimis would have to change its business model.  If Imprimis had evidence that all, or most, or even a substantial minority of the patients receiving its drugs are unable to tolerate FDA-approved drugs, Imprimis would have produced that information in discovery and Dr. Stec would have taken it into account.  Imprimis produced no such evidence.

## IV.    CONCLUSION

For the reasons set forth above, the Court should deny Imprimis's motion in limine no. 4.


Dated: May 1, 2019                      KING & SPALDING LLP


                                        By:  */s/ Joseph N. Akrotirianakis*
                                             JOSEPH N. AKROTIRIANAKIS
                                             AARON S. CRAIG
                                             Attorneys for Plaintiff
                                             ALLERGAN USA, INC.