1   PAYNE & FEARS LLP
    Attorneys at Law
2   Daniel L. Rasmussen (State Bar No. 120276)
    dlr@paynefears.com
3   4 Park Plaza, Suite 1100
    Irvine, California 92614
4   Telephone: (949) 851-1100
    Facsimile:  (949) 851-1212
5
    BROWNE GEORGE ROSS LLP
6   Keith J. Wesley (State Bar No. 229276)
      kwesley@bgrfirm.com
7   2121 Avenue of the Stars, Suite 2800
    Los Angeles, California 90067
8   Telephone: (310) 274-7100
    Facsimile: (310) 275-5697
9
    Attorneys for Defendant
10  Imprimis Pharmaceuticals, Inc.

11

12              UNITED STATES DISTRICT COURT

13      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

14

15  ALLERGAN USA, INC.,                   | Case No. 8:17-cv-01551-DOC-JDE
                                          | The Honorable David O. Carter
16          Plaintiff,                    |
                                          | **DEFENDANT IMPRIMIS**
17      vs.                               | **PHARMACEUTICALS, INC.'S**
                                          | **RENEWED MOTION FOR**
18                                        | **JUDGMENT AS A MATTER OF**
                                          | **LAW**
19  IMPRIMIS PHARMACEUTICALS,             |
    INC.,                                 | **[Declaration of Keith J. Wesley Filed**
20                                        | **Concurrently Herewith]**
            Defendant.                    |
21                                        | Date:  July 29, 2019
                                          | Time:  8:30 a.m.
22                                        | Crtrm.:  9D
23                                        | Final Pretrial Conference:
                                          |     May 8, 2019, 8:30 a.m.
24                                        | Trial Date:  May 9, 2019, 8:30 a.m.

25

26

27

28

TO ALLERGAN USA, INC. AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, on July 29, 2019 at 8:30 a.m., in the courtroom of the Honorable David O. Carter, Courtroom 9D, located in the United States Courthouse, 411 West Fourth Street, Santa Ana, California, 92701-4516, defendant Imprimis Pharmaceuticals, Inc. ("Imprimis"), will and hereby does move the Court for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on the ground that plaintiff Allergan USA, Inc. ("Allergan") did not present evidence from which a reasonable juror could have found actual damages suffered by Allergan due to the false advertisements at issue.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, all of the pleadings, files, and records in this proceeding, including Imprimis's earlier Rule 50(a) Motion, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This Motion is made following the conference of counsel under Local Rule 7-3 on June 18, 2019.

Dated:  June 25, 2019

PAYNE & FEARS LLP
Attorneys at Law
Daniel L. Rasmussen

BROWNE GEORGE ROSS LLP
Keith J. Wesley

By:        /s/  Keith J. Wesley
Keith J. Wesley
Attorneys for Defendant
Imprimis Pharmaceuticals, Inc.

1281305.1

Case No. 8:17-cv-01551-DOC-JDE
DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION. ................................................................... 1

II.    RELEVANT FACTS AND PROCEDURAL HISTORY. ............................ 2

    A.    The Court Grants Summary Judgment Against Imprimis on Liability for False Advertising Under the Lanham Act. ...................... 2

    B.    The Court Excludes Allergan's Damages Expert Prior to Trial. ........... 2

    C.    Allergan Presented No Credible Evidence Linking the False Advertisements to Lost Allergan Sales, and There Was Substantial Evidence that the False Advertisements Did *Not* Cause Allergan to Lose Any Sales. ........................................... 3

        1.    No direct testimony from a consumer deceived into buying from Imprimis rather than Allergan. ................................. 3

        2.    No consumer survey. ................................................. 4

        3.    Admissions that the relevant consumer population – eye doctors – is *not* easily deceived. ................................. 4

        4.    No evidence of even an estimate of the number of lost sales caused by the false advertising or the amount of damages being sought. ............................................. 4

        5.    Admissions that any drop in Allergan's sales could have been caused by a variety of factors other than Imprimis's advertisements. ....................................................... 5

        6.    Allergan did not disclose damage caused by Imprimis in its public filings. ..................................................... 6

        7.    No internal Allergan email supported a finding of cognizable damages, and several internal emails showed that Allergan actually believed it was being harmed by the availability of Imprimis *products*, not Imprimis *false advertising*. ......................................................... 7

        8.    There was substantial direct testimony from myriad witnesses, including third-party witnesses, that the advertisements did not actually mislead and had no effect on the parties' respective sales. ................................. 8

    D.    The Formula Presented to the Jury by Allergan's Counsel in Closing Argument Highlights the Lack of Evidence from Which a Juror Could Reasonably Find Causation of Damages or a Reasonable Method of Calculating Damages. ............................. 9

        1.    Allergan's counsel's damages formula. ......................... 9

DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

1

**TABLE OF CONTENTS**
(Continued)

2

Page

3

        2.     Why the formula was wholly inadequate. ................................. 11

4

  E.    The Jury Awards Allergan $48,500 in Actual Damages, and $0
       in Wrongful Profits. ...................................................................... 12

5

III.  THE COURT SHOULD GRANT IMPRIMIS JUDGMENT AS A
6     MATTER OF LAW ON THE ISSUE OF ACTUAL DAMAGES. .............. 13

7

  A.    Judgment as a Matter of Law is Required When a Reasonable
       Juror Could Not Rule in Favor of the Non-Moving Party. ................... 13

8

  B.    To Recover Actual Damages, Allergan Was Required to Prove
9        (1) that the False Advertising in Question Caused Allergan to
       Lose Profits; *and* (2) a Reasonable Method of Quantifying Those
10       Damages. ......................................................................................... 13

11

  C.    Allergan Failed to Present Adequate Evidence to Support a
       Damages Award Under the Lanham Act. ............................................. 16

12

IV.  CONCLUSION. ........................................................................................ 16

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## <u>FEDERAL CASES</u>

4

5
*Abarca v. Franklin Cty. Water Dist.*,
   813 F. Supp. 2d 1199 (E.D. Cal. 2011) ................................................. 13

6

7
*Art Attacks Ink, LLC v. MGA Entertainment Inc.*,
   581 F.3d 1138 (9th Cir. 2009) .............................................................. 13

8

9
*BMMG v. American-Telecast Corp.*,
   1993 WL 850564 (C.D. Cal. May 6, 1993) ........................................... 16

10
*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
   2015 WL 1735517 (W.D. Wash. Apr. 15, 2015) .................................. 14

11

12
*City of Vernon v. S. California Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ............................................................ 1, 3

13

14
*Dependable Sales and Service, Inc. v. TrueCar, Inc.*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018) ............................................ 1, 3, 14

15

16
*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
   786 F.2d 1342 (9th Cir. 1985) ............................................................ 1, 2

17

18
*Hansen Beverage Co. v. Vital Pharmaceutical, Inc.*,
   2010 WL 3069690 (S.D. Cal. 2010) ...................................................... 14

19

20
*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) ............................................... 13, 15, 16

21

22
*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2008 WL 73681 (N.D. Cal. Jan. 5, 2008) ............................................. 13

23
*Lakeside-Scott v. Multnomah Cty.*,
   556 F.3d 797 (9th Cir. 2009) ................................................................ 13

24

25
*Laughlin Products, Inc. v. ETS, Inc.*,
   257 F. Supp. 2d 863 (N.D. Tex. 2002) ............................................. 7, 14

26

27
*Lindy Pen Co., Inc. v. Bic Pen. Corp.*,
   982 F.2d 1400 (9th Cir. 1993) .............................................................. 14

28

1
2

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

3
4

*Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*,
   2013 WL 12140450 (C.D. Cal. Jan. 11, 2013) .................................................... 15

5
6

*Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*,
   732 Fed. Appx. 532 (9th Cir. Apr. 30, 2018) ........................................... 14, 15, 16

7

*Societe Civile Succession Richard Guiono v. Beseder Inc.*,
   2007 WL 3238703 (D. Ariz. Oct. 31, 2007) (Murguia, J.) ................................. 14

8
9

*TrafficSchool.com v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011) ......................................................................... 15, 16

10
11

*United Indus. Corp. v. Clorox Co.*,
   140 F.3d 1175 (8th Cir. 1998) ............................................................................ 14

12
13

*Verisign, Inc. v. XYZ.com LLC*,
   848 F.3d 292 (4th Cir. 2017) ........................................................................... 1, 3

14

**FEDERAL STATUTES**

15

15 U.S.C. § 1117(a) ................................................................................................ 13

16

Lanham Act...............................................................2, 3, 12, 13, 14, 15, 16

17

**RULES**

18
19

Federal Rules of Civil Procedure
   Rule 50(a) ........................................................................................................... 12
   Rule 50(b) ........................................................................................................... 13

20
21

Federal Rules of Evidence
   Rule 702......................................................................................................... 1, 2, 3

22
23
24
25
26
27
28

## I.   __INTRODUCTION.__

Before trial, this Court excluded plaintiff Allergan's damages expert, Jeffrey Stec, because Mr. Stec had failed to disentangle sales allegedly lost by Allergan due to false advertisements from sales allegedly lost by Allergan due to other factors. This Court held as follows:

> Stec's opinion is not a model purporting to serve as evidence of damages measuring only those damages attributable to Allergan's liability theory.  *See Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co*., 786 F.2d 1342, 1352 (9th Cir. 1985) ("[Plaintiff] provided no evidence on the amount of damages attributable only to the unlawful conduct."); *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1372–73 (9th Cir. 1992); *accord Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292 (4th Cir. 2017); *Dependable Sales and Service, Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653 (S.D.N.Y. 2018). Because Stec fails to attribute damages to any or even all of Imprimis's false ads, or to account for a handful of potential alternative factors, Allergan cannot meet its burden to show that Rule 702 and *Daubert* tests have been satisfied.

Dkt. No. 222 at 2.

At trial, Allergan could not cure the disease that had led to Mr. Stec's demise. Allergan presented no evidence of lost sales *attributable to false advertising* versus other factors.  Moreover, Allergan presented no evidence of a reasonable method of quantifying sales it allegedly lost due to false advertising versus other causes.

Allergan instead attempted to treat the Stec disorder by arguing to the jury that they need not attribute 100% of Imprimis's sales to the false advertisements (as Mr. Stec had done).  Rather, according to Allergan, the jury could pick any number – whether 1% or 50% or 87% or 90% or 100% – of sales attributable to the false advertising.  Allergan's solution addressed the symptoms of the unreliability of Mr. Stec's damages model, but the disease itself remained untreated.

The problem underlying Mr. Stec's analysis was the lack of evidence from which a reasonable calculation of sales attributable to false advertising, if any, could be made.  Inviting the jury to pick out of a hat the percentage of sales attributable to

false advertising was no better solution, from a legal perspective, than telling the jury they should pick 100%.

Allergan's counsel's valiant attempt to resuscitate a damage claim on life support after the exclusion of Mr. Stec failed.  No reasonable juror, when faithfully applying Ninth Circuit precedent to the evidentiary record, could have awarded actual damages under the Lanham Act.  Therefore, as explained in more detail below, the judgment should be amended to reduce the monetary damages awarded to Allergan from $48,500 to $0.

## II.   RELEVANT FACTS AND PROCEDURAL HISTORY.

### A.   The Court Grants Summary Judgment Against Imprimis on Liability for False Advertising Under the Lanham Act.

In an Order dated March 31, 2019, the Court ruled as a matter of law that five categories of statements made by Imprimis representatives constituted false advertising under the Lanham Act.  The Court left for trial the amount of damages, if any, Allergan suffered due to the false advertising.  Dkt. No. 138.

### B.   The Court Excludes Allergan's Damages Expert Prior to Trial.

Prior to trial, the Court granted Imprimis's motion in limine to exclude Allergan's damages expert, Jeffrey Stec.  In its written decision, the Court identified the fundamental problem with Mr. Stec's damage model – a problem that Allergan could not fix at trial and is at the core of this motion as well.  The Court held:

> Stec states in the Stec Report that there must be "a nexus between Imprimis's alleged wrongful conduct and economic harm to Allergan in the form of lost profits." *See* Dkt. 116-4 at 27 ("Stec Report"). But Stec goes on to explain that "Allergan claims that the Imprimis business model and corresponding sales were established through wrongful conduct. Thus, I have been asked to assume that absent the alleged wrongful conduct, Imprimis would not have made any of the sales that it did." *Id*. According to Stec's deposition testimony, he was not asked to analyze the impact of the particular statements at issue in this damages trial. Dkt. 153-2 at 180–88. Stec's opinion is not a model purporting to serve as evidence of damages measuring only those damages attributable to Allergan's liability theory.  *See Farley Transp. Co., Inc. v. Santa Fe*

*Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985) ("[Plaintiff] provided no evidence on the amount of damages attributable only to the unlawful conduct."); *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1372–73 (9th Cir. 1992); *accord Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292 (4th Cir. 2017); *Dependable Sales and Service, Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653 (S.D.N.Y. 2018). Because Stec fails to attribute damages to any or even all of Imprimis's false ads, or to account a handful of potential alternative factors, Allergan cannot meet its burden to show that Rule 702 and *Daubert* testshave been satisfied. Allergan attempts to distinguish cases where damages experts have been excluded on similar grounds because "[h]ere, *all* of Imprimis's 503B sales, and presumptively *all* of its 503A sales, were unlawful." Opp'n (Dkt. 175) at 7–8 (emphasis added). But this trial focuses exclusively on Lanham Act damages. The Court has already ruled on the relief available under the UCL and Sherman Law. Stec's failure to disentangle the damages and account for the effect of the statements at issue in this trial is fatal.

Dkt. No. 222 at 2.

### C. Allergan Presented No Credible Evidence Linking the False Advertisements to Lost Allergan Sales, and There Was Substantial Evidence that the False Advertisements Did *Not* Cause Allergan to Lose Any Sales.

Allergan presented no credible evidence linking the false advertisements to lost Allergan sales. The usual methods of proving whether and to what extent sales were lost by the plaintiff *due to the defendant's false advertising* are direct consumer testimony, a consumer survey, or a reliable sales trend or market analysis. All of those methods were conspicuously absent from a trial that was ostensibly about false advertising damages.

The following is a summary of what the evidentiary record instead contains on the issue of damages.

### 1. No direct testimony from a consumer deceived into buying from Imprimis rather than Allergan.

There was no direct testimony from a relevant consumer that he purchased from Imprimis rather than Allergan due to the false advertisements. Indeed, there

was no direct testimony from a deceived consumer at all.

### 2.   No consumer survey.

There was no survey of relevant consumers indicating actual confusion or economic harm to the plaintiff.  (Ex. 1, 5/14 TT, Vol. III at 29:10-30:1) ("Q.  [C]an we agree that Allergan did not conduct a survey in this case to determine whether or not doctors were deceived by Imprimis's ads?  A.  We did not conduct a survey like that").[1]

### 3.   Admissions that the relevant consumer population – eye doctors – is _not_ easily deceived.

Allergan acknowledged that the relevant consumer population – i.e., eye doctors – is careful and not easily fooled.  (_Id._ at 30:2-31:21) ("Q.  Okay. And you'd agree that doctors that prescribe Allergan medications are careful with regard to what pharmaceuticals they prescribe to their patients; true?  A.  Yes, I think physicians are careful").

### 4.   No evidence of even an estimate of the number of lost sales caused by the false advertising or the amount of damages being sought.

Allergan's corporate representative could not offer an estimate of the amount of sales lost to Imprimis due to the false advertising.  (Ex. 2, 5/14 TT, Vol IV, at 14:2-15:4) ("Q.  Now, you talked about the decline in sales with your counsel.  Tell me how many total sales units were lost because a doctor was deceived into buying from Imprimis?  A.  I don't have that calculation off the top of my head. . . . Q.  And how much in dollars does Imprimis owe your company for its false advertising?  A.  I didn't do the calculation, but I think it's substantial").  Indeed, Allergan could not even say whether the harm was being incurred at all in, for example, November

---

[1]    All exhibits referenced herein are appended to the Wesley Declaration filed concurrently herewith.

2016, which was during the period of purported damage.  (Ex. 1, 5/14 TT, Vol. III, at 61:15-17) ("As of November 2016, was Allergan being harmed by Imprimis's false advertising?  A.  I – I don't know").

> **5.** **Admissions that any drop in Allergan's sales could have been caused by a variety of factors other than Imprimis's advertisements.**

Allergan tried to show that the sales of some of its relevant products decreased during at least part of the period when the false advertisements were publicly accessible.  But Allergan readily conceded that there are a wide variety of factors that could have caused the drops.  (Ex. 1, 5/14 TT, Vol. III, at 33:24-34:7) ("Q.  And so there's a wide variety of factors why Allergan's business may decrease in any given time period; true?  A.  Yes, I agree with that").  Among those factors were the following.

1.  Allergan's medications do not work for every patient.  (*Id.* at 32:3-14.)

2.  There are other market forces, from generics to pharmacy incentives to patient access challenges to untreated patients.  (*Id.* at 32:15-34:22 & Ex. 1575-3) (Ex. 1575-3:  "Allergan Faces Several Interrelated Challenges Driving the Decline of Their Glaucoma Business" including "1.  Payers, 2. Pharmacies, 3. Patients, 4. Plans, 5. ECPs").

3.  The list price of Imprimis's medications is substantially less than the list price for the corresponding Allergan medication, (Ex. 3, 5/10 TT, Vol. II at 93:3-14), and consumers may prefer or only afford the cheaper alternative.  (Ex. 1, 5/14 TT, Vol. III, at 36:10-19, 39:3-25, 40:25-41:10 & Exs. 1525-26) (Ex. 1526-1:  "As Imprimis will almost assuredly produce their products cheaper and with significantly less overhead when compared to Allergan, the savings achieved will likely drive their pricing policy significantly below our products making them, to some extent, more attractive to buy-and-bill ophthalmologists").  That is particularly

1    true for the millions of uninsured or underinsured patients.  (Ex. 1, 5/14 TT, Vol. III,
2    at 43:16-47:12.)

3          4.     Some purchasers do not want to deal with the middle men such as
4    pharmacy benefit managers or wholesalers that distribute Allergan's products, but
5    do not work with Imprimis.  (*Id.* at 43:8-15.)

6          5.     Some doctors prefer not to incur the time and hassle of addressing
7    "prior authorizations" required by insurance companies, (*id.* at 47:17-48:17), and
8    thus prefer to purchase from Imprimis, which generally does not sell through
9    insurers.  (Ex. 3, 5/10 TT, Vol. II, at 92:20-93:2.)

10         6.     Up until mid-2016, Allergan – through its Restasis drug patent – had a
11   monopoly on the "dry eye" drug market.  But in mid-2016, a competitor (Shire)
12   obtained FDA approval for an alternative dry eye medication (Xiidra) that would
13   compete with Allergan's Restasis.  (Ex. 2, 5/14 TT, Vol. IV, at 13:4-14:1.)  Allergan
14   readily acknowledged that at least some of its Restasis sales were lost due to this
15   development.  (*Id.* at 13:23-14:1 ("Q. So wouldn't you say that some of these sales
16   were lost because Restasis was no longer the only dry eye medication in the market?
17   A. Yes.  Some were").

18         No Allergan witness analyzed whether any of the aforementioned factors – as
19   opposed to the false advertisements – drove some or all of Imprimis's sales or
20   Allergan's alleged lost sales.  Nor was there any other evidence tending to show, for
21   example, how many of the purportedly lost Restasis sales were attributable to Shire's
22   Xiidra versus false advertising versus patients who lacked insurance.

23         **6.     <u>Allergan did not disclose damage caused by Imprimis in its</u>**
24         **<u>public filings.</u>**

25         Allergan (a public company) never disclosed any harm caused by Imprimis (let
26   alone harm caused by Imprimis's advertisements) in its SEC filings.  (Ex. 1, 5/14 TT,
27   Vol. III, at 50:19-51:15.)

28

**7.** **No internal Allergan email supported a finding of cognizable damages, and several internal emails showed that Allergan actually believed it was being harmed by the availability of Imprimis *products*, not Imprimis *false advertising*.**

Not one internal Allergan email in evidence described or even alluded to harm caused by the false advertisements.  (*Id.* at 51:21-52:13.)  Several internal Allergan emails in evidence, however, showed that Allergan never sincerely believed it was being harmed by the advertisements in question.  Rather, the internal Allergan emails clearly showed that:

- Allergan had no objection whatsoever to Imprimis for several years when Imprimis solely sold medications used in cataract surgery that competed with drugs that comprised a tiny percentage of Allergan's portfolio (*id.* at 52:14-53:22, 56:18-58:22 & Exs. 1500, 1555);

- Allergan immediately reversed course and vigorously objected to Imprimis after Imprimis announced that it intended to expand into Allergan's core markets of glaucoma and dry eye medications (*id.* at 62:5-66:16, 67:12-70:8, Exs. 1515-1517, 1519, 1553); and

- Allergan manufactured the complaint regarding Imprimis's false advertisements to attempt to burden Imprimis with this lawsuit and thus negatively affect Imprimis's sales growth and/or entire existence, (*id.*).

In short, when Imprimis was competing against Allergan's products in the far left column of the chart at the top of the following page, there was no mention of any issue with Imprimis's false advertising or otherwise.  When, however, Imprimis announced that it would start selling medications used to treat glaucoma and dry eye – and thus would be competing against Allergan's products in the right two columns – Allergan manufactured a false advertising claim with no evidence of lost sales in support thereof.



**8.**     **There was substantial direct testimony from myriad witnesses, including third-party witnesses, that the advertisements did not actually mislead and had no effect on the parties' respective sales.**

There was substantial evidence that the statements in issue did not actually mislead or deceive and that Imprimis's sales were generated for other reasons.  (Ex. 3, 5/10 TT, Vol. II, at 33:5-35:13, 96:13-97:12; Ex. 4, 5/14 TT, Vol. II, 13:25-14:10, 35:9-36:20; Ex. 1, 5/14 TT, Vol. III, at 27:9-30:1; Ex. 5, 5/15 TT, Vol. I, 19:3-18, 51:4-52:13, 78:10-83:1, 86:20-87:1, 88:25-89:21, 97:14-22, 101:22-102:6.)

In sum, the record is entirely devoid of evidence that is necessary to prove damages in a false advertising case.

**D.**   **The Formula Presented to the Jury by Allergan's Counsel in Closing Argument Highlights the Lack of Evidence from Which a Juror Could Reasonably Find Causation of Damages or a Reasonable Method of Calculating Damages.**

**1.**   **Allergan's counsel's damages formula.**

Allergan attempted to make up for the hollow center of its damages case by unveiling *for the first time in closing argument* a proposed formula for calculating damages. The formula, however, actually underscores why no reasonable juror, faithfully applying the evidentiary record to Ninth Circuit precedent, could award actual damages. The formula went as follows:

Step 1:  Select the period in which Allergan was being harmed by the false advertising – *e.g.*, April 2014 through December 2018.

Step 2:  Determine how many units of product Imprimis sold during the period of harm.

Step 3:  Apply a "false advertising factor" – *i.e.*, the percentage of units sold by Imprimis that (a) would not have been sold by Imprimis but for the false advertisements; and (b) would have gone to a competitor instead.

Step 4:  Apply Allergan's market share for the corresponding product.

Step 5:  Apply Allergan's average profit per unit of corresponding product. (Ex. 6, 5/15 TT, Vol. III, at 63:13-19) ("Here is the formula. Lost profits is equal to the, for the relevant drug, Imprimis sales units which you determine using a cutoff date, multiplied by the false advertising factor, that percentage which you are to determine, multiplied by Allergan's market share, and multiplied finally by Allergan's per-unit profit which we just saw").

As a hypothetical application of the formula, counsel argued that the jury could calculate lost sales of Allergan's Restasis dry eye medication caused by Imprimis's false advertising as follows.

Step 1:  Allergan was being harmed by Imprimis's advertisements from the

moment they were published until the day (December 31, 2018) when all such advertisements had been removed from public view.  (*Id.* at 59:4-10) ("Now, Allergan believes that the effect of Imprimis's false promotion goes even beyond the end of 2018.  But for purposes of this reasonable basis for computing damages, I think that December 31, 2018, would be reasonable cutoff date").

Step 2:  Based on undisputed records, Imprimis sold 36,793 units of dry eye medication through December 31, 2018.  (*Id.* at 64:11-16) ("There is a chart with five lines, and it has the heading total units sold.  This is Exhibit 725 for Restasis, and it gives you these different periods.  The bottom line which is highlighted here is the through December 31, 2018.  That is the cumulation of all of the periods, and the number here is 36,793").

Step 3:  The false advertisement factor is 87 percent.  (*Id.* at 65:21-25) ("I said to you that I think the number should be near 100 percent.  In this example I'm going to pick a number that's less than that because it makes the math easier, okay, because it's high numbers.  It's 87 percent is the number I'm going to use to illustrate my point").  Therefore, 87 percent of the 36,793 units of dry eye medication sold by Imprimis – *i.e.*, 32,000 units – would not have been but sold by Imprimis but for the false advertisements at issue and would have instead gone to a competitor.  (*Id.* at 66:2-3.)

Step 4:  Allergan's market share for dry eye medication is 75%.  Therefore, 75 percent of the sales – *i.e.*, 24,000 units – that would have gone to a competitor would have gone to Allergan.  (*Id.* at 66:19-22) ("So 75 percent of 32,000 is 24,000.  All right.  And you could think of that number as the number of prescriptions and sales that Allergan lost because of the false advertising – 24,000").

Step 5:  The average profit Allergan historically received for a sale of one unit of Restasis was $235.  Therefore, multiplying $235 by the 24,000 additional units Allergan would have sold but for the false advertisements totals $5,640,000 in lost Restasis profits alone.  (*Id.* at 67:1-4) ("Restasis's profitability is $235 average per

unit.  So 24,000 units multiplied by $235 per unit yields a sum of $5,640,000.  That is for Restasis").

Counsel for Allergan then proceeded to apply this same formula in the same general manner to other types of medications at issue as well.  (*Id.* at 67:5-71:6.)

## 2.    Why the formula was wholly inadequate.

Allergan's damages formula was inadequate as a matter of law for multiple reasons.

First, although certain steps in the formula had evidentiary support – *e.g.*, Imprimis's unit sales, Allergan's average profit per unit – the formula itself had none.  No expert testified to the relevance or reliability of Allergan's methodology.  In fact, not even an Allergan witness testified to the relevance or reliability of the methodology, and no Allergan witness testified to the ultimate conclusion that should be reached when applying the methodology.  To the contrary, when asked directly, Allergan's corporate representative would not even hazard a guess as to the number of units or dollars lost due to Imprimis's false advertising.

Second, the formula provided no guidance as to how to calculate (or even reasonably estimate) the figure that goes to the heart of damages in this case – *i.e.*, *the number of sales caused by the false advertising as opposed to other factors*.  Instead, at Step 3 of the formula – *i.e.*, selecting the "false advertising factor" – the jury simply picks a percentage out of thin air.  (Ex. 6, 5/15 TT, Vol. III, at 59:11-15) ("Another big question you need to answer:  What is the percentage of sales in which the false promotion was a factor?  That's for you to decide.  Was it a hundred percent?  Was it 90 percent?  Was it 50 percent?  It is up to you").

In other words, the formula enables a calculation of damages *assuming* the jury were able to quantify the percentage or number of lost sales attributable to false advertising.  But the evidence provides no assistance in quantifying the key figure.[2]

---

[2]    Usually, the percentage or number of lost sales attributable to a violation of

<u>Third</u>, the formula assumes – without any evidentiary basis – that every sale made to Imprimis would have gone to a brand-name drug company instead.  The formula fails to take into account that some patients simply could not have purchased from a brand-name drug company instead of Imprimis because of cost, lack of insurance, allergies, etc.  Even Allergan acknowledges the existence of this group of patients.  Ex. 1575-3 ("We also observe that a large patient population remains untreated and those that are treated have low levels of persistence and compliance; however, opportunities related to these challenges have been deprioritized in the near-term").

In sum, Allergan's counsel's damages formula lacked evidentiary foundation both at multiple individual steps and as an overall proposition.  By presenting the jury a multi-step formula and using terminology like the "false advertising factor" that would make a political spin doctor proud, Allergan sought to manufacture the appearance of a reliable method of calculating damage where none truly existed.  Allergan's formula failed to provide any method of reasonably calculating the number of sales lost by Allergan due to the false advertising as opposed to other factors.

### E.      The Jury Awards Allergan $48,500 in Actual Damages, and $0 in Wrongful Profits.

At the conclusion of Allergan's case, Imprimis filed a motion for judgment as a matter of law under Rule 50(a).  Dkt. No. 216.  The Court deferred ruling on the motion until after the verdict.  The jury ultimately awarded Allergan $48,500 in

---

the Lanham Act is proven through (a) direct testimony of a purchaser who forewent a sale from the plaintiff due to the violation; (b) a survey of purchasers who respond that they forewent a sales from the plaintiff due to the violation; or (c) a reliable trend analysis that enables the fact-finder to tie the quantity of loss attributable to the violation to the delta between the plaintiff's expected sales and actual sales, after taking into account all other possible economic factors.  Allergan had none of this evidence.  Allergan instead invited the jury to pick the "false advertising factor" but provided the jury none of the tools that could have enabled the jury to quantify that factor based on evidence.

1  actual damages and $0 in wrongful profits.  Imprimis now, pursuant to Rule 50(b),

2  renews its motion for judgment as a matter of law on the issue of actual damages.

3  **III.   THE COURT SHOULD GRANT IMPRIMIS JUDGMENT AS A**

4  **MATTER OF LAW ON THE ISSUE OF ACTUAL DAMAGES.**

5     **A.   Judgment as a Matter of Law is Required When a Reasonable**

6     **Juror Could Not Rule in Favor of the Non-Moving Party.**

7     A renewed motion for judgment as a matter of law under Rule 50(b) of the

8  Federal Rules of Civil Procedure "is proper if the evidence, construed in favor of the

9  nonmoving party, permits only one reasonable conclusion." *Art Attacks Ink, LLC v.*

10 *MGA Entertainment Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009).  A reasonable

11 conclusion "'cannot be supported by only threadbare conclusory statements instead

12 of significant probative evidence.' . . . . Consequently, JMOL is appropriate when

13 the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott*

14 *v. Multnomah Cty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) (citations omitted).  And

15 "[a] reasonable jury cannot credit testimony that fails to reflect reality." *Abarca v.*

16 *Franklin Cty. Water Dist.*, 813 F. Supp. 2d 1199, 1204 (E.D. Cal. 2011), *quoting*

17 *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5,

18 2008).

19     **B.   To Recover Actual Damages, Allergan Was Required to Prove (1)**

20     **that the False Advertising in Question Caused Allergan to Lose**

21     **Profits; *and* (2) a Reasonable Method of Quantifying Those**

22     **Damages.**

23     Under the Lanham Act, a plaintiff may recover monetary damages it sustained,

24 if any, as a result of a defendant's false advertising.  15 U.S.C. § 1117(a).  To

25 establish a claim for actual damages, the plaintiff must introduce "actual evidence of

26 some injury *resulting from deception*[.]"  *Harper House, Inc. v. Thomas Nelson, Inc.*,

27

28

DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW

889 F.2d 197, 210 (9th Cir. 1989).[3]  The plaintiff must prove this causation with "*reasonable certainty*." *Lindy Pen Co., Inc. v. Bic Pen. Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (emphasis added).  In addition, although a plaintiff need not calculate the amount of claimed damages "with absolute exactness," "*a reasonable basis for computation must exist*," *id.* at 1407.[4]

Where a plaintiff failed to present adequate evidence proving actual damages caused by false advertising, the Ninth Circuit has not hesitated to affirm district courts that granted judgment as a matter of law, and the Ninth Circuit has not hesitated to reverse district courts that denied judgment as a matter of law.  *Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*, 732 Fed. Appx. 532, 534

---

[3] *See also United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998) ("[T]o recover money damages under the Act, a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages"); *Dependable Sales & Service, Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018) ("A plaintiff must show that its injury was caused by or attributable to the false advertisements, as opposed to a lawful factor, like a defendant's lower prices"); *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2015 WL 1735517, at **5-6 (W.D. Wash. Apr. 15, 2015) ("a showing of some evidence of actual injury is required for Cascade's Lanham Act claims to survive the summary judgment stage"); *Societe Civile Succession Richard Guiono v. Beseder Inc.*, 2007 WL 3238703, at *6 (D. Ariz. Oct. 31, 2007) (Murguia, J.) ("While a finding of literal falsity does support a presumption of actual confusion among consumers, this presumption does not somehow demonstrate that Defendant Renoir was damaged by such confusion in this case"); *Laughlin Products, Inc. v. ETS, Inc.*, 257 F. Supp. 2d 863, 869 (N.D. Tex. 2002) (granting summary judgment on false advertising claim where "[e]ven assuming that these [sales] charts show that the plaintiffs suffered significant losses, there is absolutely no evidence, beyond Thomas Laughlin's conclusory and speculative allegations, that links any loss in sales to the defendant's allegedly false advertising").

[4] Although *Lindy Pen* was a trademark infringement case under the Lanham Act, the same damages provisions apply to both trademark infringement and false advertising under the Lanham Act.  *See Hansen Beverage Co. v. Vital Pharmaceutical, Inc.*, 2010 WL 3069690, at **6-7 (S.D. Cal. 2010) (granting summary judgment in false advertising case where plaintiff failed to provide a sufficient basis for calculating damages).

---

DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

(9th Cir. Apr. 30, 2018) (reversing denial of judgment as a matter of law on damages in false advertising case based on inadequate causation evidence of plaintiff's damages and defendant's profits); *TrafficSchool.com v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011) (affirming denial of monetary recovery for false advertising where no proof of past injury or causation); *Harper House,* supra, 889 F.2d at 210 (reversing false advertising damage award where plaintiff tried to prove damages through a witness who testified that some retailers thought the defendants' organizer was made by plaintiff, causing plaintiff to have to explain that it was not).

*Out of the Box Enterprises* is particularly instructive.  There, defendants El Paseo advertised they "would buy gold jewelry for 92 percent of the market value of the pure gold contained therein."  *Out of the Box Enterprises, LLC v. El Paseo Jewelry Exchange, Inc.*, 2013 WL 12140450, at *1 (C.D. Cal. Jan. 11, 2013).  A competitor, plaintiff Out of the Box Enterprises ("OOB"), sued for false advertising, claiming that the false advertisements "cost OOB customers who would have otherwise sold their jewelry to OOB."  *Id.*

At trial, the plaintiff presented two of the three expected forms of evidence to support damages under the Lanham Act:  (a) a sales trend analysis supported by expert testimony, *id.* at *4 (citing regression analysis of damages expert, David Nolte); and (b) direct testimony of diverted customers, *id.* at *6 ("Plaintiff did present evidence that customers were diverted by El Paseo because of the 92 percent ad").  The jury found in favor of the plaintiff and awarded $1.5 million in lost profits due to the false advertising.  *Id.* at *1.   The district court denied defendant's motion for a new trial or judgment as a matter of law.  *Id.*

The Ninth Circuit reversed, holding that the district court erred in denying the motion for judgment as a matter of law on the issue of damages.  The Ninth Circuit held that the plaintiff had "failed to meet its burden of adequate proving:  (1) that El Paseo's advertisements caused Out of the Box to lose profits; and (2) the amount of any lost profits."  *Out of the Box Enterprises*, *supra*, 732 Fed. Appx. at 534.  The

Ninth Circuit held that, at best, plaintiff's expert "established only a correlation – not a causal relationship – between El Paseo's advertisements and a decline in Out of the Box's projected profits."  And, alternatively, the Ninth Circuit reversed because plaintiff's expert "did not provide the jury with a way to determine by a preponderance of evidence the amount of any lost profits Out of the Box may have suffered as a result of El Paseo's advertisements."  *Id.*, *citing TrafficSchool.com*, 653 F.3d at 831 ("[T]he record provides 'no way to determine with any degree of certainty what award would be compensatory,' as required by our precedent").

## C.    Allergan Failed to Present Adequate Evidence to Support a Damages Award Under the Lanham Act.

Allergan's evidentiary showing in this case was less adequate than the showing deemed inadequate as a matter of law in *Out of the Box Enterprises*. Unlike in *Out of the Box Enterprises*, Allergan presented no direct testimony of diverted sales that could conceivably be linked to the false advertisements in issue. Indeed, Allergan presented no direct evidence of diverted sales at all.  And like in *Out of the Box Enterprises*, Allergan's references to a drop in its sales established (at best) "correlation – not a causal relationship – between [Imprimis's] advertisements and a decline in [Allergan's] projected profits."  *Out of the Box Enterprises*, *supra*, 732 Fed. Appx. at 534; *see also BMMG v. American-Telecast Corp.*, 1993 WL 850564, at *3 (C.D. Cal. May 6, 1993) ("Here, it is important to note that we are considering the causal connection between the falsity and the claimed drop in sales, not the connection, if any, between defendants' overall sales and the drop in plaintiffs' sales.  (Harper House 9 Cir' '89, 889 F.2d 197, 210.)").

## IV.   CONCLUSION.

Allergan did not come close to sustaining its evidentiary burden of proving that it lost sales due to false advertising or a reasonable method of quantifying those lost sales.  Controlling legal precedent mandates entry of an amended judgment that

reduces the amount of actual damages awarded to Allergan to $0.  Imprimis
respectfully requests such relief from this Court.

Dated:  June 25, 2019                 PAYNE & FEARS LLP
                                      Attorneys at Law
                                            Daniel L. Rasmussen

                                      BROWNE GEORGE ROSS LLP
                                            Keith J. Wesley

                                      By:  _____/s/  Keith J. Wesley_____
                                            Keith J. Wesley
                                      Attorneys for Defendant
                                      Imprimis Pharmaceuticals, Inc.

DEFENDANT IMPRIMIS PHARMACEUTICALS, INC.'S RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW