## CIVIL MINUTES – GENERAL

Case No. SA CV 17-1551-DOC (JDEx)                    Date: July 11, 2019

Title: ALLERGAN USA INC. V. IMPRIMIS PHARMACEUTICALS, INC.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

|  Deborah Lewman  |  Not Present  |
| :---: | :---: |
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANTS: |
| :---: | :---: |
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   ORDER GRANTING IN PART MOTION FOR PERMANENT INJUNCTION [234]**

Before the Court is Plaintiff Allergan USA, Inc.'s ("Plaintiff" or "Allergan") Motion for Permanent Injunction ("Motion") (Dkt. 234). The Court heard oral argument on June 28, 2019. Having reviewed the papers and considered the parties' arguments, the Court GRANTS IN PART the Motion.

## I.     Background

Allergan filed this action against Imprimis Pharmaceuticals, Inc. ("Imprimis") on September 7, 2017. *See* Complaint (Dkt. 1). Allergan asserted two claims: (1) unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (2) unlawful and/or unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.* by unlawfully marketing, selling, and distributing their products in violation of the California Sherman Law and compounding laws. Compl. ¶¶ 108–24.

On March 27, 2019, the Court granted partial summary judgment in favor of Allergan on the issue of liability as to both of its claims ("Summary Judgment Order") (Dkt. 138). The Court ruled as a matter of law that five categories of statements made by Imprimis representatives constituted false advertising under the Lanham Act. *Id*. The Court detailed violations of the Sherman Law, discussed *infra*. *Id*. Allergan did not move for summary judgment on damages. But the Court granted Imprimis's motion for partial summary and held that only injunctive relief is proper under the UCL claim. *Id*. at 23–25. All that was left for trial was the amount of damages, if any, Allergan suffered due to the false advertising. *Id*.

The case proceeded to trial on May 9, 2019. On May 16, 2019, the jury returned a verdict awarding Allergan $48,500.00 as a result of Imprimis's false advertising and $0.00 in profits garnered through false advertising such that it should be disgorged. Dkt. 231.

On May 22, 2019, Allergan filed the present Motion seeking permanent injunction under both the false advertising and Sherman Law claims. On June 3, 2019, Imprimis opposed ("Opp'n") (Dkt. 241). On June 10, 2019, Allergan replied ("Reply") (Dkt. 242). The Court heard oral argument on June 28, 2019.

## II.    Legal Standard

The UCL empowers courts to enjoin "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §§ 17200, 17203. The Lanham Act also empowers courts "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable . . . to prevent a violation under subsection (a) . . . of section 1125 of this title." 15 U.S.C. § 1116(a).

Permanent injunctive relief is appropriate where liability has been established and the plaintiff demonstrates "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (*quoting eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay*, 547 U.S. at 1841.

## III.    Discussion

Allergan argues it is entitled to a permanent injunction under both the Lanham Act and the UCL. *See generally* Mot. The Court addresses whether a permanent injunction is warranted under each claim in turn.

### A.    Lanham Act

Allergan seeks an order enjoining Imprimis from misrepresenting in any commercial speech, advertising, or other promotional communication with any health care provider, consumer, or other customer that:

- Defendant's standardized ophthalmic formulations have been customized to meet the needs of an individual patient;

- Defendant's products or services have been demonstrated to be safe or effective;

- FDA has found Defendant's products or services to be safe or effective;

- Defendant or any product manufactured or compounded by Defendant is FDA-approved;

- Defendant uses FDA-approved ingredients, FDA-approved components, components of FDA-approved drugs, or FDA-approved Active Pharmaceutical Ingredients ("APIs");

- Defendant's compounded formulations are comprised of FDA-approved medications;

- any of Defendant's compounded formulations has safely combined FDA-approved components, ingredients, drugs, APIs, or medications;

- any of Defendant's products produces an outcome that is clinically superior or equivalent to that produced by a commercially available drug product, unless supported by reliable comparative testing between Defendant's product and the commercially available drug product(s); or

- health care providers prefer Defendant's product(s) to one or more commercially available drug products.

Proposed Order (Dkt. 234-5). Plaintiff also asks the Court to order Imprimis to make corrective advertising statements including that its products are "Not FDA Approved" and that "Clinical data sufficient to determine the safety and efficacy of this drug product has not been developed, and the safety and efficacy of this drug product are untested and unknown." Mot. at 4; Proposed Order at 13.

According to Allergan, Defendant's Lanham Act violations have caused and continue to cause irreparable harm in two independent ways. Mot. at 12. First, Allergan argues Defendant's "continued violations" of the Lanham Act could "result in lost sales" to Allergan. *Id*. at 13. Second, Allergan notes that courts have also held that the irreparable harm factor can be met where "the presumption that consumers have been deceived by Defendants' literally false statements" applies. *Id*. at 14 (citing *Nutrition Distribution LLC v. IronMag Labs, LLC*, No. CV 15-8233-R, 2018 WL 6264986, at *4 (C.D. Cal. Nov. 16, 2018)).

Imprimis responds that Allergan has failed to sustain its burden of presenting evidence of proving that it is likely to suffer irreparable harm under the Lanham Act because the parties stipulated that all use of the false advertisements at issue ceased nearly a year-and-a-half ago, and the evidence is uncontroverted that Imprimis has neither the intention nor motivation to resume use of the ads. Opp'n at 9.

To warrant a permanent injunction, Plaintiff must demonstrate that it has suffered irreparable harm, which the Court now considers. As the parties stipulated, Allergan and Imprimis are in commercial competition in the ophthalmic drug market." Dkt. 223 at 6. And the jury did find that Allergan presented evidence of some injury resulting from the deception of Imprimis's false advertisements (the jury awarded $48,500.00 in damages Allergan suffered as a result of the false advertising). Dkt. 231. But Allergan cannot overcome its stipulation that all use of the false advertisements at issue ceased in January 2018. Dkt. 241-9 (Transcript, May 15, 2019, Vol. 3 at 21:20–21 ("Imprimis stopped making the false statements on or about January 31, 2018.")). The evidence at trial supported this stipulation. And post-trial evidence including the Declaration of Andrew Boll ("Boll Decl.") (Dkt. 241-1) further supports this fact. *See* Boll Decl. ¶ 11 ("[W]e have not made any of those statements since January 2018 at the latest, [. . . and] we have no reason or intent to make the statements in the future.").

The evidence at trial made clear that the false statements were vetted by Imprimis's committee that included outside counsel, *see* Dkt. 241-6 (Transcript, May 14, 2019, Vol. II at at 76:1–17), and that within days of being put on notice via the Complaint, Imprimis took down the statements identified. Dkt. 241-5 (Transcript, May

14, 2019, Vol. I at 7:19–9:1). And Imprimis removed the remaining statements after the FDA met with Allergan and shortly thereafter issued a warning letter regarding the false statements (*Id.* at 8:1–23; Dkt. 241-7 (Transcript, May 14, 2019, Vol. III) at 71:24–72:9). There is no evidence in the record that suggests Imprimis would continue to market its materials in a misleading manner in the future. Much of this lawsuit arises from FDA inaction. But the evidence presented at the Lanham Act trial consistently demonstrated that where FDA has acted clearly—including by issuing a warning letter with regards to misleading statements—Imprimis has responded and complied by removing the advertisements. Even if Allergan demonstrated that it lost some market share because of the false advertising, Allergan has not demonstrated how it would continue to be harmed absent a Lanham Act injunction in light of Imprimis's response to the FDA warning letter and the stipulation that the false statements stopped in January 2018. Allergan cannot rely on a statement by its own witness, Dave LeCause, that the "confusion still persists today." *See* Reply at 5. Allergan presented no evidence of a customer or potential buyer to show that Imprimis continues to make false statements and continues to cause confusion. A permanent injunction is not appropriate under these circumstances.

The Court similarly denies Allergan's request for corrective advertising. There is no evidence suggesting that this remedy is reasonable in light of the jury's verdict. Allergan relies repeatedly on the testimony of Dr. Michael Rauser, who testified at trial that he learned the drugs were not FDA approved the day before he testified. *See* Dkt. 234-2 at 110–11. But this testimony does not demonstrate that deception was so widespread such that corrective advertisement is warranted. Allergan's arguments at the June 28, 2019 hearing regarding the rebuttable presumption of actual deception are well taken. But at least as to the Lanham Act claim, the jury's verdict of $48,500.00 reflects the limited effect these false statements had on the market and the harm they caused to Allergan. The Court will not order corrective statements in light of the jury's determination and the evidence presented at trial.

The request for a permanent injunction under the Lanham Act is accordingly DENIED.

### B.    UCL

Separate from the false advertising claim, Allergan seeks a permanent injunction tracking this Court's Summary Judgment Order. Specifically, Allergan asks this Court to enter an order enjoining Imprimis from:

- Dispensing any drug product from any facility claiming to operate pursuant to Section 503A without a Valid Prescription Order. Allergan asks this Court to prevent customers from "merely checking a box" or subscribing to a pre-printed verification. Instead, Allergan seeks an order requiring prescribers to articulate the clinical need for a compounded product rather than an FDA-approved drug;

- Preparing any drug product in a 503A Facility except after receipt of a Valid Prescription Order or before the receipt of a Valid Prescription Order in limited quantities based on a history of Defendant receiving Valid Prescription Orders for the compounding of that drug product generated within an established relationship between Defendant and the patient or the prescriber provided that Defendant holds for distribution no more than a 30-day supply of the drug product; and

- Operating any outsourcing facility registered pursuant to Section 503B that uses any bulk drug substance not appearing on a list established by the clinical need list or the 503 Category 1 list, if that list is still in effect.

Proposed Order at 10–12. Allergan's proposed definition for a "Valid Prescription Order" is a prescription received for an identified individual patient and stating that a *compounded product* is necessary for the individual because of a clinical need that cannot be met by an FDA-approved drug or bearing a notation, approved by the prescribing practitioner, stating that a *compounded product* is necessary for such patient because such patient's clinical needs cannot be met by an FDA-approved product. Proposed Order at 10–11 (emphasis added).

Imprimis opposes an injunction under the UCL. ***First,*** Imprimis argues that it is in compliance with the individual prescription requirement and solely engages in "anticipatory compounding" pursuant to the guidelines cited in footnote 10 of this Court's summary judgment order. Opp'n at 12. ***Second,*** Imprimis argues that as for the activities that the Court actually found unlawful—e.g., randomly picking three patient names from a patient list before shipping replacement medications from the 503A facility and allowing customers to provide a surgery schedule or list of patients in lieu of individual patient information—there is no evidence that those activities continue or are likely to occur in the future, and there is affirmative evidence that those activities do not continue and will not occur in the future. *Id*. at 13. Moreover, Imprimis argues there is no evidence as to how those activities caused or would cause Allergan any harm. ***Third***, Imprimis argues nepafenac is now on the FDA Category 1 bulk substance list, and that

and that as of May 16, 2019, new orders for formulations with gatlifoxacin will no longer be filled from the Section 503B pharmacy. *Id.* Thus according to Imprimis, no injunction is necessary to compel compliance with the Court's Order relating to Section 503, and Allergan has failed to show that it would suffer any harm absent an injunction. ***Fourth***, Imprimis attacks the scope of the injunction as regulating activities that are not directed to and have no effect on California and argues the proposed injunction is not narrowly tailored to protect against the likely harm to Allergan. *Id.* at 18.

## 1.      Summary Judgment Order

In the Summary Judgment Order, Dkt. 138, the Court detailed the landscape of federal lawsuits brought against the United States government and compounders as the FDA assembles the clinical need list and otherwise implements the DQSA. The Court addressed the course of twin cases filed by Allergan, and denied a motion for reconsideration noting that contemporaneous enforcement of California law is necessary to protect consumers and prevent economic harms. Dkt. 138 at 16 n.9 (citing *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350 (Fed. Cir. 2013)).

In the Summary Judgment Order, the Court held that as a matter of law there had been instances where Imprimis had "not matched orders with specific patients and customized prescriptions" and where Imprimis had "allowed customers to provide a surgery schedule or list of patients to obtain drug orders from the 503A facility." Dkt. 138 at 22. The Court held that "Imprimis's 503A facilities have violated the customization and individual prescription requirements, and such drugs are therefore unapproved in violation of the Sherman Law." *Id.* The Court also held that Imprimis violated Section 503B because Imprimis had distributed from a Section 503B facility certain compounded drugs containing nepafenac and gatifloxacin during periods of time when those ingredients were not on the FDA's Interim Category 1 Bulk Substance List. *Id.* at 23.

For completeness, the Court provides the following excerpts from the Summary Judgment Order:[1]

Under 21 U.S.C. § 353a(a), a drug is exempt from premarket approval requirements if the drug product is "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a

---

[1] Allergan has appealed the Summary Judgment Order to the United States Court of Appeals for the Ninth Circuit. Dkt. 253.

compounded product is necessary for the identified patient, if the drug product meets the requirements of this section, and [listing conditions of the "prescription" requirement]." 21 U.S.C. § 353a(a). The statute also allows a drug to be exempt from premarket approval requirements if it is compounded "in limited quantities before the receipt of a valid prescription order for such individual patient," if done so "based on a history of . . . receiving valid prescription orders for the compounding of the drug product . . . within an established relationship[.]" 21 U.S.C. § 353a(a)(2). Under the plain language of the statute, anticipatory mass compounding of standardized drugs in a 503A facility without identified individual patients based on valid prescription orders is clearly violative of the FDCA. Such compounded drugs are neither approved by the FDA nor exempt under the FDCA carveouts; and Imprimis does not adequately address whether it is protected by any interim FDA guidelines on customization or prescription requirements. True, there is no requirement that the 503A compounded drugs be different for every patient; there may well be common allergies to FDA-approved drugs that require large productions of 503A compounded drugs. But that reality does not eliminate the requirement that 503A facilities customize drugs for identified individual patients. [FN11: As noted during oral argument, this requirement also distinguishes compounding under 503A from compounding by an outsourcing facility under Section 503B, which states that an outsourcing facility may or may not obtain prescriptions for identified individual patients and is subject to more oversight and conditions. Imprimis acknowledged that such bulk production could be pursued under 503B]. . . . Imprimis can distribute compounded drugs under section 503A only pursuant to a valid patient-specific prescription. The uncontroverted facts show that Imprimis's 503A facilities have violated the customization and individual prescription requirements, and such drugs are therefore unapproved in violation of the Sherman Law.

Summary Judgment Order at 20–22.

With respect to 503B, the Court noted the reasoning set forth in its previous holding in *Allergan v. Prescribers Choice*, Case No. 17-cv-1550-DOC-JDE (C.D. Cal. Jan. 11, 2019). *Id.* at 15 ("The Court does not wish to set a policy that limits the ability of the FDA to determine whether there is a clinical need for particular drugs while simultaneously allowing the compounding of certain drugs to meet health needs."). The Court held:

As in *Prescribers Choice*, the Court narrows the question to whether Imprimis is using or has used bulk substances not on the Interim Category 1 list. In February 2017, Defendant began using bulk gatifloxacin and bulk nepafenac in drugs it produced and dispensed from its 503B registered outsourcing facility. SUF ¶ 38. Gatifloxacin has never been on the FDA's Category 1 Bulk Drug Substances List for 503B. *Id*. ¶ 39. Nepafenac was not added to the FDA's Category 1 Bulk Drug Substances List for 503B until July 23, 2018. *Id*. ¶ 41. Imprimis argues that it is phasing out of gatifloxacin and will not be compounding the substance by the time of trial. SGD ¶ 40. Maybe so. But again, such a statement is not sufficient. Imprimis has violated the Sherman Law by selling unapproved drugs with bulk gatifloxacin and nepafenac.

Summary Judgment Order at 23.

## 2.    Whether Injunction is Improper Private Enforcement of FDCA

Before addressing whether a permanent injunction is appropriate under the UCL and the applicable territorial scope of any such injunctive relief, the Court begins with Imprimis's renewed attack on the Summary Judgment Order as improperly allowing private enforcement of the FDCA in a way that is inconsistent with California law. *See* Opp'n at 15.

Imprimis argues it is improper to issue an injunction compelling compliance with the federal FDCA based on the California UCL where certain provisions of California's law governing compounding are different from provisions in the federal FDCA. *Id*. at 15. Imprimis notes that there is no dispute that the FDCA cannot be privately enforced. *See* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States"). According to Imprimis, Allergan is improperly using the Sherman Law to "run around" the restriction on private enforcement of the FDCA. *Id*. at 15–16.  Imprimis anticipates reliance on *Allergan, Inc. v. Athena Cosmetics, Inc.*, the Federal Circuit decision cited in the Summary Judgment Order at 16 n.9, and distinguishes the present case by arguing that the California Sherman Law is not identical to the FDCA. Opp'n at 16. Indeed, Imprimis argues that some California state law is inconsistent with the corresponding provisions in the FDCA, such as the allowance of compounding for "office use" at a 503A facility. *Id*. (citing 16 C.C.R. § 1735.2). Thus according to Imprimis, if the Court enjoined violation of Section 503A of the FDCA based on failure to comply with the FDA guidance on office use, the Court

would be entering an injunction, purportedly under California law that is contrary to California law and policy. *Id*. at 16.

There is no case directly on point. But in *Athena*, a cosmetics company appealed a grant of summary judgment that it violated California's UCL by marketing, distributing and selling, without regulatory approval, products that qualify as drugs. 738 F.3d at 1352; *see also* Summary Judgment Order at 16 n.9. Athena also challenged the district court's entry of a nationwide injunction and the denial of a motion for judgment on the pleadings that the FDCA preempts Allergan's UCL claim. *Id*. At issue in that case was Athena's RevitaLash line, which contain a prostaglandin derivative as an active ingredient. *Id*. at 1353. The FDA had not taken enforcement action against Athena, but Allergan—which sells a FDA-approved product called Latisse for the treatment of a condition that affects eyelash growth—sued Athena for patent infringement and violation of the UCL. Allergan alleged that Athena competed unfairly by violating California's Sherman Law, Health and Safety Code § 111550, by "marketing, selling, and distributing [its] hair and/or eyelash growth products without [a new drug] application approved by the FDA or California State Department of Health Services." *Id*. The district court denied Athena's motion for judgment on the pleadings that the FDCA preempts Allergan's UCL claim. *Id*. Allergan moved for summary judgment that the products at issue qualify as new drugs that lack the requisite approval under the California Health Code, giving rise to a UCL violation. *Id*. The district court (Judge James V. Selna) granted summary judgment and entered a permanent injunction. *Id*.

On appeal, the Federal Circuit addressed preemption. *Id*. 1354–55. The Federal Circuit agreed with Allergan and held that the "FDCA does not impliedly preempt its UCL claim." *Id*. at 1355. "[T]he California Health Code is not an obstacle to realizing federal objectives. To the contrary, it contains provisions that parallel the FDCA, such that the statutes have consistent goals." *Id*. at 1356. The United States Supreme Court called for the views of the Solicitor General in response to Athena's cert petition, and the Government explained that Allergan's claim was not preempted because it paralleled, rather than conflicted with, federal law. U.S. Br., No. 13-379, 2015 WL 2457643, at *11 (U.S. May 26, 2015). The Court denied certiorari. 135 S. Ct. 2886 (2015).

Here, this Court has followed the Federal Circuit decision in *Allergan, Inc. v. Athena Cosmetics, Inc*., to the extent that case is applicable, while deferring to FDA guidance as the agency develops a list of drugs for which there is a clinical need and otherwise implements the FDCA, as set forth in the DQSA.[2] The Court has followed

---

[2] As described in the Summary Judgment Order, the DQSA amended FDCA Section 503A and added Section 503B. See DQSA, 113 Pub. L. No. 54, 127 Stat. 587 (2013). The DQSA recognizes two categories of compounders: (1)

*Athena* because the applicable Sherman Law provision is the same: California law provides that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by the California Department of Human Services or the FDA. Cal. Health & Safety Code § 111550(a)–(b).

It is true that the FDA approval process at issue here is different than that presented in *Athena*. Athena argued that it did not need FDA approval because its product was a cosmetic and not a drug. *Athena*, 738 F.3d at 1357 ("there is no genuine dispute that Athena objectively intends for the products at issue to be used to affect the structure of eyelashes—i.e., as drugs."). Here, Imprimis has not complied with the requirements set forth in Section 503A or Section 503B, or certain FDA interim policies clarifying the implementation of that law. The Court follows the Federal Circuit's view of the policies underlying the Sherman Law and the FDCA: "[T]he California Health Code is not an obstacle to realizing federal objectives. To the contrary, it contains provisions that parallel the FDCA, such that the statutes have consistent goals." *Athena*, 738 F.3d at 1356. The Sherman Law forbids the sale of any new drug that has not been approved by the California Department of Human Services or the FDA. It follows that failure to comply with the FDCA or FDA implementation of the law affronts California's parallel prohibition.

With regards to Imprimis's argument that an injunction under the UCL would in fact be violative of California law and policy, the Sherman Law provides that no person shall sell any new drug "unless . . . the [California Health Department] has approved a new drug application for that new drug . . . ." Cal. Health & Safety Code § 111550(b). Imprimis argues that some of California's relevant compounding regulations are inconsistent with corresponding provisions in the DQSA. Opp'n at 16–17. But if the California Health Department approves of Imprimis compounded drugs, Imprimis is not in violation of the Sherman Law. Imprimis has not adequately demonstrated whether the California Health Department has in fact approved its compounding practices. A late-stage passing reference to 16 C.C.R. § 1735.2 does not save Imprimis from an injunction under the Sherman Law and UCL. *See* Opp'n at 16 ("California's regulations governing compounding, however, allow compounding for 'office use' at a 503A facility. See 16 C.C.R. §1735.2"). If the State of California in fact approves Imprimis's compounded

---

compounders such as state-licensed pharmacies (sometimes referred to as "traditional compounders") that compound drugs solely for identified individual patients based on the receipt of valid prescriptions (Section 503A); and (2) outsourcing facilities (Section 503B). Such 503B facilities can only compound bulk drug substances that appear on (1) a list established by the FDA "identifying bulk drug substances for which there is a clinical need"; or (2) a drug shortage list established by the FDA. 21 U.S.C. § 353b(a)(2)(A). Thus the Court has deferred to FDA guidance as the agency develops the clinical need and drug shortage lists and otherwise implements the DQSA.

drugs, Imprimis should have raised this argument in full force. There is not enough evidence in the record to make such a determination. In short, the California law includes a carveout protecting the very state interests that Imprimis argues this Court ignores.

### 3.      Territorial Scope of UCL Injunction

Next, the Court turns to the territorial scope of any permanent injunction arising under the Sherman Law and UCL. Imprimis argues that the UCL does not apply to out-of-state unlawful conduct because (1) the Commerce Clause in the United States Constitution restricts states from interfering with the sovereignty of other states in commercial matters; and (2) California law itself limits the scope of the UCL to in-state unlawful acts. Opp'n at 18.

Again, the decision in *Allergan, Inc. v. Athena Cosmetics, Inc*. is most on point. In that case, the Federal Circuit held that the district court abused its discretion by entering an injunction under the UCL that regulates any and all out-of-state conduct. 738 F.3d 1350, 1358 (Fed. Cir. 2013).

> "As the California Supreme Court has stated, '[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially.' *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011). The injunction impermissibly imposes the UCL on entirely extraterritorial conduct regardless of whether the conduct in other states causes harm to California. This injunction is so broad that it would bar Athena from making its product in Idaho, distributing it from a facility in Nevada, and selling it to Connecticut consumers."

*Id*. The injunction prevented sales that are "entirely extraterritorial." *Id*. at 1359. "It is not limited to purchases made by California residents that are being shipped into California or to sales emanating from California." *Id*.

The Federal Circuit also addressed concerns arising from the Commerce Clause, which "precludes" such extraterritorial application of state law "whether or not the commerce has effects within the state." *Id.* (citing *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). In short, California may conclude that its own unfair competition law has been violated, and it may prohibit any future conduct within its borders that would cause

continued violation of its law. *Id*. California is not permitted, however, to extend its unfair competition law to other states. *Id*.

The Federal Circuit noted that the FDA—and the FDA alone—has the power and the discretion to enforce the FDCA. *Id*. (citing 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States")). "California does not have the authority to stand in the shoes of the FDA to determine whether Athena's sale of the products at issue amounts to the sale of an unapproved drug under the FDCA. This enforcement authority relies exclusively with the FDA." *Id*. But California has chosen to enact the UCL, which prevents marketing, distributing, and selling, without regulatory approval, products that qualify as drugs. *Id*. The Federal Circuit noted the FDA does not require states to enact laws that parallel federal requirements. *Id*. Thus, "if other states have no laws that parallel relevant provisions of the UCL and California Health Code, there would be no mechanism at all in those states to challenge Athena's sales of the products at issue." *Id*. In short, imposing the UCL on other states would violate their sovereignty, and usurp the discretionary enforcement authority of the FDA. *Id*. The Federal Circuit instructed that on remand, the district court should "limit the scope of the injunction to regulate conduct occurring within California." *Id*. at 1360.

Allergan is of course familiar with the Federal Circuit decision in *Athena* and has attempted to fashion its proposed injunction to conform with the Federal Circuit's guidance. In Footnote 2 of the Proposed Order enjoining Imprimis, Allergan provides: "Sections A.1, A.2, and A.3 of this Judgment shall apply only to (1) drugs prepared in, dispensed from within, or shipped to, the State of California; (2) any outsourcing facility located within the State of California or that ships drugs to the State of California; and (3) any act (or, as applicable, omission) undertaken within or directed, counseled, commanded, induced, or procured by a person acting within the State of California. Proposed Order at 3 n.2.

Imprimis does not dispute that the qualification set forth in Subsection (1) is consistent with the law governing the geographic scope of the UCL. *See* Opp'n at 19. In other words, there appears to be no dispute that an injunction would apply to drugs prepared in, dispensed from within, or shipped to the State of California. *Id*. But Imprimis argues that Subsection (2)—any outsourcing facility . . . that ships drugs to California— could be construed to enjoin activity at an out-of-state facility that is unrelated to California. Imprimis provides the following helpful hypothetical in support of its

argument: A 503B facility in New Jersey that ships to California[3] also ships to Ohio. Neither New Jersey nor Ohio have chosen to enact a state law paralleling federal requirements. Subsection (2) could be construed to imply that California law prohibits the facility in New Jersey from shipping to Ohio even though the sale of a particular compounded drug does not violate those states' laws. *See* Opp'n at 19–20.

With respect to Subsection (3)—any act (or omission) undertaken with or directed, counseled . . . induced or procured by a person acting within California—Imprimis argues that the language could also be construed to enjoin wholly out-of-state transactions. *Id.* at 20. Critically, Imprimis notes that its headquarters are in San Diego, California. *Id.* So if Imprimis authorizes shipment from New Jersey to Ohio, does the UCL ban that out-of-state transaction because its headquarters are in San Diego? Allergan asks this Court to hold that the UCL applies in such an instance because "the conduct giving rise to liability occurs at Defendant's headquarters in California." Reply at 17.

The Court agrees with Imprimis that Subsections (2) and (3) in Allergan's proposed permanent injunction are overbroad and contrary to the Federal Circuit guidance in *Athena*. 738 F.3d at 1360 (the district court should "limit the scope of the injunction to regulate conduct occurring within California."). The Court declines to follow cases holding that the presumption against extraterritorial application does not apply where the headquarters are based in California. *See In re iPhone 4S Consumer Litigation*, No. C 12-1127 CW, 2013 WL 3829653 (N.D. Cal. July 23, 2013). Here, the Section 503B facility using bulk substances contrary to FDA policy is in New Jersey. The Court will not impose a nationwide injunction on compounding facilities across the country shipping to states other than California because the Imprimis headquarters are in San Diego. Such an interpretation of the reach of the UCL is contrary to the guidance in *Athena*. "California may conclude that its own unfair competition law has been violated, and it may prohibit any future conduct within its borders that would cause continued violation of its law. California is not permitted, however, to extend its unfair competition law to other states." 738 F.3d at 1359. In the context of pharmaceutical compounding, the Court will not deviate from this principle solely because Imprimis is headquartered in San Diego. The 503B facility is in New Jersey and the compounding of any drug not authorized by the FDA during its implementation phase is performed outside the state of California. Moreover, the practical effect of any nationwide injunction on the distribution of such drugs would be for Imprimis to move its headquarters to a different state without a parallel state law. Because California may not extend its unfair competition law to other

---

[3] The New Jersey 503B facility has never shipped into California, although Imprimis has a pending application to be licensed to do so. Boll Decl. ¶ 7.

states, any injunction must be limited to drugs prepared in, dispensed from within, or shipped to the State of California. *See* Summary Judgment Order at 21 n.10.

### 4.      Whether a Limited Injunction is Warranted

The Court next turns to whether Allergan has demonstrated that a permanent injunction under the Sherman Law and UCL is warranted.

During oral argument, Imprimis's central contention appeared to be that Imprimis will follow this Court's Summary Judgment Order even in the absence of an injunction and that Allergan primarily seeks a permanent injunction order to flaunt throughout the industry. In its papers, Imprimis attacks only the irreparable harm prong of the analysis. Defendant argues that even prior to the March 27 Order, Imprimis had required that every order shipped from a Section 503A facility be accompanied by a written confirmation from the doctor or hospital or surgery center that the order is necessary for an individual patient and subject to a valid prescription. Boll Decl. ¶ 5. Imprimis provides a copy of its standard form used for Section 503A orders, which "requires not only verifications by the prescribing physician, but also attaches a chart for the physician or his assistant to fill in the applicable patient' s information." *Id*.; Boll Decl., Ex. 1. As for the activities that the Court found unlawful – e.g., randomly picking three patient names from a patient list before shipping replacement medications from the 503A facility; allowing customers to provide a surgery schedule or list of patients in lieu of individual patient information – Imprimis argues there is no evidence that those activities continue or are likely to occur in the future, and there is affirmative evidence that those activities do not continue and will not occur in the future. Opp'n at 13.

Upon consideration of the arguments, the Court finds that a limited permanent injunction is proper to ensure compliance with the Sherman Law and this Court's Summary Judgment Order. Despite Imprimis's affirmative evidence that the company has been in compliance with the Summary Judgment Order, Allergan has demonstrated that absent an injunction, it will lose some profits from Imprimis's sale of compounded drugs that do not comply with the Summary Judgment Order.

### a.      Irreparable Harm

### (1)      503A

Imprimis argues that even prior to the Summary Judgment Order, Imprimis had required that every order shipped from a Section 503A facility be accompanied by a

written confirmation from the doctor or hospital or surgery center that the order is "necessary for an individual patient and subject to a valid prescription." Boll Decl. ¶ 5. Imprimis attaches as Exhibit 1 an example standard order form used for Section 503A orders. The form requires "not only verifications by the prescribing physician," but also attaches a "chart for the physician or his [or her] assistant to fill in the applicable patient's information." *Id*. The standard form provides that "ImprimisRx specializes in customizing medications to meet unique patient and practitioner needs. ImprimisRx dispenses these formulations only to individually identified patients with valid prescriptions." Boll Decl., Ex. 1. According to Defendant, Imprimis has "fully complied with the FDA's operative FDA guidance on pre-prescription compounding by Section 503A facilities" and the issues cited in the Court's Summary Judgment Order regarding surgery schedules or lists of patients to obtain drug orders from the 503A facility "have not occurred since entry of the Order and will not occur in the future." Boll Decl., ¶ 4. Defendants argue there is no evidence that such activities continue or are likely to continue in the future, and that there is now affirmative evidence such activities will not occur in the future. Opp'n at 13. And Imprimis argues Allergan has not demonstrated that it would be irreparably harmed absent an injunction. *Id*. "No witness testified that he or she purchased from Imprimis's 503A facility in lieu of purchasing from Allergan because of the Section 503A violations." *Id*.

Allergan argues that Defendant's business model has been to "drive a truck" through the "narrow opening" that is the 503A exception, such that Defendants treat Section 503A as a "path to mass-market standardized drugs intended for any and all patients, in unlawful competition with FDA-approved drugs like Allergan's." Mot. at 1; Reply at 12. Allergan argues that the law and FDA guidance clarify and require that the receipt of a prescription alone is inadequate: the patient must need the compounded product because she cannot take an FDA-approved product. Mot. at 1 (citing Request for Judicial Notice,[4] Ex. A); *id*. at 16–17; Reply at 13 (citing FDA Guidance, Prescription Requirement Under Section 503A (Dec. 2016) ("These conditions . . . are meant to help ensure that compounding under Section 503A is based on individual patient needs, and that entities purportedly operating under Section 503A are not actually operating as conventional manufacturers.").

---

[4] Having considered Allergan's request for judicial notice (Dkt. 235), which Imprimis has not opposed, the request is hereby GRANTED. The Court takes judicial notice of the document attached as Exhibit A to Allergan's request and the facts contained therein: Exhibit A, FDA Report, FDA's Human Drug Compounding Progress Report: Three Years After Enactment of the Drug Quality and Security Act, dated January 2017, which is available on FDA's website, https://www.fda.gov/media/102493/download.

As set forth in the Summary Judgment Order, and repeated *supra*, under the FDCA a drug is exempt from premarket approval requirements if the drug product is "compounded for an identified individual patient based on the receipt of a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is necessary for the identified patient, if the drug product meets the requirements of this section, and [listing conditions of the "prescription" requirement]." 21 U.S.C. § 353a(a). The statute also allows a drug to be exempt from premarket approval requirements if it is compounded "in limited quantities before the receipt of a valid prescription order for such individual patient," if done so "based on a history of . . . receiving valid prescription orders for the compounding of the drug product . . . within an established relationship[.]" 21 U.S.C. § 353a(a)(2). Said differently, Section 503A(a) describes two situations in which a drug product can be compounded: (1) based on the receipt of a valid prescription order for an identified individual patient (Section 503A(a)(1)); or (2) in limited quantities before the receipt of a valid prescription order for an identified individual patient (Section 503A(a)(2)). According to FDA guidance on the exception, the prescription requirement under section 503A is a critical mechanism to distinguish compounding by a licensed pharmacist or licensed physician from conventional manufacturing. Akro Decl., Ex. H at 5. The prescription requirement is also an important factor that distinguishes compounding by a licensed pharmacist in a State licensed pharmacy or a federal facility, or by a licensed physician under section 503A, from compounding by an outsourcing facility under section 503B. *Id*. But Section 503A is not a window through which compounders may produce drugs for patients even though an FDA-approved drug may have been medically appropriate for them. *See* Akro Decl., Ex. A at 4.

Defendant has stipulated that "Defendant estimates its batch-prepared formulations comprise 90 to 95 percent of its ophthalmic drug sales" and "Defendant bases its production quantity decisions in part on historical sales data." Dkt. No. 223 at 12. Mr. Boll testified that "90, 95 percent of [Defendant's] ophthalmic sales are from batch-prepared formulations" and that Defendant offers volume discounts to its customers. Dkt. 234-2 at 39– 40 (Trial Tr. May 10, 2019, Vol. II at 58:17-59:13). Imprimis does not dispute that it prepares large quantities of its Section 503A formulations. *See* Opp'n at 12.  The Court detailed instances in the Summary Judgment Order where Imprimis shipped medications that were not pursuant to individualized patient information. And the standard form attached does not adequately distinguish a Section 503A drug as medically necessary where a FDA-approved drug is medically appropriate for the patient. A limited permanent injunction is therefore proper to ensure compliance with the Sherman Law and Section 503A.

But Allergan's proposed injunction is representative of its aggressive approach to this litigation (an approach the jury flatly rejected during the damages phase of the Lanham Act trial). Allergan asks the Court to forbid a doctor from stating that a compounded medication is necessary by filling out an order form or a pre-printed verification (Proposed Judgment at 1); and enjoin Imprimis from directly or indirectly advising a doctor as to how it completes a form documenting medical necessity of compounded medications (*id*.). The request stretches beyond the requirements of the law.

Thus the injunction shall be limited to the following language with respect to Section 503A: Imprimis is permanently enjoined from directly or indirectly dispensing any drug from a 503A facility in the State of California or shipping any drug from a 503A facility to the State of California without a valid prescription order (1) stating that a compounded product is medically necessary for the identified individual patient; or (2) bearing a notation, approved by the prescribing practitioner, stating that a compounded product is medically necessary for such patient. *See* 21 U.S.C. § 353a(a). The valid prescription order must also contain language that an FDA-approved drug is not medically appropriate. Imprimis's standard form provided as Exhibit 1 to the Boll Declaration provides that the "supplies ordered are medically necessary." Boll Decl., Ex. 1. Such a form would satisfy the injunction so long as it is adequately executed for an identified individual patient and specifies that (1) the *compounded* drug is medically necessary and (2) an FDA-approved drug is not medically appropriate.

Imprimis also argues that no injunction should be imposed with respect to compounding before receipt of a valid prescription. "[S]ince the Court issued its [Summary Judgment Order], Imprimis has fully complied with the FDA's operative FDA guidance on pre-prescription compounding by Section 503A facilities – i.e., pre-prescription compounding is only permitted pursuant to the FDA's guidance on anticipatory compounding." Boll Decl. ¶ 4. Even in light of the affirmative evidence that Imprimis has reacted in accordance with the Summary Judgment Order, a limited permanent injunction is appropriate. The Court detailed in the Summary Judgment Order instances where Imprimis was not in compliance. Thus, the injunction shall provide that with respect to compounding before receipt of a valid prescription order, Imprimis is permanently enjoined from compounding a drug in a Section 503A facility except in limited quantities before the receipt of a valid prescription order for such individual patients based on a history of the licensed pharmacist or licensed physician receiving valid prescription orders for the compounding of the drug product. *See* 21 U.S.C. § 353a(a)(2)(B). The prescription orders must have been generated within an established relationship between Defendant on the one hand, and, on the other hand, either the patient for whom the drug product will be provided or the prescriber who will write the

prescription order. *See* 21 U.S.C. § 353a(a)(2)(B). The "limited quantity" shall not exceed a 30-day supply of a particular compounded drug product (i.e., units of a compounded drug product that the compounder believes it will distribute over a 30-day period) to fill valid prescriptions it has not yet received; and the amount of the supply of a particular compounded product is based on the number of valid prescriptions that the compounder has received for identified individual patients in a 30-day period over the past year that the compounder selected.

### (2)    503B

Allergan also seeks an injunction regarding the operation of any outsourcing facility registered pursuant to Section 503B that uses a bulk drug substance not appearing on (a) a list, established by the Secretary of Health and Human Services, identifying bulk drug substances for which there is a clinical need; or (b) if FDA's Interim Policy remains in effect, the 503B "Category 1" list then in effect. Proposed Order at 2.

First, Imprimis notes that nepafenac is now on the Interim Category 1 Bulk Substance List. *See* Opp'n at 14. Thus any injunction implementing the Summary Judgment Order would not prohibit its use. As for gatifloxacin, Imprimis contends that the ingredient has been nominated repeatedly for inclusion on the Interim Category 1 Bulk Substance. Opp'n at 14. Still, the FDA has not acted on the nominations. *Id.* The FDA had not acted on nominations at the time of the Summary Judgment Order. According to Defendant, its transition away from the ingredient has taken more time than hoped and expected due to issues related to continuity of care, sterility testing, and safety testing. Boll Decl. ¶ 9. However, the transition is nearly complete. Opp'n at 14; Boll Decl. ¶ 10. In fact, on May 2, 2019, Imprimis emailed and publicly posted an announcement to its customers that, as of May 16, 2019, new orders for formulations with gatifloxacin would no longer be filled from the Section 503B pharmacy, and Imprimis has stood by and will continue to stand by that representation (unless gatifloxacin is subsequently added to the Interim Category 1 list or otherwise approved by the FDA for use at Section 503B facilities). Boll Decl. ¶ 10.

The Court is sympathetic to Imprimis's position as the FDA continues to develop the Category 1 list. But a limited permanent injunction is warranted under the UCL consistent with the Summary Judgment Order. Thus the injunction shall provide that Imprimis is enjoined from operating any 503B outsourcing facility that uses any bulk substance not appearing on (a) a list, established by the Secretary of Health and Human Services, identifying bulk drug substances for which there is a clinical need; or (b) if FDA's Interim Policy remains in effect, the 503B "Category 1" list then in effect. As

discussed *supra*, because Imprimis's only 503B facility is in New Jersey, the effect is limited—Imprimis cannot ship into the state of California drugs compounded in its New Jersey 503B facility that contain such bulk substances. The New Jersey facility has never shipped into California, although it does have a pending application to be licensed in the state. Boll Decl. ¶ 7. If shipments do begin, any drug from the 503B facility shipped into California must comply with the injunction.

## b. Public Interest

Imprimis understandably focuses its argument in opposition to the Motion for a Permanent Injunction on the element of irreparable harm (a position the Court adopts with respect to the Lanham Act) and legal attacks on the scope of injunctive relief. *See generally* Opp'n. Imprimis does not address whether the "public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (*quoting eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). Nevertheless, the Court addresses whether a limited permanent injunction consistent with this order would not disserve the public interest.

The Court incorporates here the policy considerations underlying its Summary Judgment Order. Congress amended the FDCA in response to numerous serious adverse events, including deaths, linked to poor quality compounded drugs. *See* RJN, Ex. A. In particular, in 2012, injectable drug products produced by a compounder and shipped across the country caused a fungal meningitis outbreak that resulted in more than 60 deaths and more than 750 cases of illness. *Id.*

The Congressional record makes clear that passage of the DQSA was in direct response to the 2012 public health event and an attempt to remove barriers to FDA regulation of compounders. The law was intended to "give hospitals and doctors the ability to access a source of compounded medicines that are made in a facility that is subject to stringent FDA quality standards and oversight." House Hearing on H.R. 3204, 113th Cong. 1399 (2013) (statement of Rep. Henry Waxman); *see also* House Hearing on H.R. 3204, 113th Cong. 1399 (2013) (statement of Rep. Joseph Pitts) (the law "clarifies FDA's authority over the practice of compounding drugs, and it requires FDA to engage in dialogue with State regulators"); *id.* (statement of Rep. Frank Pallone) ("This effort also makes clear that FDA's authorities over compounding pharmacies needed to be fixed. A court split decision over the statute had hampered FDA's ability to effectively enforce their authority over compounding pharmacies and ensure the safety and effectiveness of compounded medications."); *id.* (statement of Rep. Deborah Dingell)

(the law "represents a major step in securing our pharmaceutical supply chain and improving FDA's authority to oversee compounding pharmacies").

Over the last six years, the FDA has worked toward a full implementation of the DQSA by finalizing guidance documents and proposed rules while overseeing drug compounders—and at times taking regulatory action. *See* RJN, Ex. A. "Such efforts are necessary to protect patients from the risks associated with compounded drug products that are not produced in accordance with applicable requirements of federal law, while preserving access to lawfully marketed compounded drugs for patients who have a medical need for them." *Id*.

But as FDA continues its implementation efforts, some compounders have taken advantage of the Section 503A exception in order to distribute drugs without individualized prescriptions, or have compounded drugs in 503B facilities using ingredients that are not undergoing FDA evaluation. While FDA does not always affirmatively act against such violations, the State of California has chosen to pass a law that parallels federal approval of such new drugs; and as discussed, this provides a limited mechanism for protecting against their distribution and production in California.

History has shown that the public will not benefit from legal decisions hampering FDA's implementation process. Indeed, Congress passed the DQSA in part because of conflicting legal decisions. Before passage of the DQSA, "FDA's authorities over compounding pharmacies were not up to the task. Divergent court decisions on the underlying statute had forced the agency to cobble together a piecemeal approach to regulating compounding pharmacies that was different in some parts of the country than in others. That untenable legal situation created loopholes that companies . . . were able to exploit." House Hearing on H.R. 3204, 113th Cong. 1399 (2013) (statement of Rep. Henry Waxman). The Court has treaded carefully in this landscape and fashioned this order and Summary Judgment Order in accordance with the law, which explicitly incorporates FDA implementation of the clinical need and drug shortage lists. 21 U.S.C. § 353b(a)(2)(A). But FDA's decision not to bring regulatory action against a compounder that is acting in violation of 503A and 503B does not equate to a determination that a plaintiff cannot seek relief under the parallel California law. The Court has drawn the line in accordance with FDA guidance to avoid hampering its implementation of the DQSA. The public interest is not disserved by enforcing these guidelines in California to protect patients from the sale and distribution of drugs that are not produced in accordance with applicable requirements.

## IV.    Disposition

Accordingly, the Motion for a Permanent Injunction is GRANTED IN PART.

Allergan's request for a permanent injunction is DENIED with respect to the Lanham Act and request for corrective advertising.

Allergan's request for a permanent injunction is GRANTED IN PART with respect to the Sherman Law. The injunction shall be limited to the following language with respect to Section 503A: Imprimis is permanently enjoined from directly or indirectly dispensing any drug from a 503A facility in the State of California or shipped to the State of California without a valid prescription order (1) stating that a compounded product is medically necessary for the identified individual patient; or (2) bearing a notation, approved by the prescribing practitioner, stating that a compounded product is medically necessary for such patient. *See* 21 U.S.C. § 353a(a). The valid prescription order must also contain language that an FDA-approved drug is not medically appropriate. The injunction shall provide that Imprimis is enjoined from operating any 503B outsourcing facility that uses any bulk substance not appearing on (a) a list, established by the Secretary of Health and Human Services, identifying bulk drug substances for which there is a clinical need; or (b) if FDA's Interim Policy remains in effect, the 503B "Category 1" list then in effect. The injunction must be limited to drugs prepared in, dispensed from within, or shipped to the State of California.

Allergan shall submit a proposed order consistent with this order **on or before July 18, 2019.**

The Clerk shall serve this minute order on the parties.